**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

---------------------------------------------------------- x
                                :

In re:                               :     Chapter 11
                                :

OFFICE PROPERTIES INCOME TRUST, *et al.*,   :     Case No. 25-90530 (CML)
                                :

                Debtors.[1]         :     (Jointly Administered)
                                :

---------------------------------------------------------- x

<u>**EMERGENCY**</u> **MOTION OF DEBTORS**
**FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING DEBTORS TO (A) CONTINUE EXISTING**
**CASH MANAGEMENT SYSTEM, (B) MAINTAIN EXISTING**
**BUSINESS FORMS AND INTERCOMPANY ARRANGEMENTS, AND**
**(C) CONTINUE INTERCOMPANY TRANSACTIONS;**
<u>**AND (II) GRANTING RELATED RELIEF**</u>

---

**Emergency relief has been requested. Relief is requested not later than 2:00 p.m. (prevailing Central Time) on November 3, 2025.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on November 3, 2025 at 2:00 p.m. (prevailing Central Time) in Courtroom 402, 4th floor, 515 Rusk Street, Houston, Texas 77002.**

**Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page. The meeting code is "Judge Lopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1] A complete list of the Debtors in the Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/OPI. The Debtors' mailing address is Two Newton Place, 255 Washington Street, Suite 300, Newton, Massachusetts 02458-1634.

Office Properties Income Trust and its debtor affiliates in the above-captioned Chapter 11 Cases (as defined herein), as debtors and debtors in possession (collectively, the "***Debtors***"), respectfully state as follows in support of this motion (this "***Motion***"):

## RELIEF REQUESTED

1.     By this Motion, the Debtors seek entry of an interim order (the "***Proposed Interim Order***") and thereafter a final order (the "***Proposed Final Order***", and together with the Proposed Interim Order, the "***Proposed Orders***"), substantially in the forms attached hereto authorizing, but not directing, the Debtors to:

   a.   continue operating their existing cash management system (the "***Cash Management System***"), including, without limitation, to continue to maintain their existing accounts and business forms;

   b.   implement changes to the Cash Management System in the ordinary course of business insofar as such changes relate to the Debtors' participation in, or control of, the Cash Management System, including, without limitation, opening new or closing existing accounts owned by the Debtors;

   c.   continue to perform under and honor intercompany transactions among Debtors and among Debtors and non-Debtor subsidiaries in the ordinary course of business;

   d.   provide administrative expense priority for postpetition Intercompany Claims (as defined below) against the Debtors; and

   e.   honor and pay all prepetition and postpetition Account Fees (as defined below) payable by the Debtors.

2.     The Debtors further request that the Court (a) waive, on a forty-five (45) day conditional basis, certain requirements under section 345 of the Bankruptcy Code (as defined below) and the Guidelines for Debtors-in-Possession (the "***U.S. Trustee Guidelines***"); (b) authorize and direct the financial institutions at which the Debtors maintain various accounts to (i) continue to maintain, service, and administer the Debtors' Accounts (as defined below) and (ii) debit the Debtors' Accounts in the ordinary course of business on account of (x) electronic

transfers (including wire transfers, book transfers, and automated clearinghouse ("***ACH***") transfers) or checks drawn on the Debtors' Accounts and (y) all amounts owed to the Banks (defined below) for maintenance of the Accounts, including, without limitation, any Account Fees, credit card processing fees, service charges and other fees, costs, charges, chargebacks, and expenses associated with the Accounts and the Cash Management System, whether arising before or after the commencement of the Chapter 11 Cases (defined below); and (c) grant related relief.

## JURISDICTION AND VENUE

3.      The United States Bankruptcy Court for the Southern District of Texas (the "***Court***") has jurisdiction to consider this Motion under 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and legal predicates for the relief requested herein are sections 105(a), 345, 363(b)(1), 363(c)(1), and 1107(a) of title 11 of the United States Code (the "***Bankruptcy Code***"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "***Bankruptcy Local Rules***"), and the Procedures for Complex Cases in the Southern District of Texas.

## BACKGROUND

5.      On October 30, 2025 (the "***Petition Date***"), the Debtors each commenced with the Court a voluntary case (collectively, the "***Chapter 11 Cases***") under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in the Chapter 11 Cases.

6.      Contemporaneously with the filing of the Motion, the Debtors filed a motion requesting joint administration of the Chapter 11 Cases, for procedural purposes, pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.

7.      Office Properties Income Trust ("*OPI*", and, together with the other Debtors and their non-Debtor subsidiaries, collectively, the "*Company*"), is a real estate investment trust ("*REIT*") formed in 2009 under Maryland law.  The Company is focused on owning and leasing office properties to high credit quality tenants in markets throughout the United States.  The Company seeks to maintain a diverse revenue base across geographies with ownership in central business districts, urban infill, and suburban locations.  As of the Petition Date, the Company owns 124 properties containing approximately 17.2 million rentable square feet with over 220 tenants, including government entities.  The Company has no employees.  The personnel and various services the Company requires to operate its business and properties are provided by The RMR Group LLC ("*RMR*") pursuant to two agreements: a business management agreement and a property management agreement (together, collectively, the "*RMR Management Agreements*").  RMR is an alternative asset management company that is focused on commercial real estate and related businesses.  Among other responsibilities, RMR provides strategic and real estate management and administrative services to the Company.

8.      On October 30, 2025, the Debtors entered into that certain Restructuring Support Agreement (as may be modified, amended, or supplemented and including all exhibits, schedules, or supplements thereto, the "*Restructuring Support Agreement*") with (a) an ad hoc group of secured noteholders (the "*September 2029 Ad Hoc Group*") that collectively hold, own, or control more than approximately 80% of the aggregate outstanding principal amount of the 9.000% senior secured notes due September 2029 and (b) RMR, in its capacity as manager to the Company,

pursuant to which the September 2029 Ad Hoc Group and RMR have agreed to support the Company's restructuring on the terms set forth therein.

9.      The factual background regarding the Debtors, including their business, their capital structure, and the events leading to the commencement of the Chapter 11 Cases is set forth in the *Declaration of John R. Castellano in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated herein by reference.[2]

### CASH MANAGEMENT SYSTEM[3]

10.      The Debtors' Cash Management System is an integrated, centralized cash management system used to collect, transfer, and disburse funds generated by the Company's operations.  The Cash Management System facilitates cash monitoring, forecasting, and reporting and enables the Debtors to maintain control over the administration of approximately (a) 33 bank accounts (together with any other bank accounts the Debtors may open in the ordinary course of their business, the "**Bank Accounts**") maintained with PNC Bank, National Association ("**PNC**"), (b) one investment account (the "**Investment Account**") maintained by PNC Capital Markets LLC ("**PNC Cap Markets**"), a registered broker dealer, which is used solely to invest in government money market mutual funds (a "**Government Money Market Fund**"), and (c) one dormant investment account (the "**Dormant Investment Account**") maintained by Clear Street, LLC ("**Clear Street**" and, together with PNC Cap Markets and PNC, the "**Banks**").  The Bank Accounts, the Dormant Investment Account and the Investment Account (collectively, the "**Accounts**") are

---

[2]     Capitalized terms used but not otherwise defined herein have the meaning assigned to them in the First Day Declaration.

