**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Office Properties Income Trust, *et al.*, | ) | Case No. 25-90530 (CML) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**THE 2027 AD HOC GROUP'S OBJECTION
TO THE DEBTORS' FIRST DAY MOTIONS**

[Relates to Docket Nos. 7, 19, 21, 23, 32, 33, 34]

---

[1]   A complete list of the Debtors in the Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/OPI. The Debtors' mailing address is Two Newton Place, 255 Washington Street, Suite 300, Newton, Massachusetts 02458-1634.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 2

BACKGROUND ................................................................................................................... 6

    **A.**   The Debtors' capital structure ............................................................................... 6
    **B.**   The Debtors' corporate governance and relationship with RMR ........................... 9
    **C.**   The Debtors' proposed DIP and restructuring ..................................................... 11
    **D.**   The 2027 Ad Hoc Group's alternative DIP proposal .......................................... 14
    **E.**   The upcoming claim-objection litigation ............................................................ 15

ARGUMENT ...................................................................................................................... 20

**I.**     The DIP motion should be denied as to the 2027 Non-ICA Obligors. ......................... 20

    **A.**   The proposed DIP is economically irrational for the 2027 Non-ICA Obligors......... 21
    **B.**   The proposed DIP is the product of a fundamentally flawed governance process... 25
    **C.**   The proposed DIP violates the Intercreditor Agreement...........................................277
    **D.**   The proposed DIP improperly predetermines critical case issues that are not yet
       before the Court. ................................................................................................. 28
    **E.**   Any relief granted under section 364 must be narrowly tailored to the actual needs
       of the 2027 Non-ICA Obligors. ........................................................................... 30

**II.**    The Joint Administration Motion should be reconsidered, and the Cash Management
       Motion should be denied, with respect to the 2027 Non-ICA Obligors. ...................... 31

**III.**   There is no emergency requiring preservation of the agreements with RMR. .......... 33

**IV.**   If independent fiduciaries are not appointed for the 2027 Non-ICA Obligors, the
       2027 Ad Hoc Group may seek additional relief as a remedy for the mismanagement
       of these entities' estates. ...................................................................................... 33

**V.**     The 2027 Noteholders are entitled to adequate protection............................................ 36

CONCLUSION ................................................................................................................... 38

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                        **Page(s)**

*In re Ames Dept. Stores, Inc.*,
    115 B.R. 34 (Bankr. S.D.N.Y. 1990) ................................................................................27

*In re Braniff Airways, Inc.*,
    700 F.2d 935 (5th Cir. 1983) ........................................................................................30

*In re Bufford*,
    343 B.R. 827 (Bankr. N.D. Tex. 2006) ........................................................................37

*In re Cajun Elec. Power Coop., Inc.*,
    191 B.R. 659 ..................................................................................................................35

*Commodity Futures Trading Commn. v. Weintraub*,
    471 U.S. 343 (1985) ......................................................................................................27

*In re Direct Response Media Inc.*,
    466 B.R. 626 (Bankr. D. Del. 2012) ............................................................................27

*In re Elmwood Dev. Co.*,
    964 F.2d 508 (5th Cir. 1992) ........................................................................................36

*In re First S. Sav. Ass'n*,
    820 F.2d 700 (5th Cir. 1987) ........................................................................................37

*In re Innkeepers USA Tr.*,
    442 B.R. 227 (Bankr. S.D.N.Y. 2010) ...................................................................26, 34

*In re L.A. Dodgers*,
    457 B.R. 308 (Bankr. D. Del. 2011) ......................................................................20, 26

*La. World Exposition v. Fed. Ins. Co.*,
    858 F.2d 233 (5th Cir. 1988) ........................................................................................27

*In re Lafayette Hotel P'ship*,
    227 B.R. 445 (Bankr. S.D.N.Y. 1998) ........................................................................26

*In re Laffite's Harbor Dev. I, LP*,
    No. 17-36191-H5-11, 2018 WL 272781 (Bankr. S.D. Tex. Jan. 2, 2018) ...............27, 30

*In re Las Torres Dev., L.L.C.*,
    413 B.R. 687 (Bankr. S.D. Tex. 2009) ..............................................................21, 32, 33

*In re LATAM Airlines Grp. S.A.*,
    620 B.R. 722 (Bankr. S.D.N.Y. 2020) ...................................................................26, 30

*In re Laymon*,
    958 F.2d 72 (5th Cir. 1992) ..........................................................................................38

*In re McKenzie Energy Corp.*,
  228 B.R. 854 (Bankr. S.D. Tex. 1998) ...................................................................33

*In re New Millenium Mgmt., LLC*,
  No. 13-35719-H3-11, 2014 WL 792115 (Bankr. S.D. Tex. Feb. 25, 2014) ..........................35

*In re Patman Drilling Int'l, Inc.*,
  2008 WL 724086 (Bankr. N.D. Tex. Mar. 14, 2008) ...............................................35

*In re Residential Cap., LLC*,
  501 B.R. 549 (Bankr. S.D.N.Y. 2013) ...................................................................20

*In re SBPM Holdings, Inc.*,
  No. 10-80310-G3-11, 2010 WL 4976952 (Bankr. S.D. Tex. Dec. 2, 2010) .........................36

*In re Simon Transp. Servs., Inc.*,
  292 B.R. 207 (Bankr. D. Utah 2003) ...................................................................26

*In re Southland Corp.*,
  160 F.3d 1054 (5th Cir. 1998) ...........................................................................38

*In re St. Mary Hosp.*,
  86 B.R. 393 (Bankr. E.D. Pa. 1988) ...................................................................20

*In re Timbers of Inwood Forest Assoc., Ltd.*,
  793 F.2d 1380 (5th Cir. 1986), *aff'd*, 484 U.S. 365 (1988) ....................................37

*In re Trib. Co.*,
  464 B.R. 126 (Bankr. D. Del. 2011) ...................................................................21

*In re Ultra Petroleum Corp.*,
  51 F.4th 138 (5th Cir. 2022) ...........................................................................19

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,
  484 U.S. 365 (1988) .......................................................................................37

*In re WGMJR, Inc.*,
  435 B.R. 423 (Bankr. S.D. Tex. 2010) ...............................................................36

*In re Xonics Photochemical, Inc.*,
  841 F.2d 198 (7th Cir. 1988) ...........................................................................21

**Statutes**

11 U.S.C. § 506(b) ...........................................................................................20

11 U.S.C. § 363(e) ...........................................................................................37

**Other Authorities**

Procedures for Complex Cases in the Southern District of Texas § C.8.b, i ....................21

The Ad Hoc Group of 2027 Noteholders (the "2027 Ad Hoc Group"), the members of which hold 71.3% of the 3.250% senior secured notes issued by the Debtors due in March 2027 (the "2027 Notes," and the holders thereof the "2027 Noteholders"), hereby submits this objection (the "Objection") to the Debtors' *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral and Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Claims; (III) Providing Adequate Protection; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (Dkt. 32) (the "DIP Motion"), the *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Existing Cash Management System, (B) Maintain Existing Business Forms and Intercompany Arrangements, and (C) Continue Intercompany Transactions; and (II) Granting Related Relief* (Dkt No. 21) (the "Cash Management Motion"), the *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Continue Performing Under the Management Agreements and Honor Obligations Related Thereto; and (II) Granting Related Relief* (Dkt. 23) (the "Emergency Prepetition Management Agreement Motion"), and the *Emergency Motion of Debtors for an Order Directing Joint Administration of Chapter 11 Cases* (Dkt. 7) (the "Joint Administration Motion") in each case to the extent such motions and such order apply to the Debtors identified in Exhibit A hereto.

The following terminology is used throughout this objection:

- "2027 Note Obligors" refers to all entities that are obligated on the 2027 Notes, including the parent-level Debtor.

- "2027 First-Lien Obligors" refers to the subset of 2027 Note Obligors that have granted first-priority liens to secure the 2027 Notes.

- "2027 Unsecured Obligors" refers to the subset of 2027 Note Obligors against which the 2027 Noteholders have unsecured claims.

- "<u>2027 Senior Unsecured Obligors</u>" refers to the subset of 2027 Unsecured Obligors against which the 2027 Noteholders have unsecured claims, and that have no secured indebtedness.

- "<u>2027 Non-ICA Obligors</u>" refers collectively to the 2027 First-Lien Obligors and the 2027 Unsecured Obligors. (This term *excludes* the parent-level Debtor; it also *excludes* subsidiary Debtors that have granted first-priority liens to other creditors and second-priority liens to the holders of the 2027 Notes, subject to an intercreditor agreement.)

In support of the Objection, the 2027 Ad Hoc Group states as follows:

## **PRELIMINARY STATEMENT**

1.     The Debtors commenced these cases to pursue a restructuring that would unlawfully divert value from the estates of the 2027 Unsecured Obligors to creditors of wholly separate Debtor entities—creditors with no claims against the 2027 Unsecured Obligors and no entitlement to their assets—all while making the 2027 Noteholders pay the costs of effectuating that transfer. To prevent immediate and irreparable harm, the 2027 Ad Hoc Group respectfully asks the Court to:  (A) deny the DIP Motion as to the 2027 Non-ICA Obligors or, at minimum, to tailor any interim relief to silo-specific needs and prohibit the use of DIP proceeds to fund claim-objection litigation against the 2027 Notes; (B) deny the Cash Management Motion and reconsider Joint Administration to the extent they enable cross-silo value transfers that prejudice the 2027 Non-ICA Obligors; (C) to require governance safeguards (independent managers/directors and silo-specific advisors) for the 2027 Unsecured Obligors; and (D) grant appropriate adequate protection, including current payment of default-rate interest, if any DIP liens or obligations are imposed on the 2027 Non-ICA Obligors.

