United States Courts
Southern District of Texas
FILED

NOV 24 2025

Nathan Ochsner, Clerk of Court

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OFFICE PROPERTIES INCOME TRUST, et al., | ) | Case No. 25-90530 (CML) |
| | ) | |
| Debtors.1 | ) | (Jointly Administered) |
| | ) | |

LIMITED OBJECTION OF Nenad Bungin TO DEBTORS' DIP FINANCING MOTION

Nenad Bungin ( the "Objector"), a beneficial holder of US$328,175 face amount of OPIRQ notes (general unsecured notes) issued by the above-captioned debtors (the "Debtors"), submits this limited objection (the "Limited Objection") to the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief (the "DIP Motion"), and respectfully states:

PRELIMINARY STATEMENT

1. The Objector is a small, non-institutional bondholder. He does not oppose postpetition financing as such and recognizes that some incremental liquidity may be needed

to administer these chapter 11 cases. This Limited Objection is not an attempt to deny the Debtors access to reasonable working capital.

2. However, on the Debtors' own numbers and the terms disclosed in the DIP Motion and interim order, the proposed US$125 million DIP facility is materially oversized relative to the Debtors' demonstrated liquidity needs, and contains fee, lien and equity conversion features that go well beyond what is necessary to preserve the estates. As structured, the DIP facility operates as a control and value-transfer mechanism for the September 2029 noteholder/DIP lender group (the "September 2029 Group"), to the detriment of general unsecured creditors such as the Objector.

3. The Objector therefore does not ask the Court to deny DIP financing outright, but respectfully requests that any final order approving the DIP facility (the "Final DIP Order") (1) right-size the overall DIP commitment, (2) narrow the scope of liens and equity-linked economics granted to the DIP lenders, and (3) preserve a meaningful ability for the Official Committee of Unsecured Creditors (the "Committee") and other parties in interest to investigate

and, if appropriate, challenge the Debtors' prepetition secured capital structure.

RELEVANT BACKGROUND

4. The Debtors commenced these chapter 11 cases on [petition date] (the "Petition Date"). According to the Debtors' Form 10-Q for the quarter ended June 30, 2025 (the "Q2 10-Q"), as of June 30, 2025 the Debtors had approximately US$78 million of cash and cash equivalents and approximately US$14 million of restricted cash, for total cash and restricted cash of approximately US$92 million.

5. For the six months ended June 30, 2025, the Debtors reported net cash provided by operating activities of approximately US$3.8 million and net cash provided by investing activities of approximately US$4.5 million (driven primarily by property sales in excess of capital expenditures). In the aggregate, operations and investing activities generated approximately US$8.3 million of cash over that six-month period, or roughly US$1.4 million per month, before financing activities.

6. The sharp decline in the Debtors' cash balance from year-end 2024 to June 30, 2025 (from roughly US$275 million to roughly US$92 million) appears to be driven primarily by repayment of senior unsecured and secured notes (approximately US$190 million of financing outflows in the first half of 2025), rather than by core operational cash burn. The Debtors themselves acknowledge in the Q2 10-Q that their issues relate mainly to leverage and debt maturities, i.e., a capital structure problem.

7. Under the restructuring support agreement and DIP term sheet filed with the Court, the September 2029 Group is both the fulcrum secured creditor and the DIP lender. The September 2029 Group is slated to receive, for its secured claims, a substantial package of Secured Exit Notes and US$98 million of Reorganized Common Equity at plan equity value, with that US$98 million allocation initially undiluted by the management incentive plan. In addition, up to US$100 million of DIP claims may be converted into Reorganized Common Equity at 63% of plan equity value (a 37% discount).

8. General unsecured noteholders (including OPIRQ holders such as the Objector) sit behind (a) this September 2029 secured package, (b) any DIP claims and equity arising from DIP conversion, (c) the Priority Guaranteed 2030 notes, which enjoy a preferential position at

certain issuers, and (d) any management incentive plan and insider equity grants.

## LIMITED OBJECTION AND BASIS THEREFOR

A. The DIP Facility Is Oversized Relative to Demonstrated Liquidity Needs

9. A debtor seeking postpetition financing must show that the facility is a sound exercise of business judgment and reasonably tailored to the debtor's actual needs. On the Debtors' own Q2 10-Q, the estates do not appear to face a catastrophic liquidity crisis requiring US$125 million of new money to avoid imminent harm.

10. As noted, operations and property sales generated positive net cash flow of approximately US$1.4 million per month in the first half of 2025, before financing outflows. While the Objector recognizes that chapter 11 entails incremental costs (professional fees, case administration, certain restructuring expenses), nothing in the record supports the conclusion that a 6–9 month chapter 11 process requires US$125 million of incremental financing on top of approximately US$92 million of cash and restricted cash.

11. Under conservative assumptions about (i) some deterioration in net operating income, (ii) ongoing but rationalized maintenance capex and leasing spend, and (iii) increased professional fees, a 6–9 month case appears to require incremental liquidity in the tens of millions of dollars, not in the full US$125 million amount. Even pessimistic scenarios for a 6–9 month period produce incremental needs far closer to US$30–70 million than to US$125 million.

12. By contrast, the proposed DIP facility provides a US$125 million commitment, of

which only US$10 million is currently drawn on an interim basis. This suggests that the DIP facility has been sized generously for reasons that include, but go beyond, pure liquidity requirements – including to support aggressive fee and equity economics in favor of the September 2029 Group.