[3]     The figures listed herein reflect accruals or balances, as applicable, as of the end of day on October 30, 2025.

identified on **Exhibit A**[4] attached hereto, and reflected on the schematic of the Cash Management System attached hereto as **Exhibit B**. Other than with respect to two Accounts held by Debtor 20 Mass Ave TRS Inc. ("**TRS**"), which are monitored and maintained by Sonesta DC Hotel LLC ("**Sonesta**"), RMR's treasury group maintains daily oversight of the Cash Management System and implements cash management controls for entering, processing, and releasing funds.

11.     The Cash Management System is comparable to those commonly employed by businesses of comparable size and scale to the Company. Any disruption of the Cash Management System would be materially detrimental and disruptive to the Company's operations, as their business requires prompt and reliable access to cash and accurate cash tracking.

12.     The Cash Management System is tailored to meet the Company's operating needs and enables the Company to control and monitor corporate funds, ensure cash availability and liquidity, comply with the requirements of their financing agreements, and reduce administrative expenses by centralizing the management of funds and the reporting of accurate account balances.

A.     **Accounts**

13.     As of the Petition Date, the Cash Management System includes a total of 35 Accounts, including 33 Bank Accounts, one Dormant Investment Account and one Investment Account holding Government Money Market Funds. All 33 Bank Accounts are held at PNC which is the Debtors' primary cash management Bank and is an authorized depository (an "**Authorized Depository**") under the U.S. Trustee Guidelines. In addition to the Bank Accounts at PNC, the Cash Management System includes one Dormant Investment Account maintained by Clear Street, which is not an Authorized Depository, and one Investment Account maintained by PNC Cap

---

[4]     The Debtors have undertaken reasonable efforts to ensure that **Exhibit A** lists all of the Accounts that comprise the Cash Management System. In the event that any account has been inadvertently omitted from **Exhibit A**, the Debtors request that the relief sought by this Motion be deemed to apply to any such account.

Markets, which is not an Authorized Depository, as the broker dealer which invests in two Government Money Market Funds: currently one with Goldman Sachs Trust ("***Goldman Sachs***") and one with JP Morgan Chase Institutional Investments ("***JPM***"), each serving as the fund sponsor respectively.

14.     As of the end of day on October 30, 2025, the Debtors had an aggregate amount of approximately $ 30,734,895 in the Accounts, with individual account balances set forth on **Exhibit A** attached hereto.  The Accounts generally fall into one of a number of categories, each of which is described below:

| Accounts | Description of Accounts |
|---|---|
| **Main Operating Accounts**<br><br>*PNC, x0198*<br><br>*PNC, x0219*<br><br>*PNC, x0641* | Debtor Government Properties Income Trust, LLC ("***GPIT***") maintains a concentration account with PNC (x0198) (the "***GPIT Concentration Account***").<br><br>• The GPIT Concentration Account is funded primarily from substantially all tenant rental collections and receipts, including tax and operating costs reimbursements and other payments and fees (the "***Tenant Receipts***"), including amounts transferred from certain Lockbox Accounts (as defined below), the SIR Properties Trust Concentration Account (as defined below) and lockbox accounts held by certain Non-Debtor Subsidiaries and except those funded into the Credit Facility Accounts (as defined below).<br><br>• Funds in the GPIT Concentration Account are (i) transferred manually to the OPI Operating Account (as defined below) on an as-needed basis to fund accounts payable owed to third parties and RMR, and (ii) used to pay RMR for property management fees, construction supervision fees, allocated payroll and related funding, regionwide expenses and certain operating expense reimbursements, each payable pursuant to the RMR Property Management Agreement. |

| Accounts | Description of Accounts |
|---|---|
| | OPI maintains two main operating accounts with PNC: (i) one account ending in x0219 (the "***OPI Operating Account***") and (ii) another account ending in x0641 (the "***OPI Checking Account***" and collectively with the GPIT Concentration Account and OPI Operating Account, the "***Main Operating Accounts***"). |
| | • The OPI Operating Account maintains a minimum balance of $25,000 and is funded manually in the ordinary course on an as-needed basis from the GPIT Concentration Account. It also draws funds, on an as-needed basis, from the GPIT Liquidity Account (as defined below) to support disbursements. Additionally, the Credit Facility Accounts (as defined below) transfer funds to the OPI Operating Account to fund third party accounts payable disbursements which are ultimately made through the OPI Checking and Operating Accounts. Certain non-Debtor joint venture bank accounts also transfer funds to the OPI Operating Account for their share of third-party payments described in the following paragraph. |
| | • Funds in the OPI Operating Account are used for (i) wire payments directly to third parties for portfolio-level expenses, such as legal and professional fees, (ii) wire payments to RMR for business management fees owed pursuant to the RMR Business Management Agreement, and (iii) the transfers to OPI Checking Account to cover non-wire accounts payable paid directly to third parties. Any excess funds greater than $25,000 in the OPI Operating Account are swept on a daily basis to the GPIT Liquidity Account. The daily automatic sweep of funds into the GPIT Liquidity Account shall cease on a post-petition basis with the initiation of the Post-Petition Cash Accounting system. |
| | • The OPI Checking Account is used to pay property-level and certain portfolio-level accounts payable distributed directly to third parties. The OPI Checking Account does not support wire transfers and is funded manually in |

| Accounts | Description of Accounts |
|---|---|
| | the ordinary course from the OPI Operating Account. |
| **Property Level Operating Accounts**<br><br>*PNC, x0589*<br><br>*PNC, x0562*<br><br>*PNC, x0315*<br><br>*PNC, x4996*<br><br>*PNC, x3377*<br><br>*PNC, x3385* | The Debtors maintain various property level operating accounts (collectively, the "***Property Level Operating Accounts***"), which are funded primarily from (i) Tenant Receipts, (ii) transfers from the Lockbox Accounts (as defined below), or (iii) collections of other non-rental income, such as hotel revenue pursuant to the hotel management agreement entered into between TRS and Sonesta (the "***Sonesta Management Agreement***") and collections related to the hotel's operations.<br><br>The Debtors with Property Operating Accounts include:<br><br>• Debtor OPI WF Owner LLC, which maintains an operating account with PNC (x0589) that receives Tenant Receipts;<br><br>• Debtor 440 First Street LLC, which maintains an operating account with PNC (x0562) that receives Tenant Receipts;<br><br>• Debtor SIR Properties Trust, which maintains an operating account with PNC (x0315) that functions as a concentration account (the "***SIR Properties Trust Concentration Account***") for transfers from the SIR Properties Trust's Lockbox Accounts; and<br><br>• TRS, which maintains two operating accounts with PNC and one capital expenditure reserve account and pays certain hotel disbursements to third parties and expense reimbursements and fees to Sonesta pursuant to the Sonesta Management Agreement.<br><br>    o One operating account (x3377) (the "***Main Hotel Operating Account***") is monitored, maintained and solely controlled by Sonesta and functions as the hotel's main operating account. This account receives hotel receipts.[5]   As |