2.     At its core, the Debtors' Restructuring Support Agreement (the "<u>RSA</u>") is designed to strip value from the 2027 Notes' recovery at the 2027 Unsecured Obligors and divert that value to holders of the company's notes due September 2029 (the "<u>September 2029 Noteholders</u>"). RMR

Group ("RMR")—which controls the Debtors' day-to-day operations and dominates the boards of the 2027 Unsecured Obligors—agreed to cause the Debtors to execute this transfer; in return, the September 2029 Noteholders agreed to entrench and enrich RMR through lucrative post-emergence management arrangements and equity. If allowed to proceed, the 2027 Noteholders' claims against the 2027 Unsecured Obligors will be stripped and the value of those entities siphoned to creditors who have no right to it.

3.      The RSA's principal mechanism for effectuating this transfer is the so-called "2027 Senior Secured Notes Claims Challenge," a claim-objection campaign aimed at reducing the allowed amount of the 2027 Notes by recharacterizing a portion of principal as disallowable "unmatured interest" under section 502(b)(2) of the Bankruptcy Code, based on allegations of the existence of original issue discount ("OID"). The stated goal is to "strip" the 2027 Noteholders' claims at the 2027 Unsecured Obligors, "freeing up" those estates' value for the parent-level Debtor, which would then issue new equity to the September 2029 Noteholders—thus delivering to them the value of the 2027 Unsecured Obligors.

4.      That litigation strategy is doomed to fail, for multiple, independent reasons. The 2027 Notes were validly accelerated following a missed interest payment on September 30, 2025, and expiration of the 30-day cure period before the petitions were filed; upon acceleration, any OID was fully amortized. In any event, the Debtors' own valuation assumptions concede the solvency of the 2027 Unsecured Obligors, which forecloses section 502(b)(2) as a basis to reduce the 2027 Noteholders' claims under controlling Fifth Circuit authority. And the Debtors' other anticipated theories fare no better. The RSA rests on a claim challenge that the Debtors are going to lose.

5.     But precisely because the "2027 Senior Secured Notes Claims Challenge" is so feeble, the proposed DIP is structured to ensure the transfer of value away from the 2027 Noteholders regardless of how that litigation turns out. Nonsensically, the 2027 Non-ICA Obligors would be required to cover the cost of *both* prosecuting *and defending against* litigation brought against their primary creditors. This will punish these entities' creditors, regardless of who wins: the harder the 2027 Noteholders fight to defend their claims, the more administrative expenses the estates will incur, and the more the 2027 Noteholders will be subordinated by the DIP claims, even if they end up prevailing. In short, the DIP manufactures a "heads I win/tails you lose" dynamic: the more vigorously the 2027 Noteholders defend their claims, the more administrative expense accrues to their obligors, and the deeper their claims are pushed beneath a DIP that was incurred specifically to attack them.

6.     The Debtors' own filings underscore this improper purpose. The proposed interim draw of $10 million is not shown as necessary to meet near-term operating needs, yet the Debtors seek to lock in joint-and-several obligations and cross-collateralizing liens on day one. Likewise, the nine-month projections do not justify obligating the 2027 Non-ICA Obligors on a $125 million facility that is principally intended to fund litigation against their only meaningful creditors and to benefit sister estates.

7.     The 2027 Non-ICA Obligors and their creditors gain nothing from this arrangement and are directly harmed by it. The 2027 Ad Hoc Group offered a silo-respecting and appropriately sized alternative DIP (the "Alternative DIP," attached hereto as Exhibit B) structured to avoid cross-silo subsidies and value leakage. The Debtors rejected it.

8.     The path the Debtors chose reflects a fundamentally flawed and conflicted governance process. In exchange for supporting the RSA and DIP, the September 2029

Noteholders secured for RMR new management agreements, board rights, and a management incentive plan awarding up to 10% of the reorganized equity. Although the Debtors purported to install independent directors for some silos, they declined to do so for the 2027 Unsecured Obligors—the prime targets of the value-transfer scheme. Those entities remain controlled solely by RMR principals and lack independent counsel and advisors. Their boards' business judgment is entitled to no deference, and there is no defensible basis for subjecting them to a cross-collateralized $125 million DIP whose benefits flow to creditors of legally and economically distinct estates.

9.      For similar reasons, the Court should deny the Cash Management Motion and reconsider Joint Administration as applied to the 2027 Non-ICA Obligors. These are not integrated cases: the Debtors themselves describe standalone silos, and their plan depends on taking value from one silo to pay creditors of another. Joint administration and permissive cash management here create the predicate for mischief—facilitating de facto substantive consolidation and cross-silo transfers that would be impossible if estates were administered separately.

10.     At a minimum, any first-day relief should be tightly constrained to preserve separateness and prevent irreparable harm before a final hearing. Any DIP approval must cap liability to amounts actually advanced to and used by each 2027 Non-ICA Obligor silo for true operational needs; prohibit use of DIP proceeds to fund the 2027 OID claims challenge or any litigation against the 2027 Noteholders; require silo-specific budgets, reporting, and allocations; and confer intercompany superpriority claims and replacement liens to the extent of any cross-silo transfers. Cash management and joint administration should be conditioned on strict segregation, weekly silo-level reporting, and express prohibitions on cross-silo leakage.

11.     Because the Debtors have sought unjustified relief for the 2027 Non-ICA Obligors amid flagrant conflicts, governance must be corrected now. The Court should require appointment of independent directors and managers for the 2027 Unsecured Obligors and engagement of silo-specific legal and financial advisors. Absent these safeguards, the 2027 Ad Hoc Group may be forced to seek more drastic remedies at the final hearing, including appointment of a trustee, conversion, dismissal or suspension, or stay relief to permit nonbankruptcy enforcement—all to stop continued efforts to blur separateness and shift value across silos.

12.     Finally, if any DIP obligations or liens are imposed on the 2027 Non-ICA Obligors, the 2027 Noteholders must receive robust adequate protection, including current payment of interest at the contractual default rate, payment of reasonable and documented advisor fees and expenses, replacement liens limited to collateral where the 2027 Noteholders hold liens, superpriority administrative claims, and parity in all reporting delivered to the proposed DIP lenders. These protections are customary and necessary to prevent diminution of the 2027 Noteholders' collateral and claims during these cases.

## BACKGROUND

### A.     The Debtors' capital structure

13.     OPIT (together with its direct and indirect subsidiaries, "OPI" or the "Company") is a real estate investment trust, or REIT, that owns and leases office space. Starting in 2024, as the business faced headwinds and borrowing costs continued to rise, the Debtors engaged in a series of transactions designed to extend OPI's runway and ensure that RMR continued to manage the properties and earn its fees. These transactions resulted in most of the Company's funded debt obligations shifting from unsecured to secured obligations at higher interest rates.

14.     Included among these 2024 transactions was the Company's entry into the "January 2024 Credit Facility," which provided for a new $325 million secured revolving credit

facility and a $100 million secured term loan. In February 2024, OPI issued the "March 2029 Notes" in an aggregate principal amount of $300 million. In June and October 2024, OPI exchanged approximately $859 million of its outstanding senior unsecured notes for the "September 2029 Notes," which had an aggregate principal amount of $610 million, along with 1,406,952 of common shares. And in December 2024, OPIT entered into a refinancing transaction that resulted in the issuance of the 2027 Notes by OPIT and the guarantee of the 2027 Notes by the remaining 2027 Notes Obligors.

15.     Concurrently with the issuance of the 2027 Notes, the agents on behalf of the holders of the September 2029 Notes and the 2027 Notes, along with the Company, entered into an intercreditor agreement (the "Intercreditor Agreement", attached hereto as Exhibit C). That agreement governs the subset of Debtors that are obligated on both sets of notes, that have provided a first-priority lien in favor of the September 2029 Notes and a second priority lien in favor of the 2027. It provides, in relevant part, that "the [2027 Noteholders] may provide, and no [September 2029 Noteholder] shall contest, interfere with, impede, or object to, or join or otherwise support any other Person in contesting, interfering with, impeding or objecting to, any debtor-in-possession financing or use of cash collateral that is secured by Liens on Independent [2027 Notes] Collateral (and not any [Shared] Collateral), and/or guaranteed by Persons not constituting [Shared] Obligors, at any time." Intercreditor Agreement § 3(e). In other words, the Intercreditor Agreement permits the 2027 Noteholders to extend debtor-in-possession financing to the 2027 Non-ICA Obligors—entities where the September 2029 Noteholders have no claims as of today—and the September 2029 Noteholders are prohibited from interfering with that financing in any way.

16.     These Company transactions in 2024 created a siloed capital structure through which various creditor constituencies have access to entirely separate asset bases and cashflows.

An organizational chart attached hereto as Exhibit D demonstrates the separateness of these silos. Each box on the chart reflects an individual entity within the OPI enterprise, many of which are limited liability companies that hold commercial real estate properties; OPIT is the ultimate equity owner. Each of the various silos is identified through color coding, as follows:

- **Dark Orange:** The entities included in this group are subject to the first-priority lien securing the 2027 Notes. These are the 2027 First-Lien Obligors.

- **Light Orange:** The entities included in this group are obligated on the 2027 Notes on an unsecured basis; they also owe a total of $14.4 million on unsecured Priority Guaranteed Notes, or "PGNs." They have no secured indebtedness. These entities are the 2027 Senior Unsecured Obligors.