B. DIP Fees, Liens and Equity Discount Reallocate Junior Value to the September 2029 Group

13. The DIP facility carries a 2.25% upfront fee on the full US$125 million commitment and a 5.75% exit fee on DIP loans repaid or otherwise satisfied, both payable in cash or Reorganized Common Equity at plan equity value. DIP claims themselves may be converted into equity at a 37% discount to plan equity value.

14. On a full-draw basis, these fees alone represent approximately 10% of the nominal DIP commitment, before interest. Because the fees and the DIP claims can be satisfied or converted into equity, they directly increase dilution to junior stakeholders. When combined with broad priming and junior liens, including over previously unencumbered assets, these features shift substantial value and upside away from the estates (and thus from general unsecured creditors) and toward the DIP/September 2029 Group.

15. Unencumbered real estate and other unencumbered assets are the natural residual value pool from which general unsecured creditors would expect to receive recoveries after payment of valid prepetition secured claims. The proposed grant of liens over these assets effectively converts junior value into additional collateral for the same secured fulcrum constituency, without a clear showing that such liens are strictly necessary to obtain a reasonably sized and priced facility.

16. The 37% equity discount on DIP conversion is particularly problematic in light of the existing plan framework. The September 2029 Group already receives (a) a large package of Secured Exit Notes and (b) a US$98 million equity allocation initially undiluted by the MIP. In some scenarios, full or significant DIP conversion, combined with this US$98 million allocation, could allow the September 2029/DIP group to control a dominant majority of the reorganized equity at an implied price materially below plan equity value, while general unsecured creditors are left with low-teens or single-digit recoveries on plan valuation.

C. Investigation Budget and Challenge Provisions Are Unduly Restrictive

17. The interim DIP order caps the amount of DIP proceeds and cash collateral available to the Committee for investigation at US$75,000 and limits such use to "investigation" rather than litigation. At the same time, the order contains broad stipulations by the Debtors regarding the validity, priority and enforceability of prepetition secured claims and liens, subject only to tight challenge periods.

18. Given the size and complexity of the Debtors' secured capital structure and the stakes for general unsecured creditors, a US$75,000 cap for investigation is unduly low and risks making the challenge rights largely illusory. If no timely and well-supported challenge is brought, the Debtors' stipulations become binding on the estates and all parties in interest, including general unsecured noteholders such as the Objector.

19. The Objector respectfully submits that any Final DIP Order should (a) increase the investigation budget to a level commensurate with the complexity of these cases and (b) avoid locking in broad stipulations and waivers that would prevent a meaningful review of

the prepetition secured capital structure and related insider arrangements.

## REQUESTED MODIFICATIONS

20. The Objector does not ask the Court to deny DIP financing altogether. Rather, he respectfully requests that any Final DIP Order:

(a) Reduce or phase the overall DIP commitment to a level supported by realistic cash-flow projections for a 6–9 month chapter 11 process, taking into account the Debtors' existing cash and restricted cash and historical operating and investing cash flows;

(b) Narrow the grant of liens on previously unencumbered assets, or provide for sharing of unencumbered value above a defined threshold with general unsecured creditors, recognizing that such assets constitute the primary recovery pool for junior claims;

(c) Reconsider or limit the combination of the 2.25% upfront fee, 5.75% exit fee and 37% equity discount, which together provide extraordinary economics to the DIP/September 2029 Group beyond what is needed to induce a reasonably sized and priced facility; and

(d) Increase the Committee's investigation budget and preserve meaningful challenge rights, so that general unsecured creditors are not bound by untested stipulations regarding the prepetition secured capital structure.

21. The Objector expressly reserves all rights to supplement, amend or modify this Limited Objection, and to object to any plan of reorganization that relies on the DIP structure to justify an inequitable allocation of value or an excessive concentration of equity in the hands of the DIP/September 2029 constituency.

WHEREFORE, the Objector respectfully requests that the Court (i) sustain this Limited Objection, (ii) decline to approve the DIP Motion absent modifications consistent with the relief requested herein, and (iii) grant such other and further relief as the Court deems just and proper.

Dated: November 19. 2025                Respectfully submitted,

                                        Nenad Bungin
                                        Bulevar Arsenija Carnojevica 114
                                        Belgrade, Serbia

                                        By: _____
                                        Nenad Bungin , Pro Se
                                        Beneficial holder of
                                        US$328 175 face amount of OPIRQ notes

DECLARATION OF HOLDER

I, Nenad Bungin, declare under penalty of perjury under the laws of the United States of America that:

1. I am the beneficial holder of US$328 175 face amount of OPIRQ notes as of the Petition Date and as of the date of this Limited Objection.

2. I make this declaration based on my review of account statements and records maintained by my broker.

I declare that the foregoing is true and correct.

Executed on November 19, 2025.

_____
Nenad Bungin

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2025, I caused a true and correct copy of the foregoing Limited Objection to be served by [first class mail / overnight courier / email, as applicable] upon: (i) counsel to the Debtors, (ii) the Office of the United States Trustee for the Southern District of Texas, (iii) counsel to the DIP Lenders and the September 2029 noteholder group, (iv) counsel to the Official Committee of Unsecured Creditors, and (v) all other parties entitled to notice in accordance with the Court's rules and the DIP Motion's notice procedures.

_____
Nenad Bungin

United States Bankruptcy Court

Southern District of Texas, Houston Division

Bob Casey United States Courthouse

515 Rusk Street, #5300

Houston, TX 77002

USA

Re: In re Office Properties Income Trust, et al.

   Case No. 25-90530 (CML)

   Limited Objection to DIP Motion

Attn: Clerk of Court