---

[5]   The Debtors describe the hotel disbursement and expense reimbursement arrangement and request relief related to the Sonesta Management Agreement in the Debtors' *Emergency Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to Continue Performing Under the Management Agreements and Honor Obligations*

| Accounts | Description of Accounts |
|---|---|
| | described more fully in the Prepetition Management Structures Motion, under the Sonesta Management Agreement, Sonesta manages the hotel property on behalf of TRS, provides all employees, negotiates all service contracts and leases (for example, related to stores and restaurants at the hotel), and pays most expenses, subject to reimbursement out of the Main Hotel Operating Account. TRS has "read-only" access to the Main Hotel Operating Account and cannot initiate deposits or withdrawals. |
| | o  The other operating account (x4996) held by TRS (the "***TRS Operating Account***") has received excess cash from the Main Hotel Operating Account owed to TRS pursuant to the terms of the Sonesta Management Agreement and has sent excess cash to the OPI Operating Account.[6] This account is monitored and maintained by RMR on behalf of TRS. |
| | o  TRS also holds a capital expenditure reserve account (x3385) (the "***Hotel CapEx Account***"), which is monitored and maintained by Sonesta.  TRS has "read-only" access to the Hotel CapEx Account and cannot initiate deposits or withdrawals.  Funds are transferred from the Main Hotel Operating Account to the Hotel CapEx Account to fund the furniture, fixtures and equipment reserve, which is required to be funded at 1% of hotel receipts in 2025, 3% in 2026, and 4% in each year thereafter, regardless of prior balances, pursuant to the Sonesta Management Agreement. |

*Related Thereto; and (II) Granting Related Relief* (the "***Prepetition Management Structures Motion***"), filed contemporaneously herewith.

[6]  OPI may be required to provide working capital to TRS if there is a working capital shortfall at the hotel that TRS is required to fund under the Sonesta Management Agreement.

| Accounts | Description of Accounts |
|---|---|
| | Funds are transferred from the Hotel CapEx Account back to the Main Hotel Operating account as needed to fund capital expenditures.<br><br>Pursuant to the requirements under the Debtors' Credit Facility, two of the Property Level Operating Accounts, ending in x0589 and x0562 (collectively, the "***Credit Facility Accounts***") are subject to deposit account control agreements by and among the applicable Debtor and Wilmington Savings Fund Society, FSB (as successor to Wells Fargo Bank, N.A., "***Credit Facility Agent***").  The Credit Facility Accounts collect Tenant Receipts from 19 properties,[7] subject to liens under the Debtors' Credit Facility.<br><br>Payments on behalf of the properties that are subject to liens under the Debtors' Credit Facility to (i) RMR for property management fees, construction supervision fees, allocated payroll and related funding, regionwide expenses and other operating expense reimbursements payable pursuant to the RMR Property Management Agreement, and (ii) the Credit Facility Agent for interest payments due under the Credit Facility, are, in each case, distributed directly from the Credit Facility Accounts, rather than the Main Operating Accounts.<br><br>For accounts payable to other third parties, the Credit Facility Accounts transfer funds to the OPI Operating Account in amounts sufficient to satisfy such third-party accounts payable obligations.  Such disbursements are then executed exclusively through the OPI Checking Account.  Excess funds in the Credit Facility Accounts are also, from time to time, transferred to the OPI Operating Account. |

---

[7]    Twenty (20) of the Debtors properties are subject to liens under the Debtors' Credit Facility; however, one such property is vacant and thus the Credit Facility Accounts only collect Tenant Receipts from nineteen (19) of the encumbered properties.

| Accounts | Description of Accounts |
|---|---|
| **Liquidity Account**<br><br>*PNC, x1861* | To earn a return on excess cash, GPIT maintains a liquidity account with PNC (the "***GPIT Liquidity Account***") with account number ending in x1861.  The GPIT Liquidity Account is funded in the ordinary course by the OPI Operating Account, with funds returning on an as-needed basis to the OPI Operating Account.<br><br>The GPIT Liquidity Account is a high yield bank account and funds are accessible daily for the Company's cash needs in connection with their business operations.  Any earnings generated on the funds in the GPIT Liquidity Account are automatically reinvested into the GPIT Liquidity Account. |
| **Investment Account**<br><br>*PNC Capital Markets LLC, x0000* | OPI maintains an Investment Account that was funded from the OPI Operating Account.<br><br>The Investment Account, ending in x0000, maintained with PNC Cap Markets as the broker dealer, holds two Government Money Market Funds: (i) one with Goldman Sachs, as portfolio manager and (ii) one with JPM, as portfolio manager.  Any earnings generated from the Government Money Market Funds are automatically reinvested into each respective fund.<br><br>On behalf of the Debtors, the portfolio managers invest in various government securities, including U.S. treasuries and federal home loan bank securities. |
| **Lockbox Accounts**<br><br>*PNC, x0091, PNC, x0104, PNC, x0112, PNC, x0139, PNC, x0147, PNC, x0155, PNC, x0171, PNC, x0227, PNC, x0235, PNC, x0243, PNC, x0278, PNC, x0286, PNC, x0294, PNC, x0307* | Debtors SIR Properties Trust and GPIT, collectively maintain fourteen active lockbox accounts (collectively, the "***Lockbox Accounts***").  Tenant Receipts are deposited into these Lockbox Accounts and are then swept, on a daily basis, into either the GPIT Concentration Account or the SIR Properties Trust Concentration Account, as applicable. |

| Accounts | Description of Accounts |
|---|---|
| | The SIR Properties Trust Concentration Account is configured to automatically sweep into the GPIT Concentration Account, such that ultimately, all Lockbox Account receipts consolidate into the GPIT Concentration Account.<br><br>The Lockbox Accounts are governed by standard lockbox account agreements with PNC. |
| **State Reserve Account**<br><br>*PNC, x4078* | GPIT maintains a reserve account (the "***State Reserve Account***") that holds security deposits made by tenants at properties in states that require such deposits to be held in a segregated reserve account. |
| **Utility Adequate Assurance Account**<br><br>*PNC, x9082* | OPI maintains a segregated account with PNC (the "***Utility Adequate Assurance Account***") that will be used by the Debtors to hold cash for the purpose of providing adequate assurance of payment to the Debtors' utility providers.[8] |
| **Professional Fee Reserve Account**<br><br>*PNC, x9103* | OPI maintains a Bank Account with PNC (the "***Professional Fee Reserve Account***") that will be used by the Debtors to hold cash for the purpose of reserving and distributing professional fees in connection with the Chapter 11 Cases. |
| **Post-Petition Operating Accounts**<br><br>*PNC, x6607*<br><br>*PNC, x6551*<br><br>*PNC, x6615*<br><br>*PNC, x 9491* | Prior to the Petition Date, the Debtors opened four new Bank Accounts to consolidate post-petition Tenant Receipts for (i) each silo of prepetition encumbered properties and (ii) the prepetition unencumbered properties (collectively, the "***Post-Petition Operating Accounts***").<br><br>• One of the Post-Petition Operating Accounts (x6607) opened by Debtor OPI Notex Properties LLC will be used on a post-petition basis to consolidate Tenant Receipts received on account of properties secured on a first lien basis |

---

[8]   The Debtors' utility providers and proposed adequate assurance procedures are described in the *Emergency Motion of Debtors for an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers; (II) Establishing Procedures for Resolving Objections by Utility Providers; (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief*, filed contemporaneously herewith.