- **Green:** The entities included in this group are subject to a first-priority lien securing the March 2029 Notes. These entities are obligated on the 2027 Notes on an unsecured basis and are among the 2027 Unsecured Obligors.

- **Blue:** The entities included in this group are subject to the first-priority lien securing the September 2029 Notes and the second-priority lien securing the 2027 Notes. The 2027 Note obligations of these entities are governed by the Intercreditor Agreement.

- **Yellow:** The entities included in this group are subject to the first-priority lien under the January 2024 Credit Facility, as well as the second-priority lien securing the September 2029 Notes. They are not 2027 Note Obligors.

17.     The different groups of Debtors have different capital structures and different creditor bodies. For example, the first-lien creditors of one silo are not the first-lien creditors of any other silo. The entities that are the subject of this objection are those shaded dark orange, light orange, and green: the 2027 Non-ICA Obligors.

18.     Each commercial property held by an OPI entity is separate from every other. Each generates its own lease income, which is independent of income from any other property. And each has its own capex needs, tax burdens, and other property-specific expenses. The entities are linked solely by the fact that they are ultimately beneficially owned by OPIT and managed by RMR. There is nothing about the properties that requires them to be managed together, however.

Each one can be sold and removed from the OPIT portfolio without affecting the cash flows of any other. As noted in the *Declaration of John R. Castellano in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (Dkt. 26) (the "Castellano Declaration"), the Company's business strategy is centered on "growing through its acquisition, disposition and financing policies," and OPIT historically has bought and sold properties separately, demonstrating that each one is a standalone business that does not depend on being part of the remainder of the portfolio. Castellano Declaration ¶ 28.

**B.    The Debtors' corporate governance and relationship with RMR**

19.    The Company has no employees of its own. OPIT Form 10-K at 36 (Feb. 13, 2025) (attached hereto as Exhibit E). Its external manager, RMR, oversees all aspects of the Company's operations. *Id.* The Company is structured to be entirely dependent upon, and under the complete control of, RMR. It has disclosed that its "ability to achieve [its] business objectives depends on RMR and its ability to effectively manage [OPI's] properties, to appropriately identify and complete [OPI's] acquisitions and dispositions and to execute [OPI's] growth strategy." *Id.* "RMR has broad discretion in operating [OPI's] day to day business." *Id.* The Company has admitted that its board of trustees "does not review or approve each decision made by RMR on [the Company's] behalf." *Id.*

20.    The Debtors pay RMR fees under a series of management agreements. Over the last five years alone, these fees have totaled over $300 million. But as the Company has publicly admitted, these "management agreements with RMR were not negotiated on an arm's length basis and their fee and expense structure may not create proper incentives for RMR." *Id.* at 37. The amount of the management fees is untethered to the performance of the properties. Instead, these fees are based primarily on the asset values of the properties and on construction activity. As a result, RMR is incentivized to expand OPI's portfolio and retain poorly performing properties—

even when doing so is financially detrimental to the Company and its creditors. And while the properties in the portfolio could be divested without affecting the others, this would be undesirable from RMR's perspective: its management fee from OPIT would be reduced if properties were sold, such as through creditor enforcement or a chapter 11 process.

21.     The parent company, OPIT, is organized as a trust and managed by a board consisting of nine trustees, including two managing trustees. Both managing trustees hold leadership roles at RMR. The first, Adam Portnoy, is the managing director, president, and chief executive officer of RMR. *See id.* at 4. He also is the sole trustee, an officer, and the controlling shareholder of RMR's controlling shareholder. *See id.* The other managing trustee of OPIT, Jennifer Clark, is a managing director and an executive officer of RMR's controlling shareholder, and an officer of RMR. *See id.* Moreover, Yael Duffy (OPIT's President and COO), Brian Donley (OPIT's CFO and treasurer), and some of OPIT's independent trustees are officers or trustees of other companies where RMR or its subsidiaries provide similar management services. "Pursuant to the RMR Business Management Agreement, all of the Debtors' officers (other than the [recently-appointed] Chief Restructuring Officer) are employees of RMR." Castellano Decl. ¶ 39.

22.     Apparently foreseeing the potential for conflicts, the Debtors apparently appointed independent directors for some of their subsidiary silos, specifically the 2027 First-Lien Obligors and the pledged subsidiaries under the September 2029 Notes. *See* Castellano Declaration ¶ 27. But they chose not to do so for the 2027 Unsecured Obligors. Rather, the decision-making authority for those entities lies with boards that include only Portnoy and Clark. The RMR-affiliated directors therefore retain their domination and control of the 2027 Unsecured Obligors. As for the 2027 First-Lien Obligors, the Debtors claim that they appointed Jill Frizzley as an independent director. But even though these entities have no creditors besides the 2027

Noteholders, Ms. Frizzley has never contacted the 2027 Ad Hoc Group. Her position on the Co-boards of the 2027 First-Lien Obligors was revealed to the 2027 Ad Hoc Group for the first time when the Debtors filed their board resolutions with the chapter 11 petitions.

23.     Likewise, while the Debtors claim to have constituted a restructuring committee independent of RMR at the parent level, for the 2027 First-Lien Obligors and the pledged subsidiaries under the September 2029 Notes, they did not establish independent committees at any other subsidiary levels. The restructuring committee, therefore, is not in a position to adequately represent multiple Debtor entities when the interests of their respective estates diverge. There is no restructuring committee that uniquely looks out for the interests of the 2027 Senior Unsecured Obligors and given the complete lack of engagement, it is unclear what role the 2027 First-Lien Obligor special committee plays.

### C.     The Debtors' proposed DIP and restructuring

24.     The Debtors filed their chapter 11 petitions on October 30, 2025. The RSA contemplates a transaction premised on transferring value from the 2027 Unsecured Obligors to the holders of the September 2029 Notes, even though those parties presently have no claim against, and no right to the value of, any of the 2027 Unsecured Obligors' estates. This value-transfer gambit has four key components.

25.     *First*, the RSA obligates the Debtors, within four business days of the petition date, to commence an adversary proceeding seeking disallowance of the 2027 Noteholders' claims, primarily on the basis that they include "unmatured interest" within the meaning of section 502(b)(2) of the Bankruptcy Code. *See* RSA, Restructuring Term Sheet at 5, "Means of Implementation"; "Case Milestones" (Dkt. 26 at 107; 116). The goal of that litigation is to reduce the size of the 2027 Noteholders' allowed claims so that they can be satisfied entirely out of the assets the 2027 First-Lien Obligors, meaning no value from the 2027 Unsecured Obligors' estates

will need to be distributed to the 2027 Noteholders. In short, the litigation would "strip" the 2027 Unsecured Obligors of the 2027 Noteholders' claims.

26.     *Second*, the Debtors propose to use the DIP to guarantee that the claim-stripping scheme will succeed, regardless of the outcome of the litigation. If the DIP facility is approved, all Debtors would be jointly and severally liable for the full $125 million, including any cost for the claim litigation the Debtors are obligated to bring against the 2027 Notes. RSA Annex 1, DIP Term Sheet, "Guarantors" (Dkt. 26 at 118). As a result, these entities would become encumbered by the DIP claims and liens, and the 2027 Noteholders' claims against the 2027 Unsecured Guarantors' estates would be subordinated. This would produce a no-win scenario for the 2027 Noteholders. Even if the Debtors are unsuccessful in their claim-objection litigation, the September 2029 Noteholders would end up with priority access to the value of the 2027 Unsecured Obligors: the more vigorously the 2027 Noteholders fight to defend their claims against those entities, the more the litigation will result in those estates incurring professional fees and drawing on the DIP to pay them, the larger the DIP claims against those estates will become, and the more the 2027 Noteholders' claims will be subordinated.

27.     *Third*, the reorganization contemplated by the RSA would result in the distribution of value after giving effect to the claim-stripping scheme. The proposed DIP lenders, the September 2029 Noteholders, would receive equity of the reorganized Debtors on account of their claims, as well as six out of seven seats on the Debtors' new board. RSA, Restructuring Term Sheet at 6–7, "Governance"; "DIP Claims" (Dkt. 26 at 108–09). The 2027 Noteholders' secured claims would be satisfied by giving these creditors the properties of the 2027 First-Lien Obligors— or cash and takeback debt, to be decided by the Debtors in consultation with the September 2029 Noteholders. Castellano Decl. ¶ 11(b). Given the complete transfer of value contemplated in the

RSA, it is unsurprising that the form of that recovery must also be approved by the September 2029 Noteholders. RSA, Restructuring Term Sheet at 8–9, "2027 Senior Secured Notes Claims" (Dkt. 26 at 110).

28.     *Fourth*, the September 2029 Noteholders have bought the Debtors' cooperation in their scheme by agreeing to share the upside with RMR. According to the RSA, the reorganized Debtors will enter into new management agreements with RMR, which will guarantee a $14 million annual management fee to RMR for at least the first two years after emergence, plus a 3% fee based on rents collected and a 5% fee based on construction costs. Additionally, the Debtors have agreed to a management incentive plan (or "MIP") that would give RMR 2% of the equity of the reorganized company and up to 8% more if financial targets are achieved. RSA, Management Term Sheet at 2 (Dkt. 26 at 141). RMR also would retain one seat on the reorganized Debtors' board. RSA, Management Term Sheet at 6–7, "Equity Compensation" (Dkt. 26 at 108–09).

29.     Thus, if the DIP is approved and the restructuring is consummated, the September 2029 Noteholders will have succeeded in gaining priority access to the value of the 2027 Unsecured Obligors. The proposed plan would distribute the value to this creditor constituency accordingly and at the expense of the 2027 Noteholders. And RMR would remain as manager, with a lucrative contract, new equity, and governance rights.