| Accounts | Description of Accounts |
|---|---|
| | in favor of the noteholders under the September 2029 Notes. |
| | • One of the Post-Petition Operating Accounts (x6551) opened by Debtor OPI BND Properties LLC will be used on a post-petition basis to consolidate Tenant Receipts received on account of properties secured on a first lien basis in favor of the noteholders under the March 2029 Notes. |
| | • One of the Post-Petition Operating Accounts (x6615) opened by Debtor OPI 25 Exchange LLC will be used on a post-petition basis to consolidate Tenant Receipts received on account of properties secured on a first lien basis in favor of the noteholders under the March 2027 Notes. |
| | • One of the Post-Petition Operating Accounts (x9491) opened by Debtor SIR Colorado Springs LLC (and, together with OPI Notex Properties LLC, OPI BND Properties LLC and OPI 25 Exchange LLC, the "***Post-Petition Operating Account Holders***") will be used on a post-petition basis to consolidate Tenant Receipts received on account of properties unencumbered on a prepetition basis. |
| **<u>DIP Proceeds Account</u>**<br><br>*PNC, x9504* | Prior to the Petition Date, OPI opened a Bank Account for the purpose of receiving proceeds of the Debtors' proposed DIP Facility (the "***DIP Proceeds Account***"), as further described in the DIP Motion.[9] |
| **<u>Dormant Accounts</u>**<br><br>*PNC, x6522*<br><br>*Clear Street, x2674* | OPI maintains two Accounts which had little to no activity prior to the Petition Date (collectively, the "***Dormant Accounts***"). The Dormant Accounts have no activity other than de minimis interest credits. |

---

[9]   The "***DIP Motion***" is the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief.* The DIP Motion is filed contemporaneously herewith.

15.     The Debtors incur periodic service charges and other fees, charges, costs, and expenses in connection with the maintenance of the Cash Management System (the "***Account Fees***").  The Account Fees are paid monthly and are automatically deducted from the Debtors' Bank Accounts as they are assessed by the Bank.  The Debtors typically pay approximately $12,000 per month in Account Fees.  As of the Petition Date, the Debtors estimate that they owe approximately $16,000 on account of Account Fees.

### B.     Description of Funds Processing

16.     A schematic of the Cash Management System setting forth the flow of funds among the Accounts is attached hereto as **Exhibit B**.  The following describes the manner in which cash generally moves through the Cash Management System:

- ***Collections and Other Receipts***: The Debtors' collections and other receipts enter the Cash Management System via check, wire transfer, or ACH transfer.[10]  The Debtors collect the vast majority of their receipts (including Tenant Receipts) into the Lockbox Accounts or other lockbox accounts held by Non-Debtor Subsidiaries, which are then automatically swept either directly into the GPIT Concentration Account or first into the SIR Properties Trust Concentration Account and then automatically swept to the GPIT Concentration Account.  However, as noted above, some receipts are also collected in the Property Level Operating Accounts.  The Debtors' cash receipts are generally derived from (i) Tenant Receipts; (ii) collections from other non-rental income, such as hotel revenue collected by TRS pursuant to the Sonesta Management Agreement; and (iii) tax refunds and incentives.

  From time to time, the Debtors have sold certain real properties.  In some instances, tenants at those properties continue to make payments to the Debtors' Bank Accounts post-closing.  In the ordinary course of business, when such payments are received, the Debtors promptly remit the funds to the applicable new property owners.  The Debtors intend to continue this practice in the ordinary course, ensuring that any Tenant Receipts are forwarded to the appropriate recipients.

- ***Disbursements***: As discussed above, the Debtors' third-party disbursements are made primarily through (i) the Main Operating Accounts using funds from the GPIT Concentration Account, the GPIT Liquidity

---

[10]     The Debtors also receive *de minimis* receipts via credit card payment.

Account and the Credit Facility Accounts; and (ii) the Main Hotel Operating Account. The Debtors' cash disbursements generally include (i) various portfolio level expenses, such as legal and professional fees, paid directly to third parties; (ii) various property level expenses paid directly to third parties, including utility payments, construction expenses, and tenant obligations; (iii) payments on account of funded indebtedness; (iv) business management fees paid to RMR pursuant to the RMR Management Agreements; (v) payments to RMR for property management fees, construction supervision fees, allocated payroll and related funding, regionwide expenses, and certain operating expense reimbursements payable pursuant to the RMR Property Management Agreement; (vi) insurance expenses; (vii) taxes and regulatory fees; (viii) capital expenditures; and (ix) property level expenses paid to third parties and Sonesta pursuant to the Sonesta Management Agreement.

- **_Liquidity_**: Excess cash from the Main Operating Accounts is moved to the Liquidity Account in the ordinary course on a manual basis and then returned as needed.

**C.    Post-Petition Cash Consolidation**

17.    Prior to the Petition Date, the Debtors opened four new Bank Accounts to consolidate post-petition Tenant Receipts for (a) each silo of prepetition encumbered properties and (b) for the prepetition unencumbered properties (such cash consolidation, the "**_Post-Petition Cash Consolidation_**").

18.    On a post-petition basis, pursuant to the Post-Petition Cash Consolidation arrangement, any Tenant Receipts collected in the GPIT Concentration Account will be transferred on a gross basis weekly to the applicable Post-Petition Operating Account. The Debtors will then reimburse OPI and GPIT, as applicable, on a weekly basis out of the applicable Post-Petition Operating Account for expenses and payments made by OPI on account of (a) for the OPI Notex Properties LLC account, properties secured on a first lien basis in favor of the holders of the September 2029 Notes, (b) for the OPI BND Properties LLC account, properties secured on a first lien basis in favor of holders of the March 2029 Notes, (c) for the OPI 25 Exchange LLC account,

properties secured on a first lien basis in favor of the holders of the March 2027 Notes and (d) for the SIR Colorado Springs LLC account, properties unencumbered on a prepetition basis.

### D.     Liquidity Account and Investment Account

19.     The RMR treasury group responsible for overseeing the Debtors' Accounts operates in accordance with an established set of guidelines (the "***Investment Guidelines***") and maintains the GPIT Liquidity Account and the Investment Account to earn a return on excess cash not needed for day-to-day operations while ensuring proper liquidity and providing working capital for present and future operations.  The Debtors seek to achieve four goals: (a) preservation of capital; (b) management of credit risk and avoidance of concentration of investments; (c) meeting liquidity needs through a liquid cash portfolio; and (d) maximizing returns.

20.     The GPIT Liquidity Account is a high yield bank account, and funds are accessible on a daily basis and the Investment Account invests in two Government Money Market Funds, as discussed above, which funds are generally accessible within one business day.

### E.     Intercompany Transactions

21.     The Debtors have historically engaged in routine intercompany transactions in the ordinary course of business and, on a post-petition basis, will engage in intercompany transactions in connection with the Post-Petition Cash Consolidation (the "***Intercompany Transactions***" and, each intercompany receivable and payable generated pursuant to an Intercompany Transaction, an "***Intercompany Claim***") with each other and with their non-Debtor subsidiaries (the "***Non-Debtor Subsidiaries***").[11]  For example, as discussed above, in the ordinary course of business, GPIT, through the GPIT Concentration Account, collects Tenant Receipts from tenants and third parties on behalf of the Company's property-owning entities, including certain Non-Debtor

---

[11]    For the avoidance of doubt, Intercompany Transactions as used herein does not include payments made by and between the Debtors and RMR.