30.     The 2027 Non-ICA Obligors plainly do not need or benefit from such a DIP or restructuring. The envisioned claim-allowance litigation is entirely for the benefit of the September 2029 Noteholders, which are not creditors of 2027 Non-ICA Obligors today and therefore have no right to the value of those entities. Yet the DIP would make the 2027 Non-ICA Obligors jointly and severally liable for the $125 million DIP facility, and the Debtors have proposed no mechanism for allocating expenses across silos. Since the 2027 Unsecured Obligors are the entities without

secured indebtedness today, they will be the ones whose value is extracted by the imposition of the DIP claims and liens of the September 2029 Noteholders, which will grow as DIP draws are used to fund litigation expenses.

31.     The DIP budget belies any actual need to burden the 2027 Non-ICA Obligors with a DIP facility as large as the one being proposed. On an interim basis, the Debtors seek to borrow $10 million, but their projections show that they will have more than enough cash to satisfy all their operating and restructuring expenses for the first month of these cases. *See* Dkt. 32-1 at 185 (Initial Approved Budget).

**D.     The 2027 Ad Hoc Group's alternative DIP proposal**

32.     The Debtors had other financing options available to them that do not suffer from the same fundamental flaws as the proposed DIP. After months of negotiations with the Debtors, *see* Castellano Decl. ¶ 97–99, on October 25, 2025, the 2027 Ad Hoc Group made the Alternative DIP proposal to the Debtors for an appropriately sized and structured alternative DIP that would fund a restructuring that benefits the Debtors' separate estates and their respective creditors. *See* Exhibit B.

33.     The Alternative DIP represented a superior financing for the 2027 Non-ICA Obligors on every front. It would not be guaranteed by, or secured by the assets of, any of the Debtors other than the 2027 Non-ICA Obligors and would not impermissibly subordinate those Debtors' current creditors or encumber their assets with joint and several obligations for the benefit of sister Debtors' estates. Rather, the Alternative DIP explicitly provided an allocation methodology to ensure that applicable Debtor silos would be responsible for their fair portion of costs in these chapter 11 cases; it also provided Debtor entities with intercompany administrative superpriority claims to the extent advances were used to benefit estates of other entities. The Alternative DIP also had superior economic terms compared with the proposed DIP, including a

lower interest rate (10.5% vs 12.0%), lower upfront fees (1.0% vs 2.25%), a lower backstop premium (4.0% vs 10.0%), and a lower exit premium (4.0% vs 5.75%) and required narrower releases and stipulations in favor of the lenders, and provided a meaningful investigation budget for the UCC ($500,000 vs. $75,000).

34.     Additionally, the Alternative DIP also included an upsize option that equaled the size of the Debtors' proposed DIP if the Debtors nonetheless concluded that $125 million in financing was needed. While the 2027 Ad Hoc Group did not believe the Debtors would need a DIP of this amount, the upsize option was proposed to ensure that the Alternative DIP was responsive to the Debtors' stated needs and provided means for some funds to be used by Debtors other than Non-ICA Obligors.

35.     The Debtors and the proposed DIP lenders presumably did not like the Alternative DIP because it would have limited the Debtors' ability to use advances to litigate against the 2027 Noteholders. As is standard in post-petition financing arrangements, however, the Alternative DIP provided a significant budget of $500,000 for use in investigating and prosecuting claim objections against the 2027 Noteholders—significantly more than the $75,000 budget that the proposed DIP creates for investigating and prosecuting claim objections against the September 2029 Noteholders. Plus, the Alternative DIP explicitly provided that additional funding could be raised for litigation purposes if the investigation budget were insufficient, so long as the supplemental financing was not secured by the assets of the 2027 Non-ICA Obligors. If the September 2029 Noteholders believe that they will benefit from litigation against the 2027 Noteholders, they should be willing to have skin in the game and fund the costs associated with it themselves.

### E.     The upcoming claim-objection litigation

36.     As described above, the Debtors' proposed restructuring is premised upon reducing the 2027 Noteholders' claims. By sticking the 2027 Non-ICA Obligors with the bill for litigation

costs, the RSA and DIP essentially guarantee that the 2027 Noteholders will bear the cost and risk of the restructuring, so that the value transfer of the 2027 Unsecured Obligor estates to the September 2029 Noteholders and RMR can be completed. The Debtors should not be permitted to use the proposed DIP to create this "heads I win/tails you lose" dynamic. Nor is there any reason to believe that the Debtors necessarily will succeed in challenging the 2027 Noteholders' claims. To the contrary, the Debtors will face serious obstacles in their adversary proceeding.

37.     The issuance of the 2027 Notes occurred as part of a refinancing transaction in December 2024, which involved OPIT exchanging and retiring $340 million in principal of previously issued notes due in 2025. The principal amount of the newly issued 2027 Notes (approximately $445 million) exceeded the principal amount of retired notes, but the interest rate was only 3.25%, significantly below then-prevailing market rates. This was to ensure that OPIT remained in compliance with debt-incurrence covenants in its existing debt documents, which would have otherwise limited OPIT's ability to incur additional interest-bearing debt. Overall, the refinancing was immensely beneficial to the Company. Without the issuance of the 2027 Notes, the 2025 notes would have matured, causing an immediate liquidity crisis. The Company was afforded much-needed runway when it retired its debt maturing in 2025 and issued new debt maturing in 2027. *See* Castellano Decl. ¶ 90 (the 2027 Notes "allow[ed] OPI to retire the Old 2025 Notes and avoid a potential maturity default"). In particular, the 2027 Notes were made necessary after the Company used up a considerable amount of its collateral and secured debt capacity undertaking exchanges of later-maturing unsecured debt that created the September 2029 Notes, and that were designed to capture discounts despite impending maturities.

38.     The Debtors' main argument in the claim-objection litigation will be that the 2027 Notes were issued with original issue discount (OID), some of which was unamortized as of the

petition date and therefore should be disallowed as unmatured interest under section 502(b)(2) of the Bankruptcy Code. *See Office Properties Income Trust v. UMB Bank, National Association,* No. 25-03802 (Bankr. S.D. Tex. Nov. 2, 2025), ECF No. 1 ¶ 3–4. Their position suffers from several fatal flaws. The first and most obvious problem is that even if the 2027 Notes were issued with OID, none of it was unamortized as of the petition date because the 2027 Notes were validly accelerated before the chapter 11 petitions were filed.

39.     Under the indenture governing the 2027 Notes (the "Indenture"), "[t]he Company covenant[ed] and agree[d] that it will duly and punctually pay" principal and interest on the Notes "in accordance with the terms of the Notes and [the] indenture. Indenture § 10.01 (attached hereto as Exhibit F). According to both the indenture and the notes, interest payments were "payable quarterly in arrears" on specified days, including September 30 of each year. Indenture § 2.01; Reverse of Note § 2. The note provided that on any day on which amounts became due and payable, the Company was obligated to deposit the requisite funds with the paying agent by 11:00 a.m. eastern time. Reverse of Note § 3. A default in the payment of interest "when it becomes due and payable, and continuance of such for default for a period of 30 days" would constitute an event of default, triggering the right of holders to accelerate, as well as an entitlement to default interest at a rate of 12% per annum. Indenture § 5.01(b).

40.     On September 30, 2025, an interest payment became due and payable, but the Company did not pay. This resulted in a default in the payment of interest starting at 11:01 am that day, the minute after the deadline for payment was missed. By 11:01 am on October 30, 2025, a "period of 30 days" had elapsed, and yet the Company still had not made the interest payment. At 1:14 pm that day—thirty days, two hours, and fourteen minutes after the Company was required to deposit its interest payment—requisite owners of the 2027 Notes sent a notice of default and

acceleration to the Company and the indenture trustee. (the "<u>Acceleration Notice</u>" at 1–2 (attached hereto as Exhibit G)). It was not until several hours later, at approximately 8:30 p.m., that the Debtors began filing their chapter 11 petitions. The Debtors apparently were under the mistaken impression that their cure period lasted until 11:59 pm on October 30, 2025—that is, that the Debtors were entitled to 30.54 days to cure their nonpayment. That is manifestly contrary to what the Indenture and note say, however.

41.     As a result of the acceleration, all principal amounts, accrued and unpaid interest, and default interest under the 2027 Notes became immediately due and payable before the filing of the petitions. To whatever extent there was any OID, it was fully amortized by the time of the filing and the Debtors' section 502(b)(2) objection will fail at the threshold.

42.     Regardless, even if there were unamortized OID as of the filing of the petitions, the Debtors' objection still would fail because they concede that the 2027 Non-ICA Obligors were solvent as of the petition date. Their proposed restructuring assumes a total enterprise value of the Debtors—excluding the 2027 First-Lien Obligors, whose properties would be given to the 2027 Noteholders—of $1.7 billion. Of this $1.7 billion in value, the RSA assumes:

- $425 million can be ascribed to the secured claims of the lenders under the 2024 Credit Facility, meaning this is the value of the yellow-shaded entities;

- $518 million can be ascribed to the secured claims of the September 2029 Noteholders, meaning this is the value of the blue-shaded entities and what remains of the yellow-shaded entities after accounting for the 2024 Credit Facility;

- at least $300 million can be ascribed to the March 2029 Noteholders' claims, meaning this is the minimum value of green-shaded entities; and

- $177.3 million can be ascribed to non-debtor entities.