Subsidiaries, and in turn, transfers funds to OPI to pay various fees, invoices and expenses owed to third parties and RMR, in each case, on behalf of such property-owning entities, including certain Non-Debtor Subsidiaries.  These transactions generate Intercompany Claims (a) owing from GPIT to the property-owning entities on account of Tenant Receipts received by GPIT in connection with such properties, (b) owing from the property-owning entities to GPIT and OPI on account of third party and RMR fees and expenses paid by GPIT and OPI on behalf of the property-owning entities, and (c) owing from OPI to GPIT on account of amounts transferred to fund accounts payable.[12]  On a post-petition basis, there will also be Intercompany Claims generated by and among GPIT, OPI and the Post-Petition Operating Account Holders in connection with the Post-Petition Cash Consolidation described above.  The Debtors are seeking relief to engage in Intercompany Transactions in the ordinary course of business and to honor Intercompany Claims in the ordinary course.

22.     The Intercompany Transactions are subject to informal arrangements, including general accounting mechanisms used among the Debtors and Non-Debtor Subsidiaries, as well as arrangements based on administrative convenience.  The Intercompany Transactions include, without limitation, (a) cash transfers between the Accounts, between the Accounts and the Lockbox Accounts, and between the Accounts and bank accounts or lockbox accounts held by

---

[12]    The Company recently updated the manner in which it accounts for these Intercompany Claims on its books and records.  Historically, third party accounts payable for the Company's properties (other than the hotel leased by 20 Mass Ave) were paid by RMR (rather than OPI) and RMR was primarily reimbursed by GPIT, OPI WF Owner LLC, 440 First Street LLC, or OPI.  The Company's property-owning entities recorded a payable balance due to RMR, and the reimbursing entities (such as GPIT and OPI) recorded a receivable balance due from RMR.  On a consolidated basis, the intercompany activity netted to zero, however, on a consolidating basis, payables and receivables balances existed which did not properly account for actual payments to RMR which were made on account of such balances.  The Debtors' revised system reflects that RMR's receivable from the property-owning entities is settled in the ordinary course of business by the payments made by GPIT and OPI to RMR on the property-owning entities' behalf.  Therefore, the consolidated and consolidating balances both now reflect the economic reality of these transactions.  In addition, the vast majority of the third-party accounts payable (other than those related to the hotel leased by 20 Mass Ave) are now paid directly by OPI, rather than paid by and reimbursed to RMR.

Non-Debtor Subsidiaries, for operational purposes and administrative efficiency and (b) transfers and setoffs related to general corporate services and operational expenses. As a result of Intercompany Transactions, a Debtor may have claims against another Debtor or a Non-Debtor Subsidiary and vice versa. Accordingly, the Debtors, out of an abundance of caution, request authority to honor Intercompany Claims arising from prepetition and postpetition Intercompany Transactions in the ordinary course of business.

23.     The Intercompany Transactions and the related Intercompany Claims, as well as the resulting cash flows through the Cash Management System, are integral to the smooth operation of the Company and are administratively beneficial to the Debtors' operations. Importantly, the benefits of these Intercompany Transactions ultimately inure to the Debtors' estates, and the failure to continue Intercompany Transactions and honor Intercompany Claims among Debtors and Non-Debtor Subsidiaries in the ordinary course postpetition would negatively impact the Debtors' ability to operate in chapter 11. The Debtors maintain, and will continue to maintain, records of these transfers of cash and bookkeeping entries on a postpetition basis (if any) and will implement such other internal mechanisms as needed to permit them, with the assistance of their advisors, to accurately track the balance of and account for all postpetition Intercompany Transactions on demand.

F.     **Non-Debtor Mortgages**

24.     As described in the First Day Declaration, OPI is the ultimate parent of the Non-Debtor Subsidiaries, including certain property-owning, special purpose entities, the majority of which have mortgage debt that has been securitized and sold into the commercial mortgage backed securities markets and are currently being administered by one or more special servicers. These Non-Debtor Subsidiaries include Clay Ave Waco LLC, Primerica Pkwy GA LLC, Echelon Pkwy MS LLC, Rio Robles CA LLC, Sterling Park LLC, 3300 75th Avenue LLC and Ewing Boulevard

LLC (collectively, the "***Non-Debtor Mortgage Entities***").  The properties owned by the Non-Debtor Mortgage Entities are leased by tenants with a credit rating of no less than A/a, and a majority of such tenants have the highest credit rating of AAA/Aaa.

25.     In connection with the related loan agreements (the "***Non-Debtor Loan Agreements***") and the mortgages thereunder (the "***Non-Debtor Mortgages***"), each of the lockbox accounts owned by the Non-Debtor Mortgage Entities are subject to deposit account control agreements ("***Non-Debtor DACAs***") among the applicable Non-Debtor Mortgage Entity and PNC, as well as a cash management agreement between the applicable Non-Debtor Mortgage Entity and applicable lender under the Non-Debtor Mortgages (the "***Non-Debtor Mortgage Lenders***").  The Non-Debtor DACAs are "hard" deposit account control agreements whereby cash generated by the applicable Non-Debtor Mortgage Entity is deposited into the applicable lockbox account (the "***Non-Debtor Lockboxes***"), which is under the control of the applicable Non-Debtor Mortgage Lender for the term of the loan.  The fund transfer instructions under the Non-Debtor DACAs currently authorize funds to be swept from the Non-Debtor Lockboxes into the GPIT Concentration Account in accordance with the Cash Management System.

26.     Under the Non-Debtor Mortgages and related documents, upon certain cash sweep triggers, including an event of default under the Non-Debtor Loan Agreements, as applicable, PNC is authorized by the applicable Non-Debtor Mortgage Lender to sweep cash (the "***Cash Sweep***") from the Non-Debtor Lockboxes on a daily basis into a separate account under the sole control of the applicable Non-Debtor Mortgage Lender and each Non-Debtor Mortgage Lender is authorized to administer the funds collected in their discretion.

27.     The Debtors' restructuring is not intended to affect the Non-Debtor Mortgage Entities or the Non-Debtor Mortgages in any way.  The Debtors have been in discussions with the

special servicers under the Non-Debtor Loan Agreements and the Non-Debtor Mortgages regarding a limited waiver of certain bankruptcy-related events of default that may arise under the Non-Debtor Loan Agreements and the Non-Debtor Mortgages in connection with the Chapter 11 Cases.  The Debtors are hopeful that they will reach agreement on such waivers with the special servicers.  However, in the event such agreement cannot be reached, the Non-Debtor Mortgage Lenders may be able to trigger a Cash Sweep.  In such event, the Non-Debtor Mortgage Entities may not have sufficient cash to operate their properties to the detriment of the Company as a whole.

28.     Accordingly, the Debtors seek authority, but not direction, to fund the operating expenses for the Non-Debtor Mortgage Entities (the "***Non-Debtor Mortgage Operating Expenses***") as they come due in the ordinary course consistent with the prepetition Cash Management System, including in the event of any Cash Sweep.  The Proposed Order provides that any such transactions will create an Intercompany Claim owed by the Non-Debtor Mortgage Entities.

## U.S. TRUSTEE GUIDELINES

### A.     Authorized Depositories and Compliance with Section 345(b) of the Bankruptcy Code

29.     The U.S. Trustee Guidelines generally require chapter 11 debtors to keep all estate funds in accounts with Authorized Depositories.  As noted above, only two of the Debtors' Accounts—the Accounts held with Clear Street and PNC Cap Markets—are not held with an Authorized Depository, and the Clear Street Bank Account is dormant.  The Debtors maintain all but two of their Accounts with PNC, an Authorized Depository.  Clear Street and PNC Cap Markets, however, are highly-rated financial institutions that are well-capitalized and financially stable.  The Debtors believe that their approach to managing their cash reserves, pursuant to the Investment Guidelines, balances their need to access liquidity on a daily basis with the return on

investment and protection of estate resources.  Therefore, the Debtors submit that maintenance of the Dormant Investment Account at Clear Street and the Investment Account at PNC Cap Markets will not jeopardize any party in interest.