43.     That leaves $279.7 million of remaining enterprise value, virtually all of which must be ascribed to the only remaining silos in the enterprise: the 2027 Unsecured Obligors.[2] The only creditors of the 2027 Unsecured Obligors besides the 2027 Noteholders are the holders of the PGNs, whose claims are just $14.4 million. That leaves about $265.3 million of value in the 2027 Unsecured Obligors for the 2027 Noteholders. The claims of the 2027 Noteholders are $418 million, but these creditors also can recover out of the collateral held by the 2027 First-Lien Obligors. This means that so long as the value of the collateral in the 2027 First-Lien Obligors is at least $153 million,[3] the 2027 Unsecured Obligors are solvent. The Debtors have never contended that the combined value of the thirty-five properties owned by the 2027 First-Lien Obligors is that low. Rather, they consistently have asserted that 2027 First-Lien Obligors are worth far in excess of (and more than double) that amount. That indicates there is substantial equity value in the 2027 Unsecured Obligors today.

44.     Binding Fifth Circuit case law holds that section 502(b)(2) cannot be invoked to deny the 2027 Noteholders the full amount of their claims against Debtors that are solvent. *See In re Ultra Petroleum Corp.*, 51 F.4th 138, 151–52 (5th Cir. 2022) ("Solvent debtors are, by definition, able to pay their debts in full on their contractual terms, and absent a legitimate bankruptcy reason to the contrary, they should."). Given that the full $418 million in principal amount of the 2027 Notes is due under applicable state law, such amounts must be paid by the solvent 2027 Non-ICA Obligors despite the filing of these chapter 11 cases. Additionally, to the extent the 2027 Noteholders are oversecured at the 2027 First-Lien Obligors, section 506 also

---

[2]     The only exceptions are properties of two non-debtor subsidiaries: 3300 75th Avenue LLC and Echelon Pkwy MS LLC. These properties are direct subsidiaries of OPIT and therefore the Priority Guaranteed Notes and the 2027 Notes do not have structurally senior claims at these entities. These properties are encumbered by mortgage loans of $30.7 million and $14.9 million, respectively.

[3]     Plus any equity value of the two non-debtors owned directly by OPIT.

provides a basis for awarding post-petition interest. *See* 11 U.S.C. § 506(b) (allowing postpetition interest where a "secured claim is secured by property the value of which . . . is greater than the amount of such claim"); *In re Residential Cap., LLC*, 501 B.R. 549, 597–98 (Bankr. S.D.N.Y. 2013) ("a secured creditor is entitled to postpetition interest, fees, costs and charges to the extent the value of the property securing the creditor's claim is greater than the amount of the creditor's claim.").

45.     These issues are not before the Court today. Nor does the 2027 Ad Hoc Group intend to lay out in this objection all the defenses and arguments it will advance in the adversary proceeding. The point for purposes of the first-day motions, however, is that it is incorrect to presume that the Debtors will win the RSA required OID related 2027 Senior Secured Notes Claims Challenge and unlawful to grant relief that prejudges the outcome. To the contrary, the Debtors are likely to lose their lawsuit.

## ARGUMENT

### I.     The DIP Motion should be denied as to the 2027 Non-ICA Obligors.

46.     On all motions under section 364 of the Bankruptcy Code, the debtor has "the burden of proving" both that "the credit transaction is necessary to preserve the assets of the estate; and . . . [t]he terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender." *See In re L.A. Dodgers*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (*citing In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988)).

47.     Further, under this Court's complex case procedures, cross-collateralization among debtor entities, especially on an interim basis, requires an "extraordinary showing." Procedures for Complex Cases in the Southern District of Texas § C.8.b, i. This is consistent with the principle that a separate bankruptcy estate is created for each debtor, and the assets of one debtor cannot be used to satisfy the liabilities of another, absent substantive consolidation. *See, e.g.*, *In re Trib. Co.*,

464 B.R. 126, 182 (Bankr. D. Del. 2011) ("In the absence of substantive consolidation, entity separation is fundamental." (citations omitted)); *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 201 (7th Cir. 1988) ("[T]here is no automatic piercing of the corporate veil in affiliation settings. The assets of affiliated corporations are not treated as a common pool available to the creditors of each affiliate." (citations omitted)).

48.     As this Court has held, "[t]he proposed use of cash collateral from one estate to pay the claims of another estate—in effect, borrowing from Peter to pay Paul—is not allowed under the applicable law." *In re Las Torres Dev., L.L.C.*, 413 B.R. 687, 699 (Bankr. S.D. Tex. 2009). Thus, "[t]he administrative expenses of one jointly administered debtor should not be paid out of the other jointly administered debtor's cash collateral" because "[a]dministrative expenses incurred in each jointly administered debtor's bankruptcy estate are not treated as a joint debt." *Id.* at 698.

49.     Under the Debtors' proposed financing, however, the 2027 Non-ICA Obligors will be jointly and severally liable for the entire $125 million repayment obligation, with their assets subject to DIP claims and liens. The Debtors are unable to meet their heightened burden for obtaining approval of this cross-collateralized facility given the harm it will cause to the 2027 Non-ICA Obligors and the existence of the Alternative DIP.

A.     **The proposed DIP is economically irrational for the 2027 Non-ICA Obligors.**

50.     There is no reason why the 2027 Non-ICA Obligors should be obligated on a $125 million facility, even if other Debtor entities may require financing. The Debtors' DIP budget shows that the funding needs of these entities are substantially below this amount. The Debtors have proposed no mechanism for allocating DIP obligations in a way that is tailored to each silo's (or each entity's) projected need.

51.     Meanwhile, the Debtors' proposed budget assumes that the single largest use of the loan proceeds will be professional fees, estimated to be over $31 million for just the first 13 weeks of the cases. The Debtors intend to use DIP proceeds to prosecute claim-objection litigation to reduce the size of the 2027 Noteholders' claims, such that the claims can be satisfied entirely out of the value of the 2027 First-Lien Obligors, without the need to look to the assets of the 2027 Unsecured Obligors. The Debtors, together with the RSA Support Parties, hope to strip the 2027 Noteholders' claims against the 2027 Unsecured Obligors to extract value from those entities for the benefit of OPIT, which then will issue new equity primarily to the September 2029 Noteholders as well as RMR. While the DIP requires an "allocation" of case costs, it does not specify what that allocation will be. The Debtors' intentions nonetheless are clear from the circumstances: the DIP does not propose to prime pre-existing secured debt, but it will subordinate the unsecured claims of the 2027 Noteholders against the 2027 Unsecured Obligors. It is evident, therefore, that by making the 2027 Unsecured Obligors jointly and severally liable for the DIP claims and subject to DIP liens, the Debtors expect the value of those entities to be used to satisfy DIP obligations.

52.     That is, the Debtors want the 2027 Noteholders to foot the bill for the anticipated litigation against them. Even if the 2027 Ad Hoc Group prevails in that dispute, they will have lost: the more vigorously they defend their claims, the more administrative expenses the estates will incur, and the more the 2027 Noteholders' claims will be subordinated by the DIP facility. In proposing the DIP facility, the Debtors have foisted an unwinnable dilemma onto the 2027 Noteholders. Either they can give up their claims against the 2027 Unsecured Obligors, or they can defend their claims in litigation but have them subordinated to the superpriority DIP claims and liens.

53.     This is not a situation in which the 2027 Non-ICA Obligors benefit from providing credit support for a loan that enables related entities to reorganize and continue as going concerns. The silos and the properties the Debtors own are independent, not part of an integrated operation. One business unit does not depend on the continuation of another for its own survival. Each silo has distinct creditor bodies, indebtedness, assets, and cash flows. Properties can be removed from one silo without affecting the properties elsewhere in the OPI portfolio. No "indirect benefits" flow to the 2027 Non-ICA Obligors from a loan being made to other entities in the group.

54.     The case is reminiscent of *Molycorp*, where the debtors similarly sought approval on the first day of a DIP that was cross-collateralized by two distinct groups of entities. *In re Molycorp, Inc.,* No. 15-11357 (CSS) (Bankr. D. Del. June 30, 2015), ECF No. 97 (first day hearing transcript; attached hereto as Exhibit H). One group, the Mountain Pass debtors, had a funding need; the other group, the Neo debtors, did not. The debtors argued that the Neo debtors nonetheless should be obligors on the DIP facility because they benefited from supporting the Mountain Pass debtors' reorganization. According to the debtors, this was because the two silos were part of an integrated operation, with the Mountain Pass debtors acting as the key supplier of materials that the Neo debtors used in their business. The Bankruptcy Court for the District of Delaware denied interim approval of the DIP as to the Neo debtors. Although the court recognized that the Neo entities' business might be dependent on the Mountain Pass debtors' continuing as a going concern, the evidence showed "that in the short term those Neo entities [did] not require Notes financing and that they could survive, certainly in the interim period without being borrowers under the DIP financing." *See id.* (Hr'g Tr. at 101:22–102:10). The court emphasized that the cases involved "separate and distinct legal entities" with capital structures that were

distinct because the debtors had "chosen to organize their business in that way [such] that the collateral packages on the various loans vary by entity and by business." *Id.*

55.     If anything, the case for cross-collateralization is substantially weaker here than it was in *Molycorp.* There is no supply-chain relationship among the OPI properties that is analogous to relationship between the Mountain Pass and Neo entities. And the Debtors' motivation for cross-collateralization here—funding litigation against the 2027 Non-ICA Obligors' only significant creditors in order to extract value for creditors of separate entities—is significantly more odious and indicative of bad faith.