30.     The Cash Management System is complex and critical to the ongoing stability of the Debtors' businesses and smooth transition into the Chapter 11 Cases.  While Clear Street and PNC Cap Markets are not Authorized Depositories, they are members of the Securities Investor Protection Corporation, well-capitalized, and financially stable and thus are (a) well-positioned to perform the depository and cash management functions during the Chapter 11 Cases, and (b) pose no cognizable risk to the Debtors' estates.  As such, the Debtors can maintain their applicable Accounts at Clear Street and PNC Cap Markets without jeopardizing any parties in interest. Conversely, requiring the Debtors to close their Accounts at Clear Street and PNC Cap Markets would impose significant costs and cause disruptions to the Cash Management System that would outweigh the marginal benefit to be gained from moving these Accounts to Authorized Depositories.  Accordingly, the Debtors request an initial forty-five (45) day waiver of the deposit and investment requirements of section 345 of the Bankruptcy Code and the U.S. Trustee Guidelines upon entry of the Proposed Interim Order.

**B.     Debtors' Existing Business Forms and Records**

31.     The Debtors use a variety of preprinted business forms, including checks, letterhead, correspondence forms, invoices, and other business forms in the ordinary course of business (collectively, and as they may be modified from time to time, the "***Business Forms***"). The Debtors also maintain books and records to document their financial results and a wide array of necessary operating information (collectively, the "***Books and Records***").  To avoid a material disruption to their business operations that would result from a disruption of the Cash Management System and to avoid unnecessary expense, the Debtors request authorization to continue using all

22

of the Business Forms and Books and Records in use immediately before the Petition Date (and as may be amended or modified in the ordinary course from time to time), including with respect to the Debtors' ability to update authorized signatories and services, as needed—without reference to the Debtors' status as chapter 11 debtors in possession—rather than requiring the Debtors to incur the expense and delay of ordering new Business Forms and creating new Books and Records.

### C.   Debtor-in-Possession Accounts

32.     The Debtors' Cash Management System is complex and maintaining it in the ordinary course is critical to the continued stability of the Debtors' businesses and smooth transition into chapter 11.  Considering the breadth and complexity of the Debtors' businesses and financial affairs and the sheer volume of collections, disbursements, and movement of funds through the Cash Management System on a daily basis, closing the Accounts and opening new ones, as well as complying with the other provisions of the U.S. Trustee Guidelines relating to the Cash Management System, would severely disrupt the ordinary financial operations of the Debtors by reducing efficiencies and causing unnecessary expense.  Accordingly, cause exists to allow the Debtors to continue utilizing the existing Accounts in the ordinary course, consistent with historical practices.

### BASIS FOR RELIEF

### A.   Continuation of the Cash Management System is in the Best Interest of the Debtors and All Other Parties in Interest

33.     The efficient and economical operation of the Debtors' business requires that the Cash Management System continue during the Chapter 11 Cases.  As a practical matter, it would be difficult and expensive to establish and maintain a separate cash management system for each Debtor.  Further, requiring the Debtors to adopt new, segmented cash management systems at this early and critical stage of the Chapter 11 Cases would be expensive, create unnecessary

administrative burdens, and be extraordinarily disruptive to their business operations.  Any such disruption would have a severe and adverse impact upon the success of the Chapter 11 Cases. Accordingly, the Debtors seek authority to continue using the Cash Management System in the same manner as the Cash Management System was utilized prior to the Petition Date, and to implement ordinary course changes to it consistent with past practices, including the Post-Petition Cash Consolidation arrangement.  The Bankruptcy Code provides for such relief.

34.     Section 363(c)(1) of the Bankruptcy Code authorizes the debtor in possession to "enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business . . . and may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  The purpose of section 363(c)(1) is to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business without unneeded oversight by its creditors or the court.  *In re HLC Props., Inc.*, 55 B.R. 685, 686 (Bankr. N.D. Tex. 1985) (finding "no need to further burden the docket or the staff of the Court with a superfluous order" when a transaction is in the ordinary course of business); *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997); *Chaney v. Off. Comm. of Unsecured Creditors of Crystal Apparel, Inc. (In re Crystal Apparel, Inc.)*, 207 B.R. 406, 409 (S.D.N.Y. 1997).  Included within the purview of section 363(c) is a debtor's ability to continue the "routine transactions" necessitated by a debtor's cash management system.  *Amdura Nat'l Distrib. Co. v. Amdura Corp, Inc. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996).  A cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets."  *Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1114 (5th Cir. 1995).  Accordingly, section 363(c)(1) authorizes the

continuation of the Cash Management System as it operated prepetition without the Court's approval.

35.    To the extent the relief requested herein is found to fall outside of the Debtors' ordinary course of business, the Court may grant such relief pursuant to section 363(b) of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *Black v. Shor (In re BNP Petroleum Corp.)*, 642 F. App'x 429, 435 (5th Cir. 2016) (noting that section 363 "requires that a sale of the estate's assets be supported by an articulated business justification, good business judgment, or sound business reasons") (internal quotation and citation omitted); *Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (internal citation omitted); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale . . . ."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989) ("[T]here must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (internal citation omitted).

36.     In addition, the Court has authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein because such relief is necessary for the Debtors to carry out their duties under section 1107(a) of the Bankruptcy Code. Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value." *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr.  N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).  Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *see CoServ*, 273 B.R. at 491-93 & n.6 (holding that sections 105 and 1107 of the Bankruptcy Code provide authority for a debtor-in-possession to pay prepetition claims); *see also In re Tusa-Expo Holdings, Inc.*, Case No. 08-45057-DML, 2008 WL 4857954, at *1 (Bankr. N.D. Tex. Nov. 7, 2008); *CEI Roofing*, 315 B.R. at 56.

37.     Moreover, Bankruptcy Rule 6003 itself implies that the payment of prepetition obligations may be permissible within the first twenty-one (21) days of a case where doing so is "needed to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  Accordingly, the Bankruptcy Code authorizes the postpetition payment of prepetition claims, including the Account Fees, where, as here, such payments are critical to preserving the going concern value of a debtor's estates.

38.     Maintaining the existing Cash Management System is in the best interests of the Debtors' estates and all parties in interest and, therefore, should be approved.  If the Debtors are required to alter the way in which they collect and disburse cash throughout the Cash Management System, their operations will experience severe disruptions, which would ultimately frustrate the Debtors' ability to maximize the value of their estates.  Further, the Cash Management System

provides material benefits to the Debtors, including the ability to (a) ensure the maximum availability of funds when and where necessary, including distributing funds to those Debtors with immediate liquidity needs, and (b) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account information.

**B.      The Debtors Should Be Authorized to Continue Intercompany Transactions and Certain Intercompany Claims Should be Granted Administrative Expense Priority**

39.      As stated above, under section 363(c)(1) of the Bankruptcy Code, a debtor in possession "may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).  The Debtors believe that they do not require the Court's approval to continue entering into and performing Intercompany Transactions.  The Debtors and their Non-Debtor Subsidiaries enter into and perform Intercompany Transactions "in the ordinary course of business" within the meaning of section 363(c)(1) of the Bankruptcy Code.   Intercompany Transactions are not just a matter of routine in the Debtors' business; they are the sort of transactions that are common among many business enterprises that operate through multiple affiliates.  It is precisely because of their routine nature that the Intercompany Transactions are integral to the Debtors' ability to operate the Company's business and successfully emerge from the Chapter 11 Cases.