56.     The proposed DIP therefore is not necessary to preserve the estates of the 2027 Non-ICA Obligors; nor are its terms fair to them. The Debtors have pursued a full-company reorganization aimed at keeping all the properties together in the OPI portfolio, which maximizes RMR's fees. OPIT and RMR consider this more desirable than a silo-specific restructuring of the 2027 Non-ICA Obligors or an out-of-court enforcement to monetize the assets of those entities, since these alternatives would remove properties from the OPIT portfolio and reduce RMR's fees. The September 2029 Noteholders, for their part, like this result because the DIP and proposed restructuring would give them priority access to the value of properties that is unavailable to them otherwise.

57.     The 2027 Non-ICA Obligors, however, do not depend on being a part of the same enterprise as the remaining Debtors. Quite the opposite: a disposition of their properties could liberate them from the onerous terms of the RMR management agreements that the September 2029 Noteholders are willing to perpetuate under the RSA. And it would not require those entities to become obligors on a $125 million DIP, which far exceeds their funding needs and, in any event, is detrimental to their estates.

**B.      The proposed DIP is the product of a fundamentally flawed governance process.**

58.     Perhaps it should be no surprise that the Debtors have proposed a DIP designed to strip claims against the 2027 Unsecured Obligors and redirect the value of those entities to the September 2029 Noteholders as part of a bargain that entrenches and enriches RMR: there was no independent fiduciary looking out for those Debtors' distinct interests. The Debtors claim to have appointed independent directors for silos that have secured indebtedness. There is no evidence, however, that they did the same for the 2027 Unsecured Obligors. *See* Castellano Decl. ¶ 27 (referencing independent directors only for "pledged subsidiaries" and making no reference to the 2027 Unsecured Obligors). Rather, the Debtors appear to have left the 2027 Unsecured Obligors' boards solely at the mercy of Portnoy and Clark, principals of RMR.[4] And while the Debtors say they appointed an independent restructuring committee, that body operates at the parent level only, and purports to serve all Debtor silos. There is no independent restructuring committee that exclusively looks out for the interests of each of the individual silos, which is necessary when a transaction purports to remove value from one silo to benefit creditors of another.

59.     The Debtors argue that their "business judgment" about the DIP and each entity's funding need is entitled to deference. Not so. Without any independence at the 2027 Unsecured Obligors, and with the interests of those entities diverging from those of the other estates that will benefit from the proposed DIP and RSA, heightened scrutiny under the entire fairness standard applies. *See, e.g., In re L.A. Dodgers*, 457 B.R. at 313 ("[T]he Court must review Debtors' decision to accept the [self-interested DIP financing] applying the entire fairness standard."); *In re LATAM*

---

[4]     *Compare* SIR Campbell Place Inc. Bankruptcy Petition at 16–17 (Oct. 30, 2025) (attached hereto as Exhibit I), *and* Elliot Ave Seattle LLC Bankruptcy Petition at 16–17 (Oct. 30, 2025) (attached hereto as Exhibit J) (showing that independent directors consented to the petitions on behalf of the 2027 First-Lien Obligors and the entities on which the 2029 Noteholders hold first-priority secured liens) *with* GOV NEW OPPTY LP REIT Bankruptcy Petition at 15 (Oct. 30, 2025) (attached hereto as Exhibit K) (showing that only Portnoy and Clark signed on behalf of the (2027 Unsecured Obligors).

*Airlines Grp. S.A.*, 620 B.R. 722, 769–71 (Bankr. S.D.N.Y. 2020) (applying entire fairness standard when DIP financing tranche was provided by insider lenders); *In re Simon Transp. Servs., Inc.*, 292 B.R. 207, 216 (Bankr. D. Utah 2003) (applying entire fairness standard to sale with an insider counterparty); *see also In re Lafayette Hotel P'ship*, 227 B.R. 445, 454 (Bankr. S.D.N.Y. 1998) ("[S]ince there is an incentive and opportunity to take advantage . . . insiders' loans in a bankruptcy must be subject to rigorous scrutiny." (citation omitted)).

60.     To satisfy the entire fairness standard, the Debtors must prove both that the transaction resulted from fair dealing and that it reflects a fair price. *See In re L.A. Dodgers*, 457 B.R. at 313. They can do neither given the evident conflicts of interest that their governance setup fails to correct. And the outcome of their flawed governance process is fundamentally unfair, as explained above. No fiduciary duties have been met here. *See In re Innkeepers USA Tr.*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010) ("In applying heightened scrutiny, courts are concerned with . . . whether fiduciary duties were properly taken into consideration.").

61.     Ultimately, however, the applicable standard is irrelevant here. Even under the more deferential business judgment standard, the proposed DIP does not pass muster for any of the 2027 Non-ICA Obligors. "[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest." *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990); *see, e.g.*, *In re Laffite's Harbor Dev. I, LP*, No. 17-36191-H5-11, 2018 WL 272781, at *3 (Bankr. S.D. Tex. Jan. 2, 2018) (finding that proposed DIP financing was "not in accord with a sound exercise of Debtors' business judgment" where, among other things, the size of the DIP relative to the property value was large enough that

the proposed priming lien amounted to a *sub rosa* plan).

62.     An independent fiduciary acting appropriately on behalf of the 2027 Non-ICA Obligors would never conclude as a matter of "business judgment" that the proposed DIP and RSA are in the best interests of those entities' estates. The directors of 2027 Non-ICA Obligors, regardless of whether they are affiliated with RMR, have agreed to subject their entities to a $125 million facility to fund litigation and a restructuring that manifestly is detrimental to those entities' creditors and that is designed to divert value to creditors of totally separate entities. This is a textbook example of a breach of duties by a debtor in possession. *See La. World Exposition v. Fed. Ins. Co*., 858 F.2d 233, 245–46 (5th Cir. 1988) (in a chapter 11, the debtor in possession "performs the same functions as a trustee," and, in that capacity, "has the duty to maximize the value of the estate." (*quoting Commodity Futures Trading Commn. v. Weintraub*, 471 U.S. 343, 352 (1985)); *In re Direct Response Media Inc.*, 466 B.R. 626, 649 (Bankr. D. Del. 2012) ("The directors of a wholly-owned subsidiary cannot allow the subsidiary to be plundered for the parent company's benefit.").

### C.     The proposed DIP violates the Intercreditor Agreement.

63.     The Intercreditor Agreement provides an alternative basis to deny the Debtors' DIP Motion. That agreement, to which the September 2029 Noteholders and the Debtors are parties, states that the 2027 Noteholders may provide debtor-in-possession financing secured by the assets of the 2027 Non-ICA Obligors—that is, assets to which the September 2029 Noteholders presently have no access. And it goes on to provide that the September 2029 Noteholders may not impede, or support any other person in impeding, such financing. Exhibit C § 3(e). Yet that is exactly what the DIP currently proposed by the Debtors, and supported by the September 2029 Noteholders, would do.

64.     The proposed RSA and DIP facility would saddle the 2027 Non-ICA Obligors,

which are not obligated on the September 2029 Notes, with joint and several liabilities under the DIP facility, as well as the obligation to pay interest payments and fees as adequate protection to the September 2029 Noteholders. The DIP and the RSA would prohibit the 2027 Non-ICA Obligors from incurring additional debt, pledging their assets to secured other debt, and from pursuing a different DIP facility. *See* DIP Credit Agreement § 9.02 (Dkt. 32-1 at 140–41) (prohibiting the Debtors from incurring any liens); RSA § 4.01(a)(ii) (Dkt. 26 at 77) (stating the RSA will terminate where a Debtor announces its intent to pursue an alternative transaction, which includes financing transactions alternative to the DIP that are not consented to by the 2029 Noteholders); RSA § 4.01(a)(viii) (Dkt. 26 at 78) (stating the RSA will terminate upon an incurrence of indebtedness or issuance of equity by a Debtor, absent prior written consent of the 2029 Noteholders). This plainly would "impede" their ability to enter into the Alternative DIP proposed by the 2027 Noteholders. That is a direct violation of the intercreditor agreement.

> **D.      The proposed DIP improperly predetermines critical case issues that are not yet before the Court.**

65.      The proposed DIP is being used as a litigation tactic to reduce the 2027 Noteholders' claims. Specifically, the Debtors will use the funds to prosecute an adversary proceeding aimed at disallowing whatever portion of the 2027 Noteholders' claims constitutes unamortized OID.

66.      This is problematic in two key ways. *First*, as discussed above, it is unlawful for the Debtors to foist superpriority claims and liens onto estates to pay for claim-objection litigation against their only significant creditors, just to create value for separate Debtor estates. *Second*, and relatedly, the Debtors' proposed DIP facility appears to presuppose the outcome of this hotly contested issue: the Debtors evidently believe that they can burden the 2027 Unsecured Obligors (where 2027 Noteholders have in-the-money unsecured claims) with the DIP without causing harm

because the 2027 Notes will be paid entirely out of the 2027 First-Lien Obligors (where 2027 Noteholders have a first-priority security interest). But this position assumes the Debtors are correct about the allowed amount of the 2027 Notes claim and the value of the associated collateral.

67.     As described above, they are not. Among other reasons, the 2027 Notes were validly accelerated because the Debtors failed to cure their nonpayment of interest by the 30-day deadline, such that any OID in the 2027 Notes was amortized before the chapter 11 petitions were filed. Nonetheless, the issues underlying the anticipated adversary proceeding have not yet been raised to the Court, let alone decided, and it is inappropriate for the Debtors to seek first-day relief that would prejudge the issues. Yet that appears to be the point of the proposed DIP facility: predetermining a valuation and claim-allowance litigation that the Debtors must win for their plan to be confirmable. They are forcing the 2027 Ad Hoc Group to choose between forfeiting their claims at the outset of the cases or defending their claims in litigation, which will result in their obligors incurring greater administrative expenses and superiority DIP obligations that prime the 2027 Notes.