40.      The Debtors also request that the Court grant administrative expense status to all Intercompany Claims arising postpetition as a result of Intercompany Transactions under section 503(b)(1)(A) of the Bankruptcy Code, which provides, "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including . . . the actual, necessary costs and expenses of preserving the estate . . . ." 11 U.S.C. § 503(b)(1)(A).  If the Intercompany Claims are accorded administrative expense status, each entity that participates in the Cash Management System and provides a benefit to the Debtors' estates will be assured that it will be compensated for its efforts.

27

**C.**     **Funding the Non-Debtor Mortgage Operating Expenses in the Event of a Cash Sweep Is in the Best Interests of the Debtors' Estates**

41.     As stated above, section 363(b) of the Bankruptcy Code permits debtors to use property of the estate other than in the ordinary course of business if such use is supported by sound business reasons.  *See, e.g.*, *BNP Petroleum*, 642 F. App'x at 435; *See also, Cont'l Air Lines*, 780 F.2d at 1226. Section 105(a) of the Bankruptcy Code also permits a Court to grant relief where necessary for the Debtors to carry out their duties under section 1107(a) of the Bankruptcy Code, which implies a duty of debtors to protect and preserve the estate, including an operating business' going-concern value.  *CEI Roofing*, 315 B.R. at 59 (quoting *CoServ*, 273 B.R. at 497).

42.     Ensuring that the operating expenses of the Non-Debtor Mortgage Entities are paid and that the operation of such properties continues without interruption is in the best interests of the Debtors' estates.  Failure to fund these operating expenses would result in a loss in the value of the properties owned by the Non-Debtor Mortgage Entities, which are among some of the highest quality properties in the Company's portfolio.  The properties owned by the Non-Debtor Mortgage Entities are all leased by tenants with credit ratings of no less than A/A, with the majority of such tenants having the highest possible rating of AAA/Aaa.  Failure of the Non-Debtor Mortgage Entities to honor their obligations to these existing tenants would result in a default under the applicable leases, leading to potential damages claims against the entities, loss of occupancy, and increased difficulty in re-letting the spaces.  Because Debtor OPI is the direct or indirect parent entity of the Non-Debtor Mortgage Entities, any material negative impact to the Non-Debtor Mortgage Entities would negatively impact OPI and in turn have adverse financial consequences for the Debtors' go-forward enterprise upon emergence.  The Debtors' ability to maintain these properties while working to address any defaults under the Non-Debtor Mortgages in connection with the proposed restructuring set forth in the RSA will result in a material benefit

to the estates as a whole.  Accordingly, the Court should authorize, but not direct, the Debtors to fund the Non-Debtor Mortgage Operating Expenses in the ordinary course of business, including in the event any Cash Sweep if required to maintain the value of the Non-Debtor Mortgage Expenses for the benefit of the Debtors' estate.  Any payment will be compensated with an Intercompany Claim that will be owed to the Debtors by the Non-Debtor Mortgage Operating Entities.

### D.      An Initial Forty-Five (45) Day Waiver of the U.S. Trustee Guidelines and Section 345 of the Bankruptcy Code Are Warranted

43.      The U.S. Trustee Guidelines generally require chapter 11 debtors to, among other things:  (a) close all existing bank accounts and open new debtor in possession bank accounts; (b) establish one debtor in possession account for all estate monies required for the payment of taxes (including payroll taxes); (c) physically set aside all monies required by law to be withheld from employees or collected from others for taxes; (d) open a new set of books and records as of the commencement date of the case; (e) use new business forms indicating the debtor-in-possession status of the chapter 11 debtor, including checks that bear the designation "debtor in possession" and reference the bankruptcy case number on such checks; and (f) make all disbursements of estate funds by check with a notation representing the reason for the disbursement.  These guidelines are intended to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent inadvertent payment of prepetition claims.

44.      In addition, section 345(a) of the Bankruptcy Code provides that a debtor may deposit or invest estate funds in a manner that "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  11 U.S.C § 345(a). For deposits that are not "insured or guaranteed by the United States or by a department, agency,

or instrumentality of the United States or backed by the full faith and credit of the United States," the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of a corporate security, "unless the court for cause orders otherwise." 11 U.S.C § 345(b).

45.     For the reasons set forth below, the Debtors submit that cause exists for the Court to authorize an initial forty-five (45) day waiver of certain requirements of the U.S. Trustee Guidelines and section 345 of the Bankruptcy Code.

> **1.     *Authorizing the Banks to Continue to Maintain, Service, and Administer the Accounts in the Ordinary Course of Business Is Warranted***

46.     In the ordinary course of business, the Debtors conduct numerous transactions by checks, wire transfers, ACH transfers, and other electronic means.  If the Debtors are denied the opportunity to conduct transactions through these means, their businesses operations would be disrupted unnecessarily, burdening the Debtors and their creditors with additional costs.

47.     Accordingly, the Debtors request that the Court authorize the Banks to receive, process, honor, and pay, to the extent funds are available in the applicable Bank Account, any and all checks, electronic fund transfers, ACH payments, and other instructions and drafts payable through, or drawn on, such Accounts, irrespective of whether such checks, drafts, electronic fund transfers, or ACH payments are dated prior or subsequent to the Petition Date.  The Debtors also request that, to the extent a Bank honors a prepetition check or other item drawn on any Account in a good-faith belief that the Court has authorized such prepetition check or item to be honored, such Bank will not be liable on account thereof because the Bank is not able to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

**2.      *Maintenance of Debtors' Existing Accounts and Business Forms Is Warranted***

48.      The Debtors seek a waiver of the requirements of the U.S. Trustee Guidelines, which would require, among other things, the closure of the Accounts and the opening of new deposit accounts.  Strict enforcement of the U.S. Trustee Guidelines at the outset of the Chapter 11 Cases with respect to the Cash Management System will severely disrupt the Debtors' ordinary financial operations by reducing efficiencies, increasing administrative burdens, and creating unnecessary expenses.  The Chapter 11 Cases will be more orderly if the Debtors are permitted to maintain all Accounts with the same account numbers during the outset of these cases.  By preserving business continuity and avoiding the disruption and delay to the Debtors' disbursement obligations, all parties-in-interest, including employees, vendors, and customers, will be best served by the relief requested herein.  Furthermore, the Debtors' continued use of their existing Business Forms will not prejudice parties in interest because parties doing business with the Debtors will know of the Debtors' status as debtors in possession.  In addition, to the extent necessary, the Debtors request authority to make ordinary course changes to the Cash Management System, such as opening or closing their accounts in accordance with the Debtors' prepetition practices.

**3.      *Cause Exists for an Initial Forty-Five (45) Day Waiver of the U.S. Trustee Guidelines and Certain Requirements of Section 345 of the Bankruptcy Code Regarding Authorized Depositories***

49.      The Debtors seek an initial forty-five (45) day waiver of the deposit and investment requirements of section 345 of the Bankruptcy Code and certain requirements of the U.S. Trustee Guidelines.