68.     The Debtors also appear to be using the DIP to undermine a key defense the 2027 Noteholders will advance in the upcoming claim-objection litigation. The Debtors know that even if some portion of the 2027 Noteholders' claims constitutes unamortized OID (which the 2027 Ad Hoc Group disputes), the "solvent debtor" exception will make section 502(b)(2) inapplicable to reduce those claims. And the Debtors further know that solvency will be a major obstacle for their claim objections, since their proposed restructuring assumes the solvency of the 2027 Unsecured Obligors by proposing to distribute the value of those entities' assets to creditors of the parent. For that reason, the Debtors and the DIP Lenders (the September 2029 Noteholders) plan to burden the 2027 Unsecured Obligors with enough DIP liabilities so as to render these entities insolvent,

thereby eliminating the "solvent debtor" defense that the 2027 Noteholders otherwise would have.

69.     It is improper for the Debtors to use section 364 of Bankruptcy Code to alter litigation rights, pre-determine contested issues that are not yet before the Court, and thus pave the way for a chapter 11 plan that would be impossible to confirm otherwise. "The bankruptcy court cannot, under the guise of Section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements." *In re Laffite's Harbor*, 2018 WL 272781 at *3; *see, e.g.*, *In re LATAM Airlines Grp. S.A.*, 620 B.R. at 816 ("[C]ourts will reject proposed DIP loans as improper sub rosa plans where the terms of the loan include concessions to creditors or parties in interest that are unauthorized under, or in conflict with, provisions under the Bankruptcy Code."); *cf. In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983) ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets.").

### E.     Any relief granted under section 364 must be narrowly tailored to the actual needs of the 2027 Non-ICA Obligors.

70.     For the reasons above, the DIP Motion should be denied as to the 2027 Non-ICA Obligors. The 2027 Ad Hoc Group is prepared to fund the Alternative DIP, which is appropriately sized and structured to meet the liquidity needs of these separate Debtors in their separate chapter 11 cases.

71.     To the extent any interim relief is granted, however, it should be limited to ensure there is no irreparable injury to the 2027 Non-ICA Obligors or their creditors. At most, the 2027 Non-ICA Obligors should become obligated only to the extent of cash actually advanced to and used by them. The Debtors should be required to break down the funding needs of the Debtors silo by silo, and each silo should be advanced only what is required to satisfy its specific requirements.

The Court should require careful allocation among the Debtor entities to ensure value is not inappropriately depleted at the 2027 Non-ICA Obligors. So, too, should it require a separate DIP budget for each of the separate 2027 Non-ICA Obligor silos. If the 2029 Noteholders want to fund litigation to reduce the claims on the 2027 Notes on account of purportedly unamortized OID in order to free up value from Debtors against whom they hold no claims, they ought to be required to fund that litigation using the collateral securing the 2029 Notes, rather than plundering the assets of the 2027 Non-ICA Obligors.

72.     Similarly, the Debtors should be required to marshal usage away from the 2027 Non-ICA Obligors, such that borrowing at those entities is minimized. In all events, the 2027 Non-ICA Obligors should be prohibited from borrowing to fund litigation against their only meaningful creditors. The 2027 Non-ICA Obligors likewise should be prohibited from borrowing under the facility and transferring the proceeds to other Debtor entities. And to whatever extent such movement of DIP proceeds nonetheless occurs, the 2027 Non-ICA Obligors should be given liens and superpriority administrative claims against the transferee entities to the extent of the amounts transferred.

## II.     The Joint Administration Motion should be reconsidered, and the Cash Management Motion should be denied, with respect to the 2027 Non-ICA Obligors.

73.     The Court should reconsider its *Order Directing Joint Administration of Chapter 11 Cases*. (Dkt. 19). The Debtors are attempting to use the procedural tool of joint administration to intertwine the fates of entities that otherwise are completely separate and have non-overlapping creditor bodies. They similarly are seeking entry of a cash management order that will allow them to move cash between entities to help the out-of-the-money parent to the detriment of the 2027 Non-ICA Obligors. This cannot be condoned.

74.     The Debtors' proposal of a cross-collateralized DIP facility is possible only in the

context of joint administration. For the reasons above, the DIP is not required at the 2027 Non-ICA Obligor entities, and so joint administration is being abused to achieve what could not be done otherwise. The Court should reconsider the Debtors' Joint Administration Motion. Likewise, the Cash Management Motion should be denied to the extent it purports to grant the Debtors authority to shift value away from the 2027 Non-ICA Obligors to other Debtor entities. The cash-management system should ensure unwarranted leakage between the separate silos is eliminated and should prevent funds that were lent to the 2027 Non-ICA Obligors from being redirected to other Debtor entities.

75.     Joint administration and the relief requested in the Debtors' Cash Management Motion should not be deployed as a means of harming the interests of the 2027 Ad Hoc Group in respect of the 2027 Non-ICA Obligors. This Court's rules mandate that joint administration not be used to prejudice substantive rights. *See* Procedures for Complex Cases in the Southern District of Texas § B.4.g (providing that final orders at first-day hearings may include motions that are procedural in nature, but only to the extent they "do not affect the substantive rights of creditors and other parties-in-interest."); *see also In re Las Torres*, 413 B.R. at 693 ("Joint administration is designed in large part to promote procedural convenience and cost efficiencies which do not affect the substantive rights of claimants or the respective debtor estates.") (quoting *In re McKenzie Energy Corp.*, 228 B.R. 854, 874 (Bankr. S.D. Tex. 1998)).

76.     As noted above, this Court has held, that "[t]he proposed use of cash collateral from one estate to pay the claims of another estate . . . is not allowed under the applicable law." *In re Las Torres*, 413 B.R. at 699. Given that the "[a]dministrative expenses incurred in each jointly administered debtor's bankruptcy estate are not treated as a joint debt" it stands that "[t]he administrative expenses of one jointly administered debtor should not be paid out of the other

jointly administered debtor's cash collateral." *Id.* at 698. The same logic applies to these cases.

## III.   There is no emergency requiring preservation of the agreements with RMR.

77.     The Debtors' Emergency Prepetition Management Agreement Motion purports to "ensure the efficient operation of the Debtors' business" by preserving the existing management agreements with RMR. Dkt. 23 at 6. There is simply no emergency here. Neither of the RMR management agreements is set to expire until the year 2045. Moreover, both RMR management agreements provide that on December 31 of each year, such agreements will automatically extend by another year, thus ensuring a perpetual 20-year term. Similarly, the Sonesta Agreement—*see* Castellano Declaration ¶ 43—has a 15-year term that runs through 2040, with two 10-year extension options exercisable by the Operator. Even absent the relief requested in that motion, given the automatic stay, RMR cannot terminate the agreements unilaterally.

78.     Rather, what the Debtors appear to be doing is further entrenching the interests of the Debtors' insider, RMR, through an emergency first-day motion. This is improper. Whether RMR's extremely lucrative and one-sided contracts should be assumed or rejected is for another day, not the outset of these cases. The 2027 Ad Hoc Group reserves all rights with respect to the assumption or rejection of the management agreements between the Debtors and RMR.

## IV.   If independent fiduciaries are not appointed for the 2027 Non-ICA Obligors, the 2027 Ad Hoc Group may seek additional relief as a remedy for the mismanagement of these entities' estates.

79.     At this early stage, the 2027 Ad Hoc Group seeks only denial of the DIP Motion, Emergency Prepetition Management Agreement Motion, and Cash Management Motion, and reconsideration of the Joint Administration Motion, as they apply to the 2027 Non-ICA Obligors. But it may be forced to move for more drastic relief at the final hearing or other phases of the cases given the lack of independence of the 2027 Non-ICA Obligors and the disregard that conflicted management already has shown for their separate interests and stakeholders.

80.     "In a bankruptcy case, it is 'Bankruptcy 101' that a debtor and its board of directors owe fiduciary duties to the debtor's creditors to maximize the value of the estate, and each of the estates in a multi-debtor case." *In re Innkeepers USA*, 442 B.R. at 235. The Debtors' management team may think that it has done what is right for OPIT or other Debtor silos in proposing a cross-collateralized DIP facility; but it is precisely because management serves these other entities that it has failed to look out for the distinct and diverging interests of the 2027 Non-ICA Obligors.

81.     This disabling conflict necessitates the appointment of a new fiduciary who can serve the 2027 Non-ICA Obligors only. The Debtors long ago should have installed independent managers or directors at **all the various silos**, as well as separate legal and financial advisors, to enable the distinct entities to navigate the restructuring process appropriately. They chose not to follow this path, especially for the 2027 Senior Unsecured Obligors. They installed purportedly independent directors only at some of the entities with secured debt. And while they established special committees at the parent and certain subsidiary entities, there is no independent committee charged with looking out for the unique interests of each silo, especially the 2027 Unsecured Obligors, and there has been no indication that the subsidiary special committees have engaged with their respective creditor bodies.

82.     The Court should order the Debtors to rectify this problem now and require the 2027 Non-ICA Obligors to be managed separately, and to have their own advisors, as has occurred in other cases involving siloed businesses. *See, e.g.*, *In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr. D. Del. Nov. 4, 2014), ECF No. 2699 (hearing transcript; attached hereto as Exhibit L) (Hr'g Tr. 18:1–23) (after finding proposed transaction raised actual conflicts of interest between estates, requiring each of the relevant debtors' boards to approve the proposed transaction by a formal vote, and requiring the operating subsidiaries' votes to be made by independent

directors).