50.      As the legislative history of the 1994 amendments to the Bankruptcy Code explains:

Section 345 of the [Bankruptcy] Code governs investments of funds of bankruptcy estates.  The purpose is to make sure that funds of a bankrupt (sic) that are obliged

31

to creditors are invested prudently and safely with the eventual goal of being able to satisfy all claims against the bankruptcy estate.  Under current law, all investments are required to be FDIC insured, collateralized or bonded.  While this requirement is wise in the case of smaller debtors with limited funds that cannot afford a risky investment to be lost, it can work to needlessly handcuff larger, more sophisticated debtors.  Th[e proposed amendment] would . . . allow the courts to approve investments other than those permitted by [s]ection 345(b) for just cause . . . .

*In re Serv. Merch. Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (quoting H.R. Rep. 103-834, 103rd Cong., 2nd Sess. 224 (Oct. 4, 1994); 140 Cong. Rec. H10767 (Oct. 4, 1994)).  In evaluating whether the requisite "cause" exists, courts consider the "totality of the circumstances," including such factors as:

    a.    the sophistication of the debtor's business;

    b.    the size of the debtor's business operations;

    c.    the amount of the investments involved;

    d.    the bank ratings (Moody's and Standard & Poor) of the financial institutions where the debtor in possession funds are held;

    e.    the complexity of the case;

    f.    the safeguards in place within the debtor's own business for ensuring the safety of the funds;

    g.    the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

    h.    the benefit to the debtor;

    i.    the harm, if any, to the debtor;

    j.    the harm, if any, to the estate; and

    k.    the reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

*Serv. Merch. Co.*, 240 B.R. at 896.

      51.    In the ordinary course of their business, the Debtors maintain substantially all of their cash in Accounts with PNC, which is an Authorized Depositary.  As noted above, only two

of the Debtors' Accounts—the Dormant Investment Account held with Clear Street and the Investment Account held with PNC Cap Markets—are not held with an Authorized Depository. The Debtors submit that "cause" exists to waive the requirements of section 345(b) of the Bankruptcy Code with respect to these two Accounts because of (a) the sophistication of the Debtors' business; (b) the size of the Debtors' business operations; (c) the creditworthiness and reputations of the financial institutions where the Investment Account and Dormant Investment Account are held; (d) the complexity of the Chapter 11 Cases; (e) the Debtors' safeguards for ensuring the safety of funds invested in the Investment Account, including the Investment Guidelines; (f) the benefits to the Debtors estates of being able to earn a return on excess cash, which maximizes value for all stakeholders; (g) the lack of harm to the Debtors' estates; and (h) the reasonableness of a waiver with respect to only these two Accounts.

52.     In light of the foregoing, the Debtors submit that cause exists to grant an initial forty-five (45) day waiver of the requirements of section 345 of the Bankruptcy Code and the U.S. Trustee guidelines.

### E.     The Court Should Authorize the Debtors to Pay Prepetition Account Fees

53.     The Court should authorize the Debtors to pay Account Fees and similar charges, if any, incurred prior to the commencement of the Chapter 11 Cases.  As the *CoServ* court stated, "it is only logical that the bankruptcy court be able to use section 105(a) of the Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate." *CoServ*, 273 B.R. at 497.

54.     Here, payment of any prepetition Account Fees is in the best interests of the Debtors and all parties-in-interest in these cases because it will prevent any disruption to the Cash Management System and ensure that the Debtors' receipt of and access to funds is not delayed.

Further, because the Bank may have setoff rights for the Account Fees, payment of such prepetition amounts should not alter the rights of unsecured creditors in the Chapter 11 Cases.

## EMERGENCY CONSIDERATION

55.     The Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Local Rule 9013-1 and Bankruptcy Rule 6003, which authorizes the Court to grant relief within the first twenty-one (21) days after the commencement of a chapter 11 case to the extent that relief is necessary to avoid immediate and irreparable harm.  As described in detail above and in the First Day Declaration, immediate and irreparable harm would result if the relief requested herein is not granted.  Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

## DEBTORS' COMPLIANCE WITH BANKRUPTCY RULE 6004(a) AND WAIVER OF BANKRUPTCY RULE 6004(a) AND (h)

56.     With respect to any aspect of the relief sought herein that constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors request that the Court find that notice of this Motion is adequate under Bankruptcy Rule 6004(a) and waive the fourteen (14) day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.  Thus, cause exists for the Court to find that notice of this Motion satisfies Bankruptcy Rule 6004(a) and waive the fourteen (14) day stay under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

57.     Nothing in this Motion is intended to be nor shall be deemed:  (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors; (b) a waiver or limitation of the Debtors', the September 2029 Ad Hoc Group's, the March 2029 Ad Hoc Group's, or any other party in interest's right to dispute the amount of, basis for, or validity of any

claim; (c) a waiver of the Debtors', the September 2029 Ad Hoc Group's, the March 2029 Ad Hoc Group's, or any other party in interest's rights under the Bankruptcy Code or any other applicable non-bankruptcy law; (d) a waiver of the obligation of any party in interest to file a proof of claim; (e) a promise or requirement to pay any particular claim; (f) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law; (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (h) an admission that any lien satisfied pursuant to this Motion is valid (and all rights to contest the extent, validity, or perfection or seek avoidance of all such liens are expressly reserved); or (i) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors', the September 2029 Ad Hoc Group's, the March 2029 Ad Hoc Group's, or any other party in interest's rights to dispute such claim subsequently.

### NOTICE

58.     Notice of the Motion will be served on: (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the September 2029 Ad Hoc Group; (c) counsel to the March 2027 Ad Hoc Group; (d) counsel to the March 2029 Ad Hoc Group; (e) counsel to the Successor Agent; (f) counsel to the DIP Lenders; (g) the Banks; (h) the creditors listed on the Debtors' consolidated list of 30 creditors holding the largest unsecured claims; (i) the United States Attorney for the Southern District of Texas; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; (l) the state attorneys general for states in which the Debtors conduct business; (m) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (n) any

other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d). The Debtors submit that, under the circumstances, no other or further notice is required.

59.    A copy of the Motion is available (a) on the Court's website, at www.txs.uscourts.gov and (b) free of charge, on the website maintained by the Debtors' proposed claims and noticing agent, Kroll Restructuring Administration LLC, at https://restructuring.ra.kroll.com/OPI.

[*Remainder of Page Intentionally Left Blank*]

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed Orders granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: October 31, 2025
      Houston, Texas

Respectfully submitted,

*/s/ Timothy A. ("Tad") Davidson II*
**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone:  (713) 220-4200
Email:  taddavidson@hunton.com
       ashleyharper@hunton.com
       pguffy@hunton.com

- and -

**LATHAM & WATKINS LLP**
Ray C. Schrock (NY Bar No. 4860631)
Andrew M. Parlen (NY Bar No. 5370085)
Anupama Yerramalli (NY Bar No. 4645859)
Ashley Gherlone Pezzi (NY Bar No. 5754213)
Anthony R. Joseph (IL Bar No. 6329886)
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Email:  ray.schrock@lw.com
       andrew.parlen@lw.com
       anu.yerramalli@lw.com
       ashley.pezzi@lw.com
       anthony.joseph@lw.com

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*

## CERTIFICATE OF SERVICE

I certify that on October 31, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.


_/s/  Timothy A. ("Tad") Davidson II_
Timothy A. ("Tad") Davidson II