83.     Failing this, the 2027 Ad Hoc Group may be forced to move for more drastic relief to address the conflicts that taint the Debtors' governance. That may include a motion to appoint a chapter 11 trustee, or to convert the cases of the 2027 Non-ICA Obligors. *See In re Cajun Elec. Power Coop., Inc.*, 191 B.R. 659, 661 ("When a debtor-in-possession cannot perform these duties [to the estate and creditors], a Chapter 11 trustee should be appointed."); *In re Patman Drilling Int'l, Inc.*, 2008 WL 724086 at *2 (Bankr. N.D. Tex. Mar. 14, 2008) (finding conflict of interest warranted cause for the appointment of a trustee where "[l]arge transactions . . . between the Debtor and insiders warrant[ed] immediate investigation" and "[t]he current board and management of the Debtor are not the appropriate parties to pursue that investigation and potential litigation because of conflicting loyalties."); *In re New Millenium Mgmt., LLC*, No. 13-35719-H3-11, 2014 WL 792115 (Bankr. S.D. Tex. Feb. 25, 2014) (finding that self-dealing transactions entered into by debtor's principal, "[s]tanding alone, . . . constitute[] cause for conversion or appointment of a trustee").

84.     Alternatively, the 2027 Ad Hoc Group may move for dismissal or suspension of the 2027 Non-ICA Obligors' cases. *See, e.g.*, *In re Elmwood Dev. Co.*, 964 F.2d 508, 510 (5th Cir. 1992) ("Lack of good faith in the filing of a Chapter 11 bankruptcy petition constitutes cause for dismissal under 11 U.S.C. § 1112(b)."). Or it may seek to lift the automatic stay to enable enforcement against the 2027 Non-ICA Obligors and their separate pieces of commercial real estate. *See, e.g., In re WGMJR, Inc.*, 435 B.R. 423, 433 (Bankr. S.D. Tex. 2010) ("The absence of good faith constitutes cause for lifting of the automatic stay."); *see also, e.g.*, *In re SBPM Holdings, Inc.*, No. 10-80310-G3-11, 2010 WL 4976952, at *1 (Bankr. S.D. Tex. Dec. 2, 2010) (lifting stay under section 362(d)(3) where the debtor's sole property and source of income was an office

building).

85.     Such relief would facilitate an alternative transaction for the 2027 Non-ICA

Obligors that might result in removal of their properties from the OPI portfolio and the strictures

of the RMR management agreements that the September 2029 Noteholders have agreed to impose

post-emergence. This may be undesirable from the point of view of RMR. From the 2027 Non-

ICA Obligors' perspective, however, no value would be lost by severing these entities from this

bankruptcy process and allowing their creditors to realize on their claims through non-bankruptcy

means or by allowing these entities to refile separate cases. Such separation would prevent further

improper attempts by management to blur the lines of corporate and operational separateness.

## V.     The 2027 Noteholders are entitled to adequate protection.

86.     Section 363(e) of the Bankruptcy Code provides that, "at any time, on request of

an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or

leased by [a debtor-in-possession], the court, with or without a hearing, shall prohibit or condition

such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

"If adequate protection cannot be offered, such use, sale or lease of the collateral must be

prohibited." 3 Collier on Bankruptcy ¶ 363.05[2] (16th ed. 2016); *In re First S. Sav. Ass'n*, 820

F.2d 700, 710 (5th Cir. 1987) (the focus of adequate protection "is protection of the secured

creditor from diminution in the value of its collateral during the reorganization process."); *In re*

*Bufford*, 343 B.R. 827, 838 (Bankr. N.D. Tex. 2006) ("adequate protection must be given to

secured creditors, or they may ask that the automatic stay imposed by § 362(a) be lifted"). "[A]n

interest is not adequately protected if the security is depreciating during the term of the stay."

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 369 (1988).

87.     "[I]n a proceeding arising under § 362(d)(1), the debtor must prove that the secured

creditor's interest is adequately protected, or the automatic stay will lift." *In re Timbers of Inwood*

*Forest Assoc., Ltd.*, 793 F.2d 1380, 1388 (5th Cir. 1986), *aff'd*, 484 U.S. 365 (1988). The Debtors have failed to provide the 2027 Noteholders with adequate protection for the continued imposition of the automatic stay and use of the collateral securing their claims. Notably, despite providing ongoing interest payments and payment of fees and expenses to all other secured creditors (including the September 2029 Noteholders, who by their own restructuring plan construct are under-secured), the Debtors and the DIP Lenders have explicitly elected not to afford the same to the 2027 Noteholders.

88.     In accordance with sections 361, 362(d), 363(e), 364(d)(1), and 105(a) of the Bankruptcy Code, the 2027 Ad Hoc Group requests that any order providing the relief that the Debtors seek in the first-day motions also grant the 2027 Noteholders adequate protection, including: (i) payment of postpetition interest at the contractual default interest rate provided for in the 2027 Notes indenture; (ii) payment of all reasonable and documented prepetition and postpetition fees and expenses of the advisors to the 2027 Ad Hoc Group; (iii) replacement liens on all DIP Collateral (subject to any existing liens); (iv) superpriority administrative expenses under section 507(b) of the Bankruptcy Code subject to the Carve-Out; and (v) any reporting or other periodic information that is required to be provided to the DIP Agent/Lenders under the documents governing the DIP. The 2027 Ad Hoc Group requests reimbursement for all fees and expenses incurred by UMB Bank, National Association in its capacity as trustee and agent under the Indenture.

89.     These forms of adequate protection are customary for prepetition secured parties and should be approved here. The indenture governing the 2027 Notes explicitly provides that "[t]he Company shall pay interest (*including post-petition interest in any proceeding under any Bankruptcy Law*) on all overdue amounts at a rate equal to 12.000% per annum to the extent . . .

an Event of Default specified in Section 5.01(a), Section 5.01(b), Section 5.01(e) or Section 5.01(f)

has occurred and is continuing." Indenture Governing Company's 3.250% Senior Secured Notes

due 2027 dated as of December 11, 2024, ¶ 3.07 (emphasis added). In addition to the clear

requirement that defaulted interest be paid on the 2027 Notes in any proceeding under Bankruptcy

Law, the accrual of defaulted interest was triggered prior to the chapter 11 filing after an Event of

Default occurred under section 5.01(b) of the indenture. As described above, before the filing of

these cases, a majority of the holders of the 2027 Notes provided the Debtors with an acceleration

notice and demand for payment after there was a default in the payment of interest on the 2027

Notes and the Debtors failed to cure before expiration of contractually-specified 30-day period.

90.     Interest at the contractually specified default rate is presumptively allowed in this

jurisdiction. *See In re Laymon*, 958 F.2d 72, 75 (5th Cir. 1992) (adopting a "flexible approach,"

allowing a determination of whether the higher default rate "would produce an inequitable or

unconscionable result" (citations omitted)); *In re Southland Corp.*, 160 F.3d 1054, 1059–60 (5th

Cir. 1998) ("The cases find that a default interest rate is generally allowed, unless the higher rate

would produce an inequitable . . . result." (citation and internal quotations omitted)). Although

courts have stated that the presumption can be overcome when allowing default-rate interest would

result in inequities, there is no basis for that outcome here: there are no creditors of the 2027 First-

Lien Obligors other than the 2027 Noteholders.[5]

## <u>CONCLUSION</u>

For the reasons above, the 2027 Ad Hoc Group respectfully requests that the Court deny

the  DIP  Motion,  Emergency  Prepetition  Management  Agreement  Motion,  and  the  Cash

---

[5]     The 2027 Ad Hoc Group's request for adequate protection is made without prejudice to, and with a full reservation
of, the 2027 Ad Hoc Group's rights, claims, defenses, and remedies, including the right to amend, modify, or
supplement this request for adequate protection and take any further appropriate steps to exercise their rights to
adequate protection.

Management Motion, and that the Court reconsider the Joint Administration Motion, in each case solely as to the 2027 Non-ICA Obligors. and grant such other and further relief to the 2027 Ad Hoc Group as is just and proper.

Respectfully submitted this 3rd day of November 2025.

**PORTER HEDGES LLP**

*/s/ John F. Higgins*
John F. Higgins (TX Bar No. 09597500)
Eric M. English (TX Bar No. 24062714)
Megan Young-John (TX Bar No. 24088700)
James A. Keefe (TX 24122842)
Joanna D. Caytas (TX Bar No. 24127230)
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
Email:    jhiggins@porterhedges.com
            eenglish@porterhedges.com
            myoung-john@porterhedges.com
            jkeefe@porterhedges.com
            jcaytas@porterhedges.com

-and-

**MILBANK LLP**
Dennis F. Dunne (pending *pro hac vice*)
Andrew M. Leblanc (pending *pro hac vice*)
Abhilash M. Raval (pending *pro hac vice*)
Michael W. Price (pending *pro hac vice*)
Alexander Lees (pending *pro hac vice*)
Brian Kinney (pending *pro hac vice*)
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219
Email:   ddunne@milbank.com
            aleblanc@milbank.com
            araval@milbank.com
            mprice@milbank.com
            alees@milbank.com
            bkinney@milbank.com

***Counsel to Ad Hoc Group of 2027 Noteholders***

## <u>Certificate of Service</u>

I certify that on November 3, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ John F. Higgins*
John F. Higgins
