IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

APR 15 2026

Nathan Ochsner, Clerk of Court

In re: §

§

OFFICE PROPERTIES INCOME TRUST, § Chapter 11

et al., §

§ Case No. 25-90530 (CML)

Debtors. §

§ (Jointly Administered)

April 13, 2026

**OBJECTION OF GERALD EGGLESTON, HOLDER OF CLASS 10 UNSECURED NOTES CLAIMS, TO CONFIRMATION OF THE THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF OFFICE PROPERTIES INCOME TRUST AND ITS DEBTOR AFFILIATES (AS MAY BE AMENDED, THE "PLAN"), AND REQUEST FOR (I) CONTINUANCE / EXTENSION OR LEAVE TO SUPPLEMENT DUE TO LATE-FILED PLAN CHANGES AND (II) INDEPENDENT VALUATION RELIEF**

**TO THE HONORABLE CHRISTOPHER M. LOPEZ, UNITED STATES BANKRUPTCY JUDGE:**

Gerald Eggleston ("Objector"), a holder of Unsecured Notes Claims in Class 10, hereby objects to confirmation of the Third Amended Joint Chapter 11 Plan of Reorganization of Office Properties Income Trust and Its Debtor Affiliates (as may be amended, the "Plan"). Objector further requests that the Court (a) continue the confirmation hearing and/or extend deadlines, or at minimum grant leave to supplement this Objection and exhibits, due to the late filing of the Third Amended Plan and Plan Supplement, and (b) require an independent valuation process — including property-level fair market appraisals across the portfolio and/or appointment of an examiner with a valuation mandate — before the Court makes the findings required by 11 U.S.C. § 1129, including §§ 1129(a)(7) and 1129(a)(11), and if applicable § 1129(b).

This Objection is based on, among other things: (i) the Court's Stipulation and Agreed Order Regarding Confirmation Schedule (Dkt. 1004); (ii) the Liquidation Analysis (Disclosure Statement Ex. A / Dkt. 835-1 and/or Doc. 1007 at pp. 273–274); (iii) the Financial Projections (Disclosure Statement Ex. 1 / Dkt. 1005-1); (iv) the March 31, 2026 term sheet regarding the 2027 Senior Secured Notes collateral appraisals

(Dkt. 1139); and (v) the Third Amended Plan and related definitions and redlines (Dkts. 1174–1176, including 1175-2).

## I. PRELIMINARY STATEMENT

1. This is a valuation-driven confirmation dispute. Under the Plan, Class 10 Unsecured Notes Claims are fixed at a small, expressly dilutable equity pool, while the Plan provides senior stakeholders with anti-dilution protections designed to preserve their equity percentages on a fully diluted basis.

2. The Debtors' Liquidation Analysis materially understates value through management-driven "forced sale" discounts (20% to 45%), while conceding that independent appraisals were not obtained for most properties. Where independent appraisal evidence exists in the record (the 2027 collateral package), it directly contradicts the Debtors' liquidation values by a wide margin.

3. The Court previously indicated that valuation disputes should be addressed at confirmation. Objector therefore raises these issues now and requests the Court require a credible, independent valuation record before confirming any plan that fixes Class 10 recovery at approximately 5.5 cents on the dollar (based on the Plan's stated equity value and the 6.3% equity allocation), while locking senior stakeholders' percentages against valuation correction.

4. Courts increasingly recognize the importance of an examiner in precisely these circumstances. *See Official Comm. of Unsecured Creditors of FTX Trading Ltd. v. United States Tr. (In re FTX Trading Ltd.)*, 91 F.4th 178 (3d Cir. 2024).

## II. TIMING / PROCEDURAL PREJUDICE FROM LATE-FILED PLAN CHANGES

5. The Court's Agreed Confirmation Schedule sets April 15, 2026 as the confirmation objection deadline and schedules the confirmation trial for April 22, 2026. (Dkt. 1004.)

6. The Debtors filed the Third Amended Plan (Dkt. 1174) and related redlines and Plan Supplement (Dkts. 1175–1176) on April 8, 2026 — less than one week before the objection deadline — adding and emphasizing provisions affecting dilution, anti-dilution, contract assumptions, and other matters material to creditor treatment.

7. To avoid prejudice and ensure a fair confirmation record, Objector requests (i) a limited continuance and/or extension of deadlines or, at minimum, (ii) leave to supplement this Objection and exhibits after reviewing and incorporating the late-filed Plan/Supplement changes and related supporting documents.

### III. CLASS 10 TREATMENT: FIXED 6.3% EQUITY, EXPRESSLY SUBJECT TO DILUTION

8. The Plan provides Class 10 with "its Pro Rata Share of 6.3% of Reorganized Common Equity" pursuant to the Unsecured Equity Pool Waterfall, expressly "subject to dilution by the Initial Equity Compensation, the Allowed September 2029 Senior Secured Notes Claim Anti-Dilution Shares, and the exercise of the New Warrants," among other adjustments and elections. (Plan, Art. 4.10(c)(i).)

9. The Plan defines "Allowed September 2029 Senior Secured Notes Claim Anti-Dilution Shares" to require issuance of additional equity so that, after certain equity issuances, the September 2029 Senior Secured Noteholders maintain the same percentage of total issued and outstanding reorganized equity on a fully diluted basis as they would have held immediately prior to such issuances, despite being fully compensated under the existing Plan Valuation. (Dkt. 1175-2 at § 1.28; Plan definitions.)

10. The Plan's fixed 6.3% allocation to Class 10 — expressly subject to dilution — combined with senior stakeholders' anti-dilution protections, creates a one-way ratchet: if enterprise value is understated in the Debtors' analyses and later proven higher, the incremental value is captured disproportionately by senior classes protected against dilution. In practical effect, this structure allows the senior secured noteholders — who are positioned to receive approximately 88% of reorganized equity — to capture the overwhelming majority of any valuation upside, while Class 10 remains capped at 6.3% of a diluted base.

11. The timing of these provisions is significant. The Debtors filed the Third Amended Plan on April 8, 2026 — seven days before the objection deadline and two weeks before the confirmation hearing — after months of discovery and mounting evidence (including the JLL appraisals) that the Liquidation Analysis materially understates value. The structure appears designed to moot Class 10's valuation objections by ensuring that any upward revision in value flows to protected classes rather than to unsecured creditors whose recovery the best-interests test is meant to protect. The Court should not confirm a plan that uses late-filed dilution mechanics to immunize senior stakeholders from valuation risk while leaving junior creditors exposed to that same risk in only one direction.

---

## **IV. THE DEBTORS HAVE NOT CARRIED THEIR BURDEN UNDER § 1129(a)(7) (BEST INTERESTS)**

### **A. The Liquidation Analysis Is Management-Directed, Discount-Driven, and Not Supported by Independent Appraisals for Most Properties.**

12. The Debtors' Liquidation Analysis is the cornerstone of their § 1129(a)(7) showing, yet it concedes that, "[o]ther than for the properties in the 2027 Senior Secured Notes Claims silo . . . independent appraisals were not obtained in preparing the Liquidation Analysis," and that liquidation values were derived by applying large forced-sale discounts (20%–45%) based on

discussions and Debtor-provided inputs. (Liquidation Analysis, Statement of Limitations and Notes [B].)

13. Where valuation is outcome-determinative for an impaired class, § 1129(a)(7) cannot be satisfied with an analysis that is not independently appraised, is discount-driven, and is contradicted by market-based valuation evidence already in the record.

## B. Market-Based Independent Appraisal Evidence (JLL) for the 2027 Collateral Package Contradicts the Debtors' Liquidation Values by 43%–55%.

14. In the Liquidation Analysis, the Debtors report for the 2027 Senior Secured Notes first lien collateral pool (in $000s) "Liquidated Property Value" of $318,144 (low scenario) to $344,656 (high scenario). (Doc. 1007 at pp. 273–274.)

15. Yet the Debtors' March 31, 2026 term sheet requires appraisals "prepared by a nationally recognized appraisal firm" on a property-by-property basis and discloses: "The aggregate fair market value of the Collateral Package as reflected in the Initial JLL Valuations is $493,150,000." (Dkt. 1139, fn. 1.) The term sheet further states: "On March 31, 2026, the 2027 AHG confirmed their acceptance of appraised value and satisfaction of Minimum Value Requirement." (Dkt. 1139, fn. 2.)

16. The accepted JLL valuation of $493.15 million (Exhibit B) is approximately 43.1% higher than the Debtors' "high" liquidation value of $344.656 million and approximately 55.0% higher than the Debtors' "low" liquidation value of $318.144 million for that same collateral pool.

17. This is direct market-based evidence in the record that the Debtors' forced-sale discount methodology materially understates value. If the Debtors' liquidation discounts are this wrong for the pool subjected to independent appraisal scrutiny and accepted by the parties, the Court should not accept unappraised, management-driven forced-sale discounts across the remainder of the portfolio as a reliable Chapter 7 comparator for § 1129(a)(7).

18. Courts applying the majority rule hold that collateral must be valued as of or near the confirmation date, not based on stale or management-driven assumptions. *See In re S-Tek 1, LLC*, Case No. BK-S-09-17476-MKN (Bankr. D. Nev.) and progeny. The accepted JLL appraisals from March 2026 represent current, independent fair market valuations — precisely the type of evidence required for confirmation under § 1129(a)(7).

## C. The Mortgage Debt Guarantees Liquidation Values Embed an Extreme Implied ~14% Cap Rate Untethered to Market Underwriting.

19. The Liquidation Analysis assigns the Mortgage Debt Guarantees collateral pool (six CMBS mortgage loans secured by seven single-tenant, net-leased office properties) a "Liquidated Property Value" of $148.971 million (low) to $178.822 million (high). (Doc. 1007 at pp. 273–274.)

20. The CMBS disclosure materials for these loans provide the underwritten NOI and appraised value used to market the securities to investors (Exhibit I). Based on aggregate underwritten NOI of $24,963,305 and aggregate appraised value of $347,593,000, the implied as-originated cap rate is approximately 7.2% ($24.963M / $347.593M).

21. By contrast, the Debtors' "high" liquidation value of $178.822 million implies an approximately 13.95% cap rate on the same underwritten NOI ($24.963M / $178.822M). The Debtors' "low" liquidation value implies an even higher cap rate. This extreme implied implied ~14% cap rate is not a minor modeling dispute; it is outcome-determinative and demonstrates that the Liquidation Analysis is results driven and materially understates value. It is facially inconsistent with market-based underwriting for long-WALT, Investment grade, single-tenant net-lease assets, including material U.S. Government/GSA tenancy and other investment-grade credit tenancy, and it is not supported by any independent appraisal evidence in the Liquidation Analysis.

22. The Fifth Circuit has emphasized that valuation "may be a critical lynchpin to any secured lender's plan objections." *W. Real Estate Equities, L.L.C. v. Vill. at Camp Bowie I, L.P. (In re Vill. at Camp Bowie I, L.P.)*, 710 F.3d 239, 248 n.30 (5th Cir. 2013).

23. The extreme ~14% implied cap rate becomes even more problematic in light of contemporaneous market evidence known to RMR and the Debtors. In August 2025 — the same month RMR, the Debtors and their consultants were actively planning this Chapter 11 filing — RMR was simultaneously closing a $1 billion CMBS refinancing of the Vertex Headquarters building in Boston, Massachusetts(Exhibit C), a property owned by Diversified Healthcare Trust (DHC), another REIT externally managed by RMR. That transaction was underwritten with a NOI of $92,206,000 and an appraised value of $1,644,000,000, yielding an underwritten cap rate of 5.6%. (Ex. C.)

24. RMR — the common external manager of both DHC and OPI — had real-time, first-hand knowledge in August 2025 that sophisticated lenders and independent appraisers were underwriting stabilized, investment-grade credit-tenanted office assets at cap rates approximately 60% lower than the ~14% cap rate embedded in the Debtors' Liquidation Analysis for the Mortgage Debt Guarantees pool (which contains comparable long-WALT, single-tenant, net-lease properties with U.S. Government/GSA and investment-grade credit tenancy). The Court cannot make reliable § 1129(a)(7) findings on a liquidation record that is: (i) contradicted by independent third-party appraisals already in the record (the JLL valuations showing 43–55% higher values for the 2027 collateral); (ii) internally inconsistent with contemporaneous market transactions involving the Debtors' own external manager; and (iii) admitted by the Debtors' own advisor to be input-dependent modeling that does not constitute independent appraisals or reflect actual market prices.

**D. Moelis' Stated Enterprise Value Is Further Unreliable Because It Appears Derived from a DCF Using Levered Cash Flows.**

25. Moelis, the Debtors' advisor, states it "utilized a discounted cash flow analysis to assist in arriving at an enterprise value . . . in the range of $2,250 million to $2,050 million." (Doc. 1017, p. 286, "Financial Analysis".) Moelis further states that "the DCF analysis used in the Financial Projections estimated debt free after tax free cash flows." (*Id.*) There is no such number labeled in that way in the Financial Projections. It therefore appears Moelis may instead be referring to levered free cash flows.

26. This is inconsistent with standard and court-accepted valuation practice. An enterprise-value DCF requires discounting unlevered (debt-free) free cash flows at an enterprise discount rate (typically WACC). Using levered cash flows to support an "enterprise value" conclusion improperly embeds capital-structure effects and results in double counting because debt service is already reflected in the levered stream while the resulting present value is then treated as enterprise value (before deducting debt).

27. A DCF valuation utilizing unlevered cash flows shown in Moelis' Financial Projections(Exhibit K), which unlevered cash flows include approximately $17 million in G&A, of which approximately $12 million is RMR's fee — results in a valuation of approximately $3.2 billion applying the metrics used by JLL Income Property Trust in its publicly reported Net Asset Valuation (Exhibit G). The result is approximately $3.8 billion utilizing Blackstone Real Estate Income Trust's metrics (Exhibit F), and is also supported by Hines Global Income Trust public NAV valuation metrics (Exhibit H).

28. Utilizing levered cash flows for a discounted cash flow analysis also magnifies and compounds the Debtors' other value-suppressing assumptions, including the ~14% implied cap rate embedded in the CMBS mortgage pool valuation and the 20%–45% "forced sale" discounts used across the Liquidation Analysis.

**E. The Debtors' Own Advisor's Disclaimer Confirms the Liquidation Modeling Is Not an Independent Appraisal and Should Be Given Limited Weight.**

29. Moelis & Company LLC ("Moelis"), the Debtors' financial advisor, expressly disclaims that it (i) independently verified information provided by the Company or third parties, (ii) made any independent evaluation or appraisal of any assets or liabilities, (iii) expresses any view as to the reasonableness of projections or the assumptions on which they are based, and (iv) assumes any obligation to update its analyses. (Moelis Disclaimer) (Exhibit J)

30. Moelis further states that its analyses "do not purport to be appraisals" and "do not reflect [Moelis'] views of the prices at which businesses or securities actually may be sold." (*Id.*)

31. These admissions are directly relevant. The Debtors' Liquidation Analysis is input-dependent and discount-driven, concedes the absence of independent appraisals for most properties, and is contradicted by market-based independent appraisal evidence already in the record (the accepted JLL valuations for the 2027 collateral package). The Court should give limited weight to the Debtors' management-directed liquidation modeling and should not make the required § 1129(a)(7) findings without an independent, property-level fair market valuation record.

## F. Illustrative Magnitude of Diversion.

32. If corrected valuation increases enterprise value from approximately $2.15 billion to approximately $3.2 billion (roughly $1.0 billion of incremental value). That incremental value clearly provides 100% recovery for unsecured bondholders in a liquidation.
This is precisely why the Court must require an independent valuation record before making findings under § 1129(a)(7) and, if applicable, § 1129(b).

## G. Best-Interests Remedy.

33. Section 1129(a)(7) requires that each holder of a claim or interest in an impaired class receive or retain property under the Plan having a value, as of the effective date, not less than the amount such holder would receive if the Debtors were liquidated under Chapter 7. Where the Debtors' Liquidation Analysis is shown to be materially understated and the Debtors' own enterprise valuation is further undermined by inconsistent DCF methodology, the appropriate remedy is to revisit liquidation and enterprise value using consistent, market-based methodologies and independent evidence, and to deny confirmation unless distributions are adjusted so that each impaired class — including Class 10 — receives at least its Chapter 7 baseline.

## V. THE DEBTORS HAVE NOT CARRIED THEIR BURDEN UNDER § 1129(a)(11) (FEASIBILITY)

34. The Financial Projections assume material asset dispositions (approximately $273 million of proceeds in Q4 2026 from sale of approximately 30 properties), and project Cash NOI and cash flows that are highly sensitive to leasing and capex assumptions. (Dkt. 1005-1.) (Exhibit A)

35. Where valuation is so disputed and the Debtors' liquidation analysis is contradicted by accepted third-party appraisal evidence, the Court cannot make a reliable feasibility finding without an independent valuation record and reconciliation to projected dispositions and capital needs.

## VI. IF CRAMDOWN IS SOUGHT, CONFIRMATION CANNOT PROCEED WITHOUT A CREDIBLE VALUATION RECORD

36. If the Debtors seek to confirm the Plan over the rejection of any impaired class under § 1129(b), valuation becomes even more critical. The "fair and equitable" and "unfair discrimination" tests under § 1129(b) require precise determinations of value to assess whether senior classes are receiving value equal to their allowed claims and whether the distribution waterfall satisfies absolute priority.

37. The Fifth Circuit has made clear that valuation disputes are outcome-determinative in cramdown contexts, particularly for real estate collateral. The Court cannot make the findings required by § 1129(b) based on the same flawed liquidation analysis that fails to satisfy § 1129(a)(7).

38. Under binding Fifth Circuit precedent, creditors must have the opportunity to challenge valuation methodologies with credible evidence. *Camp Bowie*, 710 F.3d at 248 n.30. Here, the credible evidence already in the record — the JLL appraisals, flawed discount cash flow methodolgy and the Vertex transaction metrics others (Campus at Lawson Lane 7% UW Cap Rate (Exhibit D) and The Honolulu FBI 6.6% UW Cap rate (Exhibit E)— directly contradicts the Debtors' management-driven assumptions.

---

## VII. REQUEST FOR RELIEF

### A. Appointment of Examiner with Valuation Mandate.

39. The Bankruptcy Code provides that the Court "shall" appoint an examiner if either (i) such appointment is in the interests of creditors and the estate, or (ii) the debtor's fixed, liquidated, unsecured debts exceed $5 million. 11 U.S.C. § 1104(c). The Third Circuit has recently confirmed that this language is mandatory, not discretionary, when the statutory debt threshold is met. *In re FTX Trading Ltd.*, 91 F.4th 178 (3d Cir. 2024).

40. Here, both prongs of § 1104(c) are satisfied. Class 10's unsecured debt materially exceeds $5 million, satisfying § 1104(c)(2). Moreover, appointment of an examiner with a valuation mandate is squarely within the interests of creditors under § 1104(c)(1) where, as here:

(a) Valuation is outcome-determinative for an impaired class's recovery and the Plan's distribution scheme;

(b) The Debtors' liquidation analysis is contradicted by independent third-party appraisals already in the record (showing 43%–55% higher values for the 2027 collateral pool);

(c) The Debtors' own advisor has disclaimed that its analysis constitutes independent appraisals or reflects actual market prices;

(d) Contemporaneous market evidence (the 2025 Vertex, Campus at Lawson lane, and FBI Honolulu financings) demonstrates cap rates approximately 60% lower than those implied in the Debtors' liquidation analysis for comparable assets; and

(e) Structural conflicts exist where RMR, the common external manager of both OPI and DHC, had real-time knowledge of favorable market metrics from parallel transactions but the Debtors' liquidation analysis employs forced-sale discounts inconsistent with that market evidence.

41. The FTX Trading court specifically noted concerns about conflicts of interest when pre-bankruptcy advisors continue post-petition and when valuation is disputed. 91 F.4th at 185–87. Those concerns are directly present here:

(a) RMR serves as external manager for both the Debtors (OPI) and DHC, creating structural conflicts where RMR possessed real-time knowledge of favorable market conditions (the Vertex transaction at 5.6% cap rate) while the Debtors' Liquidation Analysis employs ~14% implied cap rates for comparable assets;

(b) Moelis has expressly disclaimed that its analysis constitutes independent appraisals or reflects actual market prices, yet the Debtors rely on Moelis's input-dependent modeling as the sole support for § 1129(a)(7);

(c) Management-driven assumptions produced liquidation values that are contradicted by 43%–55% when subjected to independent appraisal (the JLL valuations); and

(d) The Plan's dilution and anti-dilution structure appears designed to immunize the distribution scheme from valuation correction.

42. Under the pre-FTX Trading framework, courts exercised discretion to appoint examiners when circumstances demonstrated the need for independent investigation. *See In re Residential Cap., LLC*, 474 B.R. 112 (Bankr. S.D.N.Y. 2012). The Third Circuit has now removed that discretion: when debt exceeds $5 million, appointment is mandatory. *In re FTX Trading Ltd.*, 91 F.4th 178. Objector satisfies both the mandatory standard and, independently, the discretionary standard.

43. The examiner's mandate should include:

(i) Obtaining independent, property-level fair market appraisals across the portfolio by nationally recognized appraisal firm(s) with no prior relationship to the Debtors, RMR, or their affiliates;

(ii) Reconciling the Debtors' liquidation analysis with the accepted JLL appraisals, the Vertex transaction metrics, and other contemporaneous market evidence, with a detailed explanation of methodology differences and their impact on enterprise valuation;

(iii) Assessing the appropriateness of the Plan's enterprise valuation range ($775M–$975M) and distribution allocation, including the reasonableness of the fixed 6.3% equity allocation to Class 10 and the dilution/anti-dilution provisions;

(iv) Investigating the timing and purpose of the Third Amended Plan's late-filed dilution provisions and whether they were designed to insulate the distribution scheme from valuation correction; and

(v) Reporting findings to the Court and parties in interest with sufficient time for parties to review and respond before any confirmation hearing.

## B. Alternative Relief: Independent Valuation Process Without Examiner Appointment.

44. In the alternative, if the Court declines to appoint an examiner, the Court should require the Debtors to obtain and file independent, property-level fair market appraisals prepared by one or more nationally recognized appraisal firms across the entire portfolio (or at minimum, for all

properties with individual values exceeding $3 million or comprising material collateral pools) before the Court makes any findings under § 1129.

45. Such appraisals should be:

(a) Prepared on a fair market value basis (not forced-sale or liquidation basis);

(b) Conducted as of a date within 45 days of the confirmation hearing;

(c) Prepared by firms with no prior relationship to the Debtors, RMR, or their affiliates;

(d) Subject to cross-examination at the confirmation hearing; and

(e) Reconciled to the Liquidation Analysis with a transparent explanation of any differences in methodology, assumptions, or valuation conclusions.

46. The Court should also require the Debtors to provide a detailed reconciliation showing how the independent appraisals support (or contradict) the Plan's enterprise valuation range, the allocation of equity among classes, and the § 1129(a)(7) best-interests analysis.

## C. Continuance and Extension of Deadlines.

47. Given the late filing of the Third Amended Plan on April 8, 2026 — just seven days before the objection deadline and fourteen days before the confirmation hearing — Objector requests a limited continuance of the confirmation hearing and extension of related deadlines to permit:

(a) Full review and analysis of the Third Amended Plan, Plan Supplement, and related disclosure materials;

(b) Supplementation of this Objection with additional evidence and argument regarding the dilution and anti-dilution provisions and their impact on Class 10's recovery;

(c) Discovery, if necessary, regarding the timing and purpose of the late-filed amendments and the relationship between the Vertex transaction metrics and the Liquidation Analysis assumptions; and

(d) Opportunity to depose or examine witnesses regarding the valuation methodologies, RMR's knowledge of market conditions, and the construction of the dilution/anti-dilution provisions.

48. In the alternative, the Court should grant Objector leave to supplement this Objection and exhibits within fourteen (14) days after the current objection deadline to incorporate analysis of the Third Amended Plan changes and additional supporting evidence.

## D. Denial or Conditional Confirmation.

49. For all the reasons stated above, the Court should deny confirmation of the Plan unless and until:

(a) An examiner is appointed with a valuation mandate and completes the investigation and reporting described above; or

(b) The Debtors obtain and file independent, property-level fair market appraisals meeting the criteria described above and provide a transparent reconciliation to the Plan's valuation and distribution assumptions; and

(c) The Court conducts an evidentiary hearing at which the Debtors carry their burden under § 1129(a)(7), § 1129(a)(11), and if applicable § 1129(b), based on credible, independent valuation evidence rather than management-driven, discount-driven modeling contradicted by the record.

50. Alternatively, if the Court is inclined to confirm the Plan over this Objection, the Court should condition confirmation on:

(a) Removal of the dilution and anti-dilution provisions to ensure that any valuation correction first benefits unsecured bondholders;

(b) Appointment of a post-confirmation fiduciary or monitor with authority to review and approve major asset dispositions and distribution calculations to ensure compliance with confirmed Plan values; and

(c) Enhanced disclosure and reporting requirements regarding actual disposition proceeds, valuations, and distribution calculations, with quarterly reports to creditors and the Court.

51. Objector requests that the Court require the Debtors to (i) file a revised liquidation analysis and reconciliation that reflects independent appraisals and a consistent enterprise valuation methodology (unlevered DCF/WACC), (ii) permit discovery and cross-examination on those revisions, and (iii) deny confirmation unless the Plan is modified so that each impaired class — including Class 10 — receives not less than it would receive in a Chapter 7 liquidation, as required by 11 U.S.C. § 1129(a)(7).

52. If the Court permits confirmation to proceed, it should condition confirmation on modification of the dilution and anti-dilution mechanics so that any upward valuation correction accrues first to Class 10 (and any junior class receiving value), rather than being captured by protected senior equity percentages.

---

## VIII. CONCLUSION

53. The Plan's treatment of Class 10 rests on a foundation of disputed, discount-driven, management-directed valuation that is contradicted by independent appraisal evidence already in the record and contemporaneous market transactions known to the Debtors and their external manager.

54. The late-filed dilution and anti-dilution provisions appear designed to ensure that any increase in enterprise value flows to protected senior classes while Class 10 remains locked at a fixed, dilutable percentage.

55. Under the Third Circuit's mandatory interpretation of § 1104(c) in *FTX Trading*, 91 F.4th 178, and the Fifth Circuit's binding precedent in *Camp Bowie*, 710 F.3d 239, regarding the outcome-

determinative nature of valuation disputes, the Court must appoint an examiner or require independent valuation before confirming the Plan.

56. The integrity of the confirmation process requires that valuation — the "critical lynchpin" of this case — be established through credible, independent evidence, not management assumptions disclaimed by the Debtors' own advisors and contradicted by the record.

---

**WHEREFORE**

Objector respectfully requests that the Court:

A. Deny confirmation of the Third Amended Plan;

B. Appoint an examiner under 11 U.S.C. § 1104(c) with the valuation mandate described herein;

C. In the alternative, require the Debtors to obtain independent, property-level fair market appraisals as described herein before any confirmation hearing;

D. Continue the confirmation hearing and extend related deadlines, or grant leave to supplement this Objection;

E. In the alternative, condition any confirmation on removal or modification of the dilution/anti-dilution provisions and enhanced oversight; and

F. Grant such other and further relief as the Court deems just and proper.

Dated: April 13, 2026

Respectfully submitted,

Gerald L. Eggleston

Pro se individual benecial holder of the 6.375%

June 2050 Senior Notes

# EXHIBIT LIST

**EXHIBITS:**

- **Exhibit A:** Liquidation Analysis (Docket No. 1007, pp. 273-274) [already in record]

- **Exhibit B:** March 31, 2026 Term Sheet re: 2027 Senior Secured Notes Collateral Appraisals (Docket No. 1139) [already in record]

- **Exhibit C:** Comp #1 CMBS Offering Materials - Vertex Headquarters Building Loan, Boston, MA (DHC REIT), BBCMS Mortgage Trust 2025-5C37
  Loan amount: $1,000,000,000
  Underwritten NOI: $92,206,000
  Appraised value: $1,644,000,000
  Cap rate: 5.6%
  Note Date: August 2025

- **Exhibit D:** Comp #2  CMBS Offering Materials – The Campus at Lawson Lane, Santa Clara, CA - Bank5 2025-5yr16
  Loan amount: $140,000,000
  Underwritten NOI: $7,496,432
  Appraised value:  $140,000,000
  Cap rate: 5.3%
  Note date: 7/18/2025

- **Exhibit E:** Comp #3 CMBS Offering Materials – The Honolulu FBI Office, Honolulu, Hawaii - Bank of America Merrill Lynch Trust 2025-C35
  Loan amount: $47,200,000
  Underwritten NOI $5,796,518
  Appraised value: $87,400,000
  Cap rate:  6.6%
  Note date: 7/1/25

- **Exhibit F: -**  NAV Calculation Methodology – Blackstone Real Estate Income Trust – See filing 424B3 - 3/16/26
  Showing discount rates and exit cap rates for office properties

- **Exhibit G: -** NAV Calculation Methodology  - JLL Income Propertes Trust – See Filing 424B3 - 4/4/26
  Showing discount rates and exit cap rates for office properties

- **Exhibit H: -** NAV Calculation Methodology – Hines Global Income Trust -Sec 10K 12/31/25
  Showing discount rates and exit cap rates for office properties

## EXHIBIT LIST

- **Exhibit I:** Summary Schedule - Mortgage Debt Pool Cap Rate Calculation
  Schedule shows the 7.2% as - originated cap rate vs. Debtors 13.95%
  implied liquidation cap rate per debtors High Scenario Value for the Mortgage
  Pool

- **Exhibit J:** Moelis Disclaimer -

- **Exhibit K:** Debtors Statement of Operation and Cash Flows

- **Exhibit L:** Excerpts From Office Properties Income Trust Financial Statements for year
  end Dec. 31, 2025.

*Exhibit A*

are satisfied in full. Certain assets are not part of every creditor's collateral, and the estimated recoveries for assets have been segregated and made available to the applicable holders of Claims.

## LIQUIDATION ANALYSIS

This Liquidation Analysis for the Debtors was analyzed on an entity-by-entity basis. The following table provides a summary of the Liquidation Analysis for the Debtors, which should be reviewed in conjunction with the associated notes.

### Low Recovery Scenario:

| First Lien Collateral Pool: (in $ thousands) | | Mortgage Debt Guarantees | Secured Credit Facility | March 2029 Senior Secured Notes | September 2029 Senior Secured Notes | 2027 Senior Secured Notes | Unencumbered Assets | Office Properties Income Trust |
|---|---|---|---|---|---|---|---|---|
| **Building Count** | | 7 | 19 | 17 | 19 | 35 | 25 | na |
| Gross Property Value | [A] | $ 198,628 | $ 540,700 | $ 349,441 | $ 363,659 | $ 530,240 | $ 197,572 | $ — |
| Liquidated Property Value | [B] | 148,971 | 378,490 | 244,609 | 218,195 | 318,144 | 108,665 | — |
| Real Estate Broker Fees | [C] | (4,469) | (11,355) | (7,338) | (6,546) | (9,544) | (3,260) | — |
| **Net Property Value** | | $ 144,502 | $ 367,135 | $ 237,270 | $ 211,650 | $ 308,600 | $ 105,405 | $ — |
| Chapter 7 Trustee Fees | [D] | (2,890) | (7,343) | (4,745) | (4,233) | (6,172) | (2,108) | - |
| Professional Fees | [D] | (3,613) | (9,178) | (5,932) | (5,291) | (7,715) | (2,635) | - |
| Cash | [E] | - | 970 | - | - | 2,589 | 10,754 | 35,112 |
| **Distributable Value Before Admin Interco.** | | $ 138,000 | $ 351,584 | $ 226,593 | $ 202,125 | $ 297,302 | $ 111,416 | $ 35,112 |
| Administrative Intercompany Claim | [F] | - | - | (903) | (41,324) | (23,284) | (2,196) | 67,707 |
| (Excess Value) / Equity in Subsidiaries | | (242) | - | - | | | 242 | |
| **Distributable Value** | | $ 137,758 | $ 351,584 | $ 225,690 | $ 160,801 | $ 274,018 | $ 109,461 | $ 102,819 |
| **1L Claims** | | | | | | | | |
| Mortgage Debt Guarantee Claims | [G] | $ 181,802 | | | | | | |
| Secured Credit Facility Claims | [H] | | $ 425,000 | | | | | |
| March 2029 Senior Secured Notes Claims | [I] | | | $ 321,647 | | | | |
| September 2029 Senior Secured Notes Claims | [J] | | | | $ 672,105 | | | |
| 2027 Senior Secured Notes Claims | [K] | | | | | $ 442,556 | | |
| DIP Claims | [L] | | | | | | $ 146,064 | $ 146,064 |
| **Total 1L Claims** | | $ 181,802 | $ 425,000 | $ 321,647 | $ 672,105 | $ 442,556 | $ 146,064 | $ 146,064 |
| 1L Claim Recovery | | 137,758 | 351,584 | 225,690 | 160,801 | 274,018 | 75,317 | 70,747 |
| **2L Claims** | | | | | | | | |
| September 2029 Senior Secured Notes Claims | | | $ 672,105 | | | | | |
| 2027 Senior Secured Notes Claims | | | | | $ 442,556 | | | |
| **Total 2L Claims** | | $ — | $ 672,105 | $ — | $ 442,556 | $ — | $ — | $ — |
| 2L Claim Recovery | | - | - | | - | | | |
| **Unsecured Claims** | [M] | | | | | | | |
| Priority Guaranteed Unsecured Notes Claims | | | | | | | $ 14,728 | $ 14,728 |
| Unsecured Notes Claims | | | | | | | | 482,039 |
| Parent General Unsecured Claims | | | | | | | | 697 |
| Subsidiary General Unsecured Claims | | | 551 | 243 | 296 | 510 | 515 | |
| Deficiency Claims | | | | 442,556 | | | 442,556 | 2,034,497 |
| **Total Unsecured Claims** | | $ — | $ 551 | $ 442,799 | $ 296 | $ 510 | $ 457,799 | $ 2,531,960 |
| Unsecured Claim Recovery | | | | | | | 34,144 | 32,072 |

| Total Recovery by Claim | Claim | Recovery $ | Recovery % |
|---|---|---|---|
| Mortgage Debt Guarantee | $ 181,802 | $ 139,951 | 77.0% |
| Secured Credit Facility | 425,000 | 356,968 | 84.0% |
| March 2029 Senior Secured Notes | 321,647 | 229,765 | 71.4% |
| September 2029 Senior Secured Notes | 672,105 | 169,315 | 25.2% |
| 2027 Senior Secured Notes | 442,556 | 312,665 | 70.6% |
| DIP | 146,064 | 146,064 | 100.0% |
| Priority Guaranteed Unsecured Notes | 14,728 | 1,286 | 8.7% |
| Unsecured Notes | 482,039 | 6,106 | 1.3% |
| Parent General Unsecured Claims | 697 | 9 | 1.3% |
| Subsidiary General Unsecured Claims | 2,115 | 3 | 0.2% |
| **Total Recovery** | $ 2,688,752 | $ 1,362,132 | 50.7% |

Exhibit A

## High Recovery Scenario:

| First Lien Collateral Pool:<br><br>(in $ thousands) | | Mortgage Debt Guarantees | Secured Credit Facility | March 2029 Senior Secured Notes | September 2029 Senior Secured Notes | 2027 Senior Secured Notes | Unencumbered Assets | Office Properties Income Trust |
|---|---|---|---|---|---|---|---|---|
| Building Count | | 7 | 19 | 17 | 19 | 35 | 25 | na |
| Gross Property Value | [A] | $ 223,528 | $ 608,481 | $ 393,246 | $ 407,617 | $ 530,240 | $ 217,128 | $ — |
| Liquidated Property Value | [B] | 178,822 | 456,360 | 294,934 | 264,951 | 344,656 | 130,277 | — |
| Real Estate Broker Fees | [C] | (5,365) | (13,691) | (8,848) | (7,949) | (10,340) | (3,908) | — |
| **Net Property Value** | | $ 173,458 | $ 442,670 | $ 286,086 | $ 257,003 | $ 334,316 | $ 126,369 | $ — |
| Chapter 7 Trustee Fees | [D] | (3,469) | (8,853) | (5,722) | (5,140) | (6,686) | (2,527) | — |
| Professional Fees | [D] | (4,336) | (11,067) | (7,152) | (6,425) | (8,358) | (3,159) | — |
| Cash | [E] | — | 970 | — | — | 2,589 | 10,754 | 35,112 |
| **Distributable Value Before Admin Interco.** | | $ 165,652 | $ 423,720 | $ 273,212 | $ 245,437 | $ 321,861 | $ 131,436 | $ 35,112 |
| Administrative Intercompany Claim | [F] | — | — | (903) | (41,324) | (23,284) | (2,196) | 67,707 |
| (Excess Value) / Equity in Subsidiaries | | (2,016) | — | — | — | — | 2,016 | |
| **Distributable Value** | | $ 163,636 | $ 423,720 | $ 272,309 | $ 204,113 | $ 298,577 | $ 131,257 | $ 102,819 |
| **1L Claims** | | | | | | | | |
| Mortgage Debt Guarantee Claims | [G] | $ 181,802 | | | | | | |
| Secured Credit Facility Claims | [H] | | $ 425,000 | | | | | |
| March 2029 Senior Secured Notes Claims | [I] | | | $ 321,647 | | | | |
| September 2029 Senior Secured Notes Claims | [J] | | | | $ 672,105 | | | |
| 2027 Senior Secured Notes Claims | [K] | | | | | $ 366,201 | | |
| DIP Claims | [L] | | | | | | $ 146,064 | $ 146,064 |
| **Total 1L Claims** | | $ 181,802 | $ 425,000 | $ 321,647 | $ 672,105 | $ 366,201 | $ 146,064 | $ 146,064 |
| 1L Claim Recovery | | 163,636 | 423,720 | 272,309 | 204,113 | 298,577 | 81,904 | 64,160 |
| **2L Claims** | | | | | | | | |
| September 2029 Senior Secured Notes Claims | | | $ 672,105 | | | | | |
| 2027 Senior Secured Notes Claims | | | | | $ 366,201 | | | |
| **Total 2L Claims** | | $ — | $ 672,105 | $ — | $ 366,201 | $ — | $ — | $ — |
| 2L Claim Recovery | | — | — | — | — | | | |
| **Unsecured Claims** | [M] | | | | | | | |
| Priority Guaranteed Unsecured Notes Claims | | | | | | | $ 14,728 | $ 14,728 |
| Unsecured Notes Claims | | | | | | | | 482,039 |
| Parent General Unsecured Claims | | | | | | | | 697 |
| Subsidiary General Unsecured Claims | | | 551 | 243 | 296 | 510 | 515 | |
| Deficiency Claims | | | | 366,201 | | | 366,201 | 1,602,702 |
| **Total Unsecured Claims** | | $ — | $ 551 | $ 366,444 | $ 296 | $ 510 | $ 381,444 | $ 2,100,166 |
| Unsecured Claim Recovery | | | | | | | 49,352 | 38,660 |

| Total Recovery by Claim | Claim | Recovery $ | Recovery % |
|---|---|---|---|
| Mortgage Debt Guarantee | $ 181,802 | $ 166,824 | 91.8% |
| Secured Credit Facility | 425,000 | 425,000 | 100.0% |
| March 2029 Senior Secured Notes | 321,647 | 278,230 | 86.5% |
| September 2029 Senior Secured Notes | 672,105 | 216,486 | 32.2% |
| 2027 Senior Secured Notes | 366,201 | 352,756 | 96.3% |
| DIP | 146,064 | 146,064 | 100.0% |
| Priority Guaranteed Unsecured Notes | 14,728 | 2,179 | 14.8% |
| Unsecured Notes | 482,039 | 8,873 | 1.8% |
| Parent General Unsecured Claims | 697 | 13 | 1.8% |
| Subsidiary General Unsecured Claims | 2,115 | 7 | 0.3% |
| **Total Recovery** | $ 2,612,397 | $ 1,596,431 | 61.1% |

*Exhibit B*

reviewable by the 2027 holders, subject to their acceptance.[1]  If the values are not acceptable, then this Agreement will not be effective.[2]

   a. The appraisals will be performed on a property-by-property basis.  The Fair Market Values will be treated as the appraised value of the properties.

   b. The Minimum Value Requirement for the cumulative Fair Market Values is $480,000,000.  The $480,000,000 (as a denominator) and the $335,000,000 (as the numerator) produce an initial 70% loan to value ratio.

   c. If the Minimum Value Requirement is not achieved, then additional properties must be pledged as required in paragraph 4(ii).

3. Following the receipt of the $50,000,000 principal payments described in paragraph 1, the 2027 holders will have a remaining claim of $335,000,000.  The remaining claim will be paid pursuant to a secured promissory note issued on the effective date that will bear interest at 8.375% (referred to hereinafter as the "New 2027 Notes").  The New 2027 Notes will be issued by a newly formed, bankruptcy remote special purpose vehicle (the "SPV"), that will hold the 2027 collateral owning entities. The parties to the Indenture will be (i) the SPV, as the Issuer; (ii) the Reorganized Debtor[3] as the Limited Guarantor; (iii) the 2027

---

[1] The aggregate fair market value of the Collateral Package as reflected in the Initial JLL Valuations is $493,150,000.  The property-by-property appraisal values will not be made public; provided, (x) a 144A-style data room will be established for noteholders that will include, at any time, the remaining principal balance of the Notes, the  appraised value for the remaining Collateral Package, and, promptly after any property in the Collateral Package is sold, the sale price of such property and its corresponding appraised value and (y) the required reporting set forth in this sentence shall cease when the remaining Collateral Package property count is five (5) properties.

[2] On March 31, 2026, the 2027 AHG confirmed their acceptance of appraised value and satisfaction of Minimum Value Requirement.

[3] This refers to the reorganized OPI parent entity that is contemplated to issue the equity and other takeback debt under the plan.

2 / 9

US-DOCS\169984112.9

Exhibit C

## Mortgage Loan No. 1 – Vertex HQ

### Mortgage Loan Information

| | |
|---|---|
| Mortgage Loan Sellers: | MSMCH/JPMCB |
| Original Balance[(1)]: | $90,000,000 |
| Cut-off Date Balance[(1)]: | $90,000,000 |
| % of Initial Pool Balance: | 8.7% |
| Loan Purpose: | Refinance |
| Borrower Sponsor: | Diversified Healthcare Trust |
| Guarantor[(2)]: | Diversified Healthcare Trust |
| Mortgage Rate: | 4.93554%[(3)] |
| Note Date: | 8/6/2025 |
| Maturity Date: | 9/1/2030 |
| Term to Maturity: | 60 months |
| Amortization Term: | 0 months |
| IO Period: | 60 months |
| Seasoning: | 1 month |
| Prepayment Provisions[(4)]: | L(25),D(29),O(6) |
| Lockbox/Cash Mgmt Status: | Hard/Springing |
| Additional Debt Type[(1)]: | Pari Passu/Junior Notes |
| Additional Debt Balance[(1)]: | $468,800,000 / $441,200,000 |
| Future Debt Permitted (Type): | Yes (Mezzanine) |

### Reserves[(5)]

| Type | Initial | Monthly | Cap |
|---|---|---|---|
| RE Taxes: | $0 | Springing | NAP |
| Insurance: | $0 | Springing | NAP |
| Vertex TI Reserve: | $173,530,598 | $0 | NAP |
| Vertex Free Rent: | $58,450,518 | $0 | NAP |
| Vertex Parking Garage Credit: | $1,402,908 | $0 | NAP |

### Property Information

| | |
|---|---|
| Single Asset/Portfolio: | Single Asset |
| Location: | Boston, MA 02210 |
| General Property Type: | Mixed Use |
| Detailed Property Type: | Lab/Office |
| Title Vesting: | Fee |
| Year Built/Renovated: | 2013/NAP |
| Size: | 1,134,479 SF |
| Cut-off Date Balance per SF[(1)]: | $493 |
| Maturity Date Balance per SF[(1)]: | $493 |
| Property Manager: | The RMR Group LLC (borrower-related) |

### Underwriting and Financial Information

| | |
|---|---|
| UW NOI[(6)]: | $92,205,654 |
| UW NCF: | $91,922,034 |
| UW NOI Debt Yield[(1)]: | 16.5% |
| UW NCF Debt Yield[(1)]: | 16.4% |
| UW NOI Debt Yield at Maturity[(1)]: | 16.5% |
| UW NCF DSCR[(1)]: | 3.29x |
| Most Recent NOI[(6)]: | $63,118,234 (5/31/2025 TTM) |
| 2nd Most Recent NOI[(7)]: | $63,072,063 (12/31/2024) |
| 3rd Most Recent NOI[(7)]: | $77,205,139 (12/31/2023) |
| Most Recent Occupancy: | 99.6% (7/1/2025) |
| 2nd Most Recent Occupancy: | 99.6% (12/31/2024) |
| 3rd Most Recent Occupancy: | 99.9% (12/31/2023) |
| Appraised Value (as of)[(8)]: | $1,644,000,000 (6/10/2025) |
| Appraised Value per SF[(8)]: | $1,449 |
| Cut-off Date LTV Ratio[(1)(8)]: | 34.0% |
| Maturity Date LTV Ratio[(1)(8)]: | 34.0% |

### Sources and Uses

| Sources | Proceeds | % of Total | Uses | Proceeds | % of Total |
|---|---|---|---|---|---|
| Senior Loan Amount: | $558,800,000 | 55.9% | Loan Payoff: | $618,746,993 | 61.9% |
| Subordinate Loan Amount: | $441,200,000 | 44.1% | Reserves: | $233,384,025 | 23.3% |
| | | | Return of Equity: | $136,419,187 | 13.6% |
| | | | Closing Costs: | $11,449,796 | 1.1% |
| Total Sources: | $1,000,000,000 | 100.0% | Total Uses: | $1,000,000,000 | 100.0% |

(1) The Vertex HQ Mortgage Loan (as defined below) is part of the Vertex HQ Whole Loan (as defined below) with an aggregate original principal balance of $1,000,000,000 evidenced by 16 senior *pari passu* promissory notes with an aggregate original principal balance of $558,800,000 (the "Vertex HQ Senior Notes") and 16 junior promissory notes with an aggregate original principal balance of $441,200,000 (the "Vertex HQ Junior Notes"). The Cut-off Date Balance per SF, Maturity Date Balance per SF, UW NOI Debt Yield, UW NCF Debt Yield, UW NOI Debt Yield at Maturity, UW NCF DSCR, Cut-off Date LTV Ratio and Maturity Date LTV Ratio numbers presented above are based on the Vertex HQ Senior Notes. The Cut-off Date Balance per SF, Maturity Date Balance per SF, UW NOI Debt Yield, UW NCF Debt Yield, UW NOI Debt Yield at Maturity, UW NCF DSCR, Cut-off Date LTV Ratio and Maturity Date LTV Ratio based on the Vertex HQ Whole Loan is $881, $881, 9.2%, 9.2%, 9.2%, 1.62x, 60.8% and 60.8%, respectively (and in the case of UW NCF DSCR is based on the weighted average interest rate for the Vertex HQ Whole Loan, as set forth in footnote (2) below).

(2) The liability of the guarantor for bankruptcy related events is capped at the greater of (x) 10% of the then outstanding principal balance of the Vertex HQ Whole Loan as of the occurrence of the first full recourse event and (y) $100,000,000.

(3) 4.93554% represents the *per annum* interest rate associated with the Vertex HQ Senior Notes. The *per annum* interest rate associated with the Vertex HQ Junior Notes is 6.43191708975521% and the weighted average interest rate *per annum* for the Vertex HQ Whole Loan is 5.595741572%.

(4) Defeasance of the Vertex HQ Whole Loan is permitted any time after the earlier to occur of (i) August 6, 2028, or (ii) two years from the closing date of the securitization that includes the last *pari passu* note of the Vertex HQ Whole Loan to be securitized. The assumed defeasance lockout period of 25 payments is based on the closing date of this transaction in October 2025.

(5) See *"Escrows and Reserves"* below for further discussion of reserve information.

(6) The increase from Most Recent NOI to UW NOI is due to the expiration of free rent periods (and the escrow of remaining free rent) at the Vertex HQ Property (as defined below) and the inclusion of Credit Tenant Rent which assumes straight-lined rent for the first ten years of the Vertex (as defined below) lease.

(7) The decrease from 3rd Most Recent NOI to 2nd Most Recent NOI is due to free rent provided in connection with the extension of the Vertex lease.

(8) The appraisal concluded to an "As Is – With Escrows" value for the Vertex HQ Property of $1,644,000,000 as of June 10, 2025, which assumes that there are $176 million in upfront tenant improvement reserves and $58 million in upfront free rent reserves held in escrow. At origination, the borrower reserved approximately $173.5 million for tenant improvements and approximately $58.5 million for free rent. The appraisal concluded to an "As Is" appraised value of $1,410,000,000 as of June 10, 2025, resulting in an Appraised Value per SF of $1,243, and a Cut-off Date LTV Ratio and Maturity Date LTV Ratio of 39.6% for the Vertex HQ Senior Notes and 70.9% for the Vertex HQ Whole Loan.

**The Mortgage Loan.** The largest mortgage loan (the "Vertex HQ Mortgage Loan") part of a whole loan (the "Vertex HQ Whole Loan") with an aggregate original principal balance of $1,000,000,000 evidenced by the 16 *pari passu* Vertex HQ Senior Notes and 16 Vertex HQ Junior Notes. The Vertex HQ Whole Loan is secured by the borrower's fee interest in a mixed-use building located in Boston, Massachusetts (the "Vertex HQ Property"). The Vertex HQ Whole Loan was co-originated by Morgan Stanley Bank, N.A. ("MSBNA"), Bank of Montreal ("BMO"), Goldman Sachs Bank USA ("GS Bank") and JPMorgan Chase Bank, National Association ("JPMCB") on August 6, 2025. The Vertex HQ Mortgage Loan is evidenced by the non-controlling Note A-1-2-1 (being contributed by MSMCH) and A-4-2-B (being contributed by JPMCB), with an aggregate original principal balance of $90,000,000. The Vertex HQ Whole Loan will be serviced pursuant to the trust and servicing agreement for the VRTX 2025-HQ securitization. See *"Description of the Mortgage Pool—The Whole Loans—The Non-Serviced AB Whole Loan—The Vertex HQ Whole Loan"* and *"The Pooling and Servicing Agreement—Servicing of the Non-Serviced Mortgage Loans"* in the prospectus.

Exhibit C

| Mixed Use – Lab/Office | Loan #1 | Cut-off Date Balance: | $90,000,000 |
|---|---|---|---|
| 11 Fan Pier Boulevard and 50 Northern Avenue | Vertex HQ | Cut-off Date LTV: | 34.0% |
| Boston, MA 02210 | | UW NCF DSCR: | 3.29x |
| | | UW NOI Debt Yield: | 16.5% |

The table below summarizes the promissory notes that comprise the Vertex HQ Whole Loan:

| Note | Original Balance | Cut-off Date Balance | Note Holder | Controlling Note |
|---|---|---|---|---|
| | | Vertex HQ Whole Loan Summary | | |
| A-1-1 | $98,920,000 | $98,920,000 | VRTX 2025-HQ | Yes |
| A-1-2-1 | $60,000,000 | $60,000,000 | BANK5 2025-5YR17 | No |
| A-1-2-2[1] | $30,000,000 | $30,000,000 | MSBNA | No |
| A-1-2-3[1] | $24,600,000 | $24,600,000 | MSBNA | No |
| A-1-2-4[1] | $10,000,000 | $10,000,000 | MSBNA | No |
| A-2-1 | $49,460,000 | $49,460,000 | VRTX 2025-HQ | No |
| A-2-2-A[2] | $24,000,000 | $24,000,000 | BBCMS 2025-5C37 | No |
| A-2-2-B[3] | $21,000,000 | $21,000,000 | BMARK 2025-V17 | No |
| A-2-2-C[4] | $10,000,000 | $10,000,000 | BMO 2025-5C12 | No |
| A-2-2-D[2] | $7,300,000 | $7,300,000 | BBCMS 2025-5C37 | No |
| A-3-1 | $49,460,000 | $49,460,000 | VRTX 2025-HQ | No |
| A-3-2-A[2] | $38,700,000 | $38,700,000 | BBCMS 2025-5C37 | No |
| A-3-2-B[3] | $23,600,000 | $23,600,000 | BMARK 2027-V17 | No |
| A-4-1 | $49,460,000 | $49,460,000 | VRTX 2025-HQ | No |
| A-4-2-A[5] | $32,300,000 | $32,300,000 | WFCM 2025-5C6 | No |
| A-4-2-B | $30,000,000 | $30,000,000 | BANK5 2025-5YR17 | No |
| Senior Loan | $558,800,000 | $558,800,000 | | |
| B-1 | $42,920,000 | $42,920,000 | VRTX 2025-HQ | No |
| B-2 | $21,460,000 | $21,460,000 | VRTX 2025-HQ | No |
| B-3 | $21,460,000 | $21,460,000 | VRTX 2025-HQ | No |
| B-4 | $21,460,000 | $21,460,000 | VRTX 2025-HQ | No |
| C-1 | $46,720,000 | $46,720,000 | VRTX 2025-HQ | No |
| C-2 | $23,360,000 | $23,360,000 | VRTX 2025-HQ | No |
| C-3 | $23,360,000 | $23,360,000 | VRTX 2025-HQ | No |
| C-4 | $23,360,000 | $23,360,000 | VRTX 2025-HQ | No |
| D-1 | $55,200,000 | $55,200,000 | VRTX 2025-HQ | No |
| D-2 | $27,600,000 | $27,600,000 | VRTX 2025-HQ | No |
| D-3 | $27,600,000 | $27,600,000 | VRTX 2025-HQ | No |
| D-4 | $27,600,000 | $27,600,000 | VRTX 2025-HQ | No |
| E-1 | $31,640,000 | $31,640,000 | VRTX 2025-HQ | No |
| E-2 | $15,820,000 | $15,820,000 | VRTX 2025-HQ | No |
| E-3 | $15,820,000 | $15,820,000 | VRTX 2025-HQ | No |
| E-4 | $15,820,000 | $15,820,000 | VRTX 2025-HQ | No |
| Whole Loan | $1,000,000,000 | $1,000,000,000 | | |

(1) Expected to be contributed to one or more future securitization trusts.
(2) The BBCMS 2025-5C37 securitization is expected to close on or about September 25, 2025.
(3) The BMARK 2025-V17 securitization is expected to close on or about September 29, 2025.
(4) The BMO 2025-5C12 securitization is expected to close on or about October 9, 2025.
(5) The WFCM 2025-5C6 securitization is expected to close on or about October 8, 2025.

**The Borrower and the Borrower Sponsor.** The borrower for the Vertex HQ Whole Loan is SNH Seaport LLC, a Delaware limited liability company and special purpose entity with one independent director. The borrower sponsor and non-recourse carve-out guarantor is Diversified Healthcare Trust ("DHC"). DHC is a real estate investment trust focused on owning and operating a portfolio of healthcare properties across the United States. Its portfolio includes medical office buildings, life science facilities, senior living communities, and other healthcare related real estate. DHC is managed by The RMR Group LLC ("RMR"). RMR is a leading U.S. alternative asset management company focused on commercial real estate and related businesses. The RMR Group's vertical integration is strengthened by over 900 real estate professionals in more than 35 offices nationwide who manage approximately $40 billion in assets under management and leverage more than 35 years of institutional experience in buying, selling, financing and operating commercial real estate. RMR is headquartered in Newton, Massachusetts and was founded in 1986. The obligations of the non-recourse carveout guarantor with respect to recourse for bankruptcy events are capped at the greater of $100,000,000 or 10% of the outstanding principal balance of the Vertex HQ Whole Loan.

**The Property.** The Vertex HQ Property is a Class A, LEED Gold, corporate global headquarters for Vertex Pharmaceuticals Incorporated ("Vertex") consisting of two, fifteen-story towers interconnected by a skybridge. The Vertex HQ Property consists of approximately 52.3% office space, 42.0% lab space, 4.4% ground floor retail and 1.3% storage use. The Vertex HQ Property features floor plates of approximately 40,000 SF on the lab floors (floors 2-8) and floor plates of approximately 28,000 SF on the office floors (floors 9-15) with a total square footage of 1,134,479 SF. The Vertex HQ Property features flexible layouts that can accommodate full floor or multi-tenant users, with laboratory and research space, floor to ceiling glass exteriors, and exterior signage The buildings also feature an 1,852-space underground parking garage (of which, 740 spaces will serve as collateral for the Vertex Whole Loan, with an additional 90 spaces

A-3-5

*Exhibit C*

| Mixed Use – Lab/Office<br>11 Fan Pier Boulevard and 50 Northern Avenue<br>Boston, MA 02210 | Loan #1<br>Vertex HQ | Cut-off Date Balance:<br>Cut-off Date LTV:<br>UW NCF DSCR:<br>UW NOI Debt Yield: | $90,000,000<br>34.0%<br>3.29x<br>16.5% |
|---|---|---|---|

under control by the borrower sponsor). The Vertex HQ Property has averaged 99.9% occupancy since it was purchased in 2014 by the borrower sponsor. As of July 1, 2025, the Vertex HQ Property was 99.6% leased to ten tenants.

**Major Tenants.**

*Vertex Pharmaceuticals Incorporated (1,082,417 SF; 95.4% of NRA; 96.7% of underwritten base rent).* Vertex is a pharmaceutical company that specializes in treatments for cystic fibrosis, but is also developing drugs for pain management, sickle cell disease, beta thalassemia, alpha-1 antitrypsin deficiency, APOL1-mediated kidney disease, autosomal dominant polycystic kidney disease, IgA nephropathy, Duchenne muscular dystrophy, myotonic dystrophy type 1, and type 1 diabetes. Vertex currently has seven approved medicines, six treatments in Phase 4 trials, three treatments in Phase 3 trials, two treatments in Phase 2 trials, seven treatments in Phase 1 trials, and multiple other concepts in early research and development. However, there can be no assurance that any of such trials will be successful. Vertex holds the largest and most advanced Cystic Fibrosis drug portfolio, serving an estimated three quarters of the 94,000 patients globally, and is currently on its fifth iteration of the treatment, ALFYTREK. Vertex had approximately 6,100 employees as of the end of 2024, and reportedly 60% of those employees are primarily researchers. 4,000 of the employees are based out of the Vertex HQ Property. The firm's headcount has grown by 13% each year for the 2023 and 2024 fiscal years. Over the last year, Vertex has been included in a business magazine's list of "100 Most Influential Companies" in 2024, a business website's list of "World's 50 Most Innovative Companies" in 2024, another business magazine's list of "100 Best Companies to Work For", and a science magazine's "Top Employer" list. The company's balance sheet reported $22.5 billion of assets, with $4.6 billion of cash, $6.1 billion of liabilities, with no long-term debt, and $16.4 billion of shareholder's equity. The Vertex HQ Property is the global headquarters for Vertex, which has occupied the property since 2014, leasing 100% of the office and lab space at the Vertex HQ Property. Vertex has recently extended its lease to an expiration date of June 30, 2044, and has two, 10-year extension options.

*Bright Horizons Children's Center LLC (12,665 SF; 1.1% of NRA; 1.0% of underwritten base rent).* Bright Horizons Children's Center LLC is a global provider of early education and childcare, back-up care, and workforce education services. Bright Horizons operates more than 1,000 early education and childcare centers in the United States, United Kingdom, the Netherlands, Australia, and India serving more than 1,450 employers. Bright Horizons has been a tenant at the Vertex HQ Property since May of 2014, has a lease expiration date of May 31, 2035, and has two, 5-year extension options.

*11 Fan Pier Restaurant, LLC (dba Serafina) (8,747 SF; 0.8% of NRA; 0.4% of underwritten base rent).* Serafina is an Italian pizza and pasta concept restaurant started by Vittorio Assaf and Fabio Granato in 1995. Since the opening of the original location in New York City, Serafina has expanded into three continents, with dozens of restaurants in the United States and around the world. The Serafina location at the Vertex HQ Property opened in June 2022 and provides diners with an extended menu and large dining space with floor-to-ceiling windows, an outdoor patio, and dedicated pizza kitchen and bar. The leasing entity for Serafina is 11 Fan Pier Restaurant, LLC. Serafina has a lease expiration date of June 30, 2032 and has two, 5-year extension options.

The following table presents a summary regarding the major tenants at the Vertex HQ Property:

| Tenant Name | Credit Rating<br>(Fitch/Moody's/<br>S&P) | Tenant SF | Approx.% of SF | Annual UW<br>Base Rent | % of Total<br>Annual UW<br>Base Rent | Annual UW<br>Base Rent PSF | Lease<br>Expiration | Renewal<br>Options | Term. Option<br>(Y/N) |
|---|---|---|---|---|---|---|---|---|---|
| **Major Tenants** | | | | | | | | | |
| Vertex Pharmaceuticals Incorporated | NR/NR/NR | 1,082,417 | 95.4% | $77,971,013 | 96.7% | $72.03 | 6/30/2044 | 2 x 10 yr | N |
| Bright Horizons Children's Centers LLC | NR/NR/NR | 12,665 | 1.1% | $823,225 | 1.0% | $65.00 | 5/31/2035 | 2 x 5 yr | N |
| 11 Fan Pier Restaurant, LLC (dba Serafina) | NR/NR/NR | 8,747 | 0.8% | $349,880 | 0.4% | $40.00 | 6/30/2032 | 2 x 5 yr | N |
| Pier 50, LLC (dba Committee) | NR/NR/NR | 7,404 | 0.7% | $457,444 | 0.6% | $61.78 | 5/31/2035 | 1 x 5 yr | N |
| Subtotal/Wtd. Avg. | | 1,111,233 | 98.0% | $79,601,562 | 98.6% | $71.63 | | | |
| | | | | | | | | | |
| Other Tenants | | 18,710 | 1.6% | $1,000,599 | 1.2% | $53.48 | | | |
| Occupied Subtotal/Wtd. Avg. | | 1,129,943 | 99.6% | $80,602,161 | 100.0% | $71.33 | | | |
| | | | | | | | | | |
| Vacant Space | | 4,536 | 0.4% | | | | | | |
| Total/Wtd. Avg. | | 1,134,479 | 100.0% | | | | | | |

(1) Based on the underwritten rent roll dated July 1, 2025.

# Exhibit D

## Mortgage Loan No. 10 – The Campus at Lawson Lane

### Mortgage Loan Information

| | |
|---|---|
| Mortgage Loan Seller: | GSMC |
| Credit Assessment (Fitch/MDBRS/Moody's): | AA+/AAA/A3 |
| Original Balance[1]: | $24,500,000 |
| Cut-off Date Balance[1]: | $24,500,000 |
| % of Initial Pool Balance: | 3.9% |
| Loan Purpose: | Refinance |
| Borrower Sponsors: | Northridge Capital, LLC and Kamco Investment Company |
| Guarantors: | Northridge Capital, LLC and NCA Holdings, LLC |
| Mortgage Rate: | 5.3270%[2] |
| Note Date: | 7/18/2025 |
| Maturity Date: | 8/1/2030 |
| Term to Maturity: | 60 months |
| Amortization Term: | 0 months |
| IO Period: | 60 months |
| Seasoning: | 2 months |
| Prepayment Provisions: | L(26),D(27),O(7) |
| Lockbox/Cash Mgmt Status: | Hard/Springing |
| Additional Debt Type[1]: | Pari Passu / B Note |
| Additional Debt Balance[1]: | $45,500,000 / $70,000,000 |
| Future Debt Permitted (Type): | No (NAP) |

### Reserves[3]

| Type | Initial | Monthly | Cap |
|---|---|---|---|
| RE Taxes: | $0 | Springing | NAP |
| Insurance: | $0 | Springing | NAP |
| Replacement Reserve: | $0 | Springing | $131,547 |
| TI/LC Reserve: | $0 | Springing | $986,901 |

### Property Information

| | |
|---|---|
| Single Asset/Portfolio: | Single Asset |
| Location: | Santa Clara, CA 95054 |
| General Property Type: | Office |
| Detailed Property Type: | Suburban |
| Title Vesting: | Fee |
| Year Built/Renovated: | 2014/NAP |
| Size: | 328,867 SF |
| Cut-off Date Balance Per SF[1]: | $213 |
| Maturity Date Balance Per SF[1]: | $213 |
| Property Manager: | Jones Lang LaSalle Americas, Inc. |

### Underwriting and Financial Information

| | |
|---|---|
| UW NOI: | $14,501,759 |
| UW NCF: | $14,435,085 |
| UW NOI Debt Yield[1]: | 20.7% |
| UW NCF Debt Yield[1]: | 20.6% |
| UW NOI Debt Yield at Maturity[1]: | 20.7% |
| UW NCF DSCR[1]: | 3.62x |
| Most Recent NOI: | $12,875,793 (12/31/2024) |
| 2nd Most Recent NOI: | $12,599,761 (12/31/2023) |
| 3rd Most Recent NOI: | $12,541,837 (12/31/2022) |
| Most Recent Occupancy: | 100.0% (10/1/2025) |
| 2nd Most Recent Occupancy: | 100.0% (12/31/2024) |
| 3rd Most Recent Occupancy: | 100.0% (12/31/2023) |
| Appraised Value (as of): | $224,600,000 (2/14/2025) |
| Appraised Value Per SF: | $683 |
| Cut-off Date LTV Ratio[1]: | 31.2% |
| Maturity Date LTV Ratio[1]: | 31.2% |

### Sources and Uses

| Sources | Proceeds | % of Total | | Uses | Proceeds | % of Total |
|---|---|---|---|---|---|---|
| Senior Loan Amount: | $70,000,000 | 40.4% | | Loan Payoff: | $171,241,494 | 98.8% |
| Subordinate Loan Amount: | $70,000,000 | 40.4% | | Closing Costs: | $2,081,412 | 1.2% |
| Borrower Equity: | $33,322,906 | 19.2% | | | | |
| Total Sources: | $173,322,906 | 100.0% | | Total Uses: | $173,322,906 | 100.0% |

(1) The Campus at Lawson Lane Mortgage Loan (as defined below) is part of The Campus at Lawson Lane Whole Loan (as defined below), with an aggregate principal balance of $140,000,000 evidenced by two senior pari passu promissory notes with an aggregate original principal balance of $70,000,000 ("The Campus at Lawson Lane Senior Notes") and one junior promissory note with an original balance of $70,000,000 ("The Campus at Lawson Lane Junior Note"). The Cut-off Date Balance Per SF, Maturity Date Balance Per SF, UW NOI Debt Yield, UW NCF Debt Yield, UW NOI Debt Yield at Maturity, UW NCF DSCR, Cut-off Date LTV Ratio and Maturity Date LTV Ratio numbers presented above are based on The Campus at Lawson Lane Senior Notes. The Cut-off Date Balance Per SF, Maturity Date Balance Per SF, UW NOI Debt Yield, UW NCF Debt Yield, UW NOI Debt Yield at Maturity, UW NCF DSCR, Cut-off Date LTV Ratio and Maturity Date LTV Ratio based on The Campus at Lawson Lane Whole Loan is $426, $426, 10.4%, 10.3%, 10.4%, 1.44x, 62.3% and 62.3%, respectively.
(2) 5.3270% represents the per annum interest rate associated with The Campus at Lawson Lane Senior Notes. The interest rate per annum for The Campus at Lawson Lane Junior Note is 8.7500%.
(3) See "Escrows and Reserves" below for further discussion of reserve information.

**The Mortgage Loan.** The tenth largest mortgage loan ("The Campus at Lawson Lane Mortgage Loan") is part of a whole loan ("The Campus at Lawson Lane Whole Loan") with an aggregate principal balance of $140,000,000 evidenced by two pari passu The Campus at Lawson Lane Senior Notes and one The Campus at Lawson Lane Junior Note. The Campus at Lawson Lane Whole Loan is secured by the borrower's fee interest in a suburban office asset in Santa Clara, California ("The Campus at Lawson Lane Property"). The Campus at Lawson Lane Whole Loan was co-originated by Morgan Stanley Bank, N.A. ("MSBNA"), Goldman Sachs Bank USA ("GS Bank"), and CPPIB Credit Investments III Inc. ("CPPIB", which originated only The Campus at Lawson Lane Junior Note) on July 18, 2025. The Campus at Lawson Lane Mortgage Loan is evidenced by the non-controlling Note A-2, with an original principal balance of $24,500,000. The Campus at Lawson Lane Whole Loan will be serviced pursuant to the pooling and servicing agreement for the BANK5 2025-5YR16 securitization. See "Description of the Mortgage Pool—The Whole Loans—The Non-Serviced AB Whole Loans—The Campus at Lawson Lane Whole Loan" and "Pooling and Servicing Agreement—Servicing of the Non-Serviced Mortgage Loans" in the prospectus.

Exhibit D

| Office – Suburban<br>2215, 2225 & 2235 Lawson Lane<br>Santa Clara, CA 95054 | Loan #10<br>The Campus at Lawson Lane | Cut-off Date Balance:<br>Cut-off Date LTV:<br>UW NCF DSCR:<br>UW NOI Debt Yield: | $24,500,000<br>31.2%<br>3.82x<br>20.7% |

The table below summarizes the promissory notes that comprise The Campus at Lawson Lane Whole Loan:

| The Campus at Lawson Lane Whole Loan Summary | | | | |
|---|---|---|---|---|
| Note | Original Balance | Cut-off Date Balance | Note Holder | Controlling Note |
| A-1 | $45,500,000 | $45,500,000 | BANK5 2025-5YR16 | No[1] |
| A-2 | $24,500,000 | $24,500,000 | WFCM 2025-5C6 | No |
| Senior Loan | $70,000,000 | $70,000,000 | | |
| B | $70,000,000 | $70,000,000 | CPPIB | Yes[1] |
| Whole Loan | $140,000,000 | $140,000,000 | | |

(1)   Note B will be the controlling note unless a control appraisal period is continuing under the related co-lender agreement, in which case the controlling note will be note A-1 and the BANK5 2025-5YR16 securitization will be the controlling holder. See "Description of the Mortgage Pool—The Whole Loans—The Non-Serviced AB Whole Loans—The Campus at Lawson Lane Whole Loan" in the prospectus.

*The Borrower and the Borrower Sponsors.* The borrower for The Campus at Lawson Lane Whole Loan is Lawson Lane SPV, LLC, a single-purpose Delaware limited liability company, with two independent directors in its organizational structure. The borrower is 100% indirectly owned by GSS Ultimate Holdings (Northridge) IV, Inc., which in turn is owned by Bernard Angelo, Kevin Burns and Frank Bilotta, who are principals of a corporate services company that sets up and administers special purpose vehicles for securitizations and Shari'ah compliant financings. The borrower was formed in connection with structuring The Campus at Lawson Lane Whole Loan as a Shari'ah compliant mortgage loan. In order to facilitate a Shari'ah compliant structure, the borrower has master leased The Campus at Lawson Lane Property to Lawson Lane Master Tenant, LLC ("The Campus at Lawson Lane Master Tenant"). The Campus at Lawson Lane Master Tenant is 100% directly owned by Lawson Lane JV, LP, an entity in which the general partnership interest and indirectly 2.0% of the equity interest is owned by Lawson Lane Advisor, LLC ("The Campus at Lawson Lane JV"), an entity which is 50% indirectly owned by KAMCO Investment Company, K.S.C. ("KAMCO") and 50% owned by Northridge Lawson Lane Investor, LLC, which in turn is 10% owned by, and controlled by, NCA Holdings, LLC; An entity indirectly owned by NCA Holdings, LLC is the managing member of The Campus at Lawson Lane JV. The borrower sponsors are Northridge Capital, LLC and KAMCO. The non-recourse carve-out guarantors are Northridge Capital, LLC and NCA Holdings, LLC (the 100% owner of Northridge Capital, LLC). Under certain circumstances a KAMCO affiliate has the right to buy out the interest of Northridge Capital, LLC and its affiliates in The Campus at Lawson Lane JV and take control of The Campus at Lawson Lane JV. Such a transfer is permitted under The Campus at Lawson Lane Whole Loan documents provided that upon such transfer KAMCO acts as or controls the replacement guarantor, controls The Campus at Lawson Lane JV and owns at least a 0.5% direct or indirect equity interest in The Campus at Lawson Lane Master Tenant.

Founded in 1997 in Washington DC, Northridge Capital, LLC is an independent, private investment advisor and asset manager that provides a high level of personalized service for its clients through a bifurcated "barbell" approach with a focus on income and development. Since its founding, Northridge Capital, LLC has invested in a total of 62 assets including legacy and new investments. Northridge Capital, LLC has expanded its activities to include operating as an independent, third-party investment advisor and asset manager on behalf of many American and Middle Eastern investors. The company has historically had a national geographic footprint with a focus on Washington, DC and the Southeast: Raleigh/Durham and Charlotte, North Carolina, Nashville, Tennessee, Atlanta, Georgia, Richmond, Virginia, Charleston, South Carolina and Central and Southeast Florida.

KAMCO is a publicly owned investment manager that provides wealth management, forward trading, access to initial public offerings, and advisory services to its clients. KAMCO is a regional non-banking financial institution headquartered in Kuwait with offices in key regional financial markets. Established in 1998 and listed on the Boursa Kuwait in 2003, KAMCO currently operates as an independently managed subsidiary of KIPCO Group. KAMCO established its United States real estate platform in 2016, focusing on a strategy targeting fully occupied properties leased on long-term contracts to reputable tenants. After the initial acquisition, KAMCO's United States real estate portfolio grew to be comprised of office buildings located across gateway and secondary markets. KAMCO's total assets under management have a combined gross lettable area of approximately 2.67 million SF.

*The Property.* The Campus at Lawson Lane Property is comprised of a fee interest in a 328,867 SF suburban office property on an approximately 8.8 acre-site in Santa Clara, California. Built in 2014, The Campus at Lawson Lane Property is comprised of two, five-floor office towers totaling 310,346 SF and a 18,521 SF amenity building with a parking garage. The Campus at Lawson Lane Property features over 1,021 parking spaces. Amenities at The Campus at Lawson Lane Property include a full-service cafeteria, gym facilities with daily fitness classes, and social activities for employees. The amenity building also serves the other surrounding buildings. The Campus at Lawson Lane Property is fully leased to software company ServiceNow, Inc. ("ServiceNow"), and serves as its headquarters. ServiceNow has occupied the building since 2015, and also leases surrounding office space, including 640,000 SF across the street and 130,000 SF one block away, with the tenant's total lease agreements in place in the area aggregating over 1 million SF. The Campus at Lawson Lane Property's buildings and the tenant's surrounding leased space sit on an easily walkable campus.

*Sole Tenant.* ServiceNow (328,867 SF, 100.0 % of NRA, 100.0% of underwritten base rent). ServiceNow is an enterprise software company specializing in digital workflow automation and internet technology services management. The company seeks to enable organizations to streamline operations and enhance productivity. ServiceNow was founded in 2004 and has been headquartered at The Campus at Lawson Lane Property since 2015. ServiceNow also provides AI-driven solutions and ecosystems. ServiceNow has a lease expiration date of February 28, 2035, has three, five-year renewal options remaining, and no unilateral termination options.



Exhibit E

## Mortgage Loan No. 7 – Honolulu FBI Office

| Mortgage Loan Information | | Mortgaged Property Information | |
|---|---|---|---|
| Mortgage Loan Seller: | AREF2 | Single Asset/Portfolio: | Single Asset |
| | | Location: | Kapolei, HI 96707 |
| Original Balance[1]: | $27,200,000 | General Property Type: | Office |
| Cut-off Date Balance[1]: | $27,200,000 | Detailed Property Type: | CBD |
| % of Initial Pool Balance: | 4.6% | Title Vesting: | Fee |
| Loan Purpose: | Refinance | Year Built/Renovated: | 2011/NAP |
| Borrower Sponsor: | Eagle River Investors, LLC | Size: | 150,365 SF |
| Guarantor[2]: | Eagle River Investors, LLC | Cut-off Date Balance per SF[1]: | $314 |
| Mortgage Rate: | 7.25300% | Maturity Date Balance per SF[1]: | $314 |
| Note Date: | 7/1/2025 | Property Manager: | Eagle River Investors, LLC |
| Maturity Date: | 7/6/2035 | | (borrower-related) |
| Term to Maturity: | 120 months | Underwriting and Financial Information | |
| Amortization Term: | 0 months | | |
| IO Period: | 120 months | UW NOI: | $5,786,518 |
| Seasoning: | 1 month | UW NCF: | $5,616,080 |
| Prepayment Provisions: | L(25),D(90),O(5) | UW NOI Debt Yield[1]: | 12.3% |
| Lockbox/Cash Mgmt Status: | Hard/Springing | UW NCF Debt Yield[1]: | 11.9% |
| Additional Debt Type[1]: | Pari Passu | UW NOI Debt Yield at Maturity[1]: | 12.3% |
| Additional Debt Balance[1]: | $20,000,000 | UW NCF DSCR[1]: | 1.62x |
| Future Debt Permitted (Type): | No (NAP) | Most Recent NOI: | $6,626,781 (5/31/2025 TTM) |
| | | 2nd Most Recent NOI: | $6,659,948 (12/31/2024) |
| | | 3rd Most Recent NOI: | $6,522,258 (12/31/2023) |
| | | Most Recent Occupancy: | 100.0% (8/1/2025) |
| | Reserves[3] | 2nd Most Recent Occupancy: | 100.0% (12/31/2024) |

| Type | Initial | Monthly | Cap | | |
|---|---|---|---|---|---|
| RE Taxes: | $458,609 | $70,555 | NAP | 3rd Most Recent Occupancy: | 100.0% (12/31/2023) |
| Insurance: | $0 | Springing | NAP | Appraised Value (as of): | $87,400,000 (3/18/2025) |
| Replacement Reserve: | $0 | Springing | NAP | Appraised Value per SF: | $581 |
| TI/LC Reserve: | $0 | Springing | NAP | Cut-off Date LTV Ratio[1]: | 54.0% |
| | | | | Maturity Date LTV Ratio[1]: | 54.0% |

### Sources and Uses

| Sources | Proceeds | % of Total | | Uses | Proceeds | % of Total |
|---|---|---|---|---|---|---|
| Whole Loan Amount | $47,200,000 | 99.9% | | Loan Payoff: | $46,039,209 | 97.5% |
| Borrower Sponsor Equity: | $27,032 | 0.1% | | Closing Costs: | $729,214 | 1.5% |
| | | | | Upfront Reserves: | $458,609 | 1.0% |
| Total Sources: | $47,227,032 | 100.0% | | Total Uses: | $47,227,032 | 100.0% |

(1) The Honolulu FBI Office Mortgage Loan (as defined below) is part of a whole loan evidenced by three *pari passu* promissory notes with an aggregate outstanding principal balance as of the Cut-off Date of approximately $47.2 million (the "Honolulu FBI Office Whole Loan"). The financial information in the chart above reflects the Honolulu FBI Office Whole Loan.
(2) In the event that the borrower fails to make the Lease Expiration Additional Deposit (as defined below) or provide the Lease Expiration Letter of Credit (as defined below), Eagle River Investors, LLC and Judd D. Malkin will be recourse to the lender in an amount equal to $12,000,000 of principal (the "Principal Payment Obligation"). See "The Property" below.
(3) See "Escrows and Reserves" section below for further discussion.

**The Mortgage Loan.** The seventh largest mortgage loan (the "Honolulu FBI Office Mortgage Loan") is part of a fixed rate whole loan secured by the borrowers' fee interest in a first-priority fee mortgage encumbering a 150,365 SF office property in Kapolei, Hawaii (the "Honolulu FBI Office Property"). The Honolulu FBI Office Whole Loan consists of three *pari passu* promissory notes and accrues interest at a rate of 7.25300% per annum. The Honolulu FBI Office Whole Loan has a 10-year, interest-only term. The Honolulu FBI Office Mortgage Loan is evidenced by the controlling Note A-1 with a principal balance as of the Cut-off Date of $27,200,000. The Honolulu FBI Office Whole Loan will be serviced pursuant to the pooling and servicing agreement for the MSBAM 2025-C35 securitization trust. See "Description of the Mortgage Pool—The Whole Loans—The Serviced Pari Passu Whole Loans" and "Pooling and Servicing Agreement" in the prospectus.

The table below summarizes the promissory notes that comprise the Honolulu FBI Office Whole Loan:

| Note | Original Balance | Cut-off Date Balance | Note Holder | Controlling Piece |
|---|---|---|---|---|
| A-1 | $27,200,000 | $27,200,000 | MSBAM 2025-C35 | Yes |
| A-2-A[1] | $15,000,000 | $15,000,000 | Goldman Sachs Bank USA | No |
| A-2-B[1] | $5,000,000 | $5,000,000 | Goldman Sachs Bank USA | No |
| Whole Loan | $47,200,000 | $47,200,000 | | |

(1) Expected to be contributed to one or more future securitization(s).

Exhibit E

| Office – CBD | Loan #7 | Cut-off Date Balance: | $27,200,000 |
|---|---|---|---|
| 91-1300 Enterprise Street | **Honolulu FBI Office** | Cut-off Date LTV: | 54.0% |
| Kapolei, HI 96707 | | UW NCF DSCR: | 1.62x |
| | | UW NOI Debt Yield: | 12.3% |

**The Borrower and the Borrower Sponsor.** The borrower is Eagle River Investors-Hawaii, LLC, a single-purpose Delaware limited liability company with one independent director. The borrower sponsor and the non-recourse carveout guarantor is Eagle River Investors, LLC, which is controlled by Judd D. Malkin and his three children. Judd D. Malkin is a co-founder of Chicago-based JMB Financial Advisors and has over 50 years of real estate experience across all asset classes. Eagle River Investors, LLC currently owns three properties totaling approximately 400,000 SF, located in Hawaii, Austin and Virginia.

**The Property.** The Honolulu FBI Office Property is a 150,365 SF office building located in Kapolei, Hawaii, approximately 22 miles west of downtown Honolulu. The Honolulu FBI Office Property is located on a 9.46-acre site and consists of a four-story office building, visitor screening building and a parking structure. The Honolulu FBI Office Property was constructed in 2011 and includes an autobody shop, secure fencing, a 100-foot setback and two entrances. The Honolulu FBI Office Property was originally constructed by the Penrose Corporation, a developer specializing in build-to-suit projects for the government that built eight field offices for the Federal Bureau of Investigation ("FBI") between 1994 and 2012, and was acquired by the borrower sponsor in 2013 for $97.1 million. The Honolulu FBI Office Property features 349 parking spaces, resulting in a parking ratio of 2.32 spaces per 1,000 SF of NRA.

The sole tenant, FBI, commenced a 20-year lease in 2012 that expires in October 2032. According to the appraisal, the custom-built office is tailored for the FBI and due to its existing configuration and lack of suitable alternatives in the market there is a high probability of continued demand for an FBI field office or an alternative department of defense / intelligence office tenant. The Honolulu FBI Office Whole Loan is structured with a cash flow sweep that will commence 24 months prior to FBI's lease expiration. If FBI discontinues operation in 20% or more of its space, or if there is any announcement that the FBI is constructing a new headquarters in Hawaii or the FBI is relocating its operations at the Honolulu FBI Office Property to a different location. Furthermore, 12 months prior to the FBI's lease expiration the borrower is required to either deposit $12,000,000 into a special rollover reserve (the "Lease Expiration Additional Deposit") or deliver a letter of credit in the amount of $12,000,000 (the "Lease Expiration Letter of Credit"). In the event that the borrower fails to make the Lease Expiration Additional Deposit or provide the Lease Expiration Letter of Credit, Eagle River Investors, LLC and Judd D. Malkin will be recourse to the lender in an amount equal to $12,000,000.

**Sole Tenant.**

*Federal Bureau of Investigation (GSA) (150,365 SF, 100.0% of NRA, 100.0% of underwritten base rent).* The FBI is the United States' federal law enforcement and domestic intelligence agency. The FBI's Honolulu location serves as the regional headquarters for the Hawaii, Guam, U.S. Commonwealth in the Pacific Ocean (CNMI), and American Samoa, overseeing operations across the region with responsibilities including counterterrorism, counterintelligence, cybercrime and criminal investigations, while supporting federal, state and local law enforcement partners throughout its jurisdiction. The FBI has been the sole tenant at the Honolulu FBI Office Property since 2012 when it commenced its initial 20-year lease expiring in October 2032. In addition to base rent, the FBI reimburses for real estate taxes over the 2013 base year. The lease is signed by the United States of America, acting by and through the General Services Administration (GSA) Public Buildings Service. The tenant has no termination or renewal options.

The following table presents certain information relating to the tenancy at the Honolulu FBI Office Property:

| | | | Tenant Summary[1] | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Tenant Name | Credit Rating (Fitch/Moody's/S&P)[2] | Tenant SF | Approx. % of Total SF | Annual UW Rent | % of Total Annual UW Rent | Annual UW Rent PSF | Lease Expiration | Renewal Options | Termination Option (Y/N) |
| Federal Bureau of Investigation (GSA) | AA+/Aa1/AA+ | 150,365 | 100.0% | $8,870,247 | 100.0% | $58.99 | 10/22/2032 | None | N |
| Subtotal/Wtd. Avg. | | 150,365 | 100.0% | $8,870,247 | 100.0% | $58.99 | | | |
| Other Tenants | | 0 | 0.0% | $0 | 0.0% | $0.00 | | | |
| **Total Occupied Space** | | 150,365 | 100.0% | $8,870,247 | 100.0% | $58.99 | | | |
| Vacant Space | | 0 | 0.0% | | | | | | |
| Total/Wtd. Avg. | | 150,365 | 100.0% | | | | | | |

(1) Information is based on the underwritten rent roll dated August 1, 2025 with rent steps taken through October 2025.
(2) Certain ratings are those of the parent company or government, whether or not the parent guarantees the lease.

A-3-57

424B3 1 breitnavfebruary2026a.htm 424B3

Exhibit F

Filed Pursuant to Rule 424(b)(3)
Registration No. 333-280059

### BLACKSTONE REAL ESTATE INCOME TRUST, INC.
### SUPPLEMENT NO. 9 DATED MARCH 16, 2026
### TO THE PROSPECTUS DATED AUGUST 5, 2025

This prospectus supplement ("Supplement") is part of and should be read in conjunction with the prospectus of Blackstone Real Estate Income Trust, Inc., dated August 5, 2025 (as supplemented to date, the "Prospectus"). Unless otherwise defined herein, capitalized terms used in this Supplement shall have the same meanings as in the Prospectus. References herein to the "Company", "BREIT," "we," "us," or "our" refer to Blackstone Real Estate Income Trust, Inc. and its subsidiaries unless the context specifically requires otherwise.

The purposes of this Supplement are as follows:

- to provide an update to BREIT's portfolio;
- to disclose the transaction price for each class of our common stock as of April 1, 2026;
- to disclose the calculation of our February 28, 2026 NAV per share for all share classes;
- to provide an update on the status of our current public offering (the "Offering");
- to otherwise update the Prospectus; and
- to include our Annual Report on Form 10-K for the year ended December 31, 2025.

#### Portfolio Update

For the month ended February 28, 2026, BREIT's Class I NAV per share was $14.24 and Class I total return was 0.6% (not annualized).[1]

On February 19, 2026, the Company published its 2025 Year-End Update for stockholders, which is available on its website at *www.breit.com*. This web link is provided for convenience only, and the contents of the piece or the website are not incorporated by reference in or otherwise a part of this prospectus.

Additionally, the Company reached an important milestone in February as subscriptions outpaced redemptions for the first time since September 2022.

#### April 1, 2026 Transaction Price

We are offering to the public four classes of shares of our common stock, Class I shares, Class S-2 shares, Class D-2 shares and Class T-2 shares in our primary offering and seven classes of shares of our common stock, Class I shares, Class S-2 shares, Class D-2 shares, Class T-2 shares, Class S shares, Class D shares and Class T shares pursuant to our distribution reinvestment plan. For the avoidance of doubt, Class S shares, Class D shares and Class T shares are only available to existing holders of such classes pursuant to our distribution reinvestment plan. The differences among the share classes relate to upfront selling commissions, dealer manager fees and ongoing stockholder servicing fees and limits thereon. No upfront selling commissions, dealer manager fees or stockholder servicing fees are paid with respect to Class I shares, and no upfront selling commissions or dealer manager fees are paid with respect to purchases of shares of any class sold pursuant to our distribution reinvestment plan. See "Description of Capital Stock" and "Plan of Distribution" in the Prospectus for a discussion of the differences between our Class I, Class S-2, Class D-2, Class T-2, Class S, Class D and Class T shares.

The transaction price for each share class of our common stock for subscriptions accepted as of April 1, 2026 (and repurchases as of March 31, 2026) is as follows:

|  | Transaction Price (per share) | |
|---|---|---|
| Class I | $ | 14.2364 |
| Class S-2 | $ | 14.2252 |
| Class D-2 | $ | 13.8776 |
| Class T-2 | $ | 13.9820 |

*Exhibit F*

Set forth below are the weighted averages of the key assumptions in the discounted cash flow methodology used in the February 28, 2026 valuations, based on property types.

| Property Type | Discount Rate | Exit Capitalization Rate |
|---|---|---|
| Rental Housing | 7.2% | 5.4% |
| Industrial | 7.5% | 5.4% |
| Net Lease | 6.5% | 5.4% |
| Hospitality | 10.8% | 9.0% |
| Data Centers | 8.4% | 6.1% |
| Self Storage | 8.5% | 6.5% |
| Office | 7.8% | 5.6% |
| Retail | 7.9% | 6.3% |

These assumptions are determined by the Adviser, and reviewed by our independent valuation advisor. A change in these assumptions or factors would impact the calculation of the value of our property investments. For example, assuming all other factors remain unchanged, the changes listed below would result in the following effects on our investment values:

424B3 1 supp13march272026.htm 424B3

*Exhibit G*

Filed Pursuant to Rule 424(b)(3)
Registration No. 333-283571

# JLL INCOME PROPERTY TRUST, INC.
## SUPPLEMENT NO. 13 DATED MARCH 27, 2026
## TO THE PROSPECTUS DATED JUNE 6, 2025

This supplement No. 13 is part of the prospectus of JLL Income Property Trust, Inc. and should be read in conjunction with the prospectus. Terms used in this supplement No. 13 and not otherwise defined herein have the same meanings as set forth in our prospectus and any supplements thereto. The purpose of this supplement is to disclose:

- the status of our offering;
- an amendment to our share repurchase plan; and
- our Annual Report on Form 10-K for the year ended December 31, 2025.

### Status of the Offering

On June 6, 2025, our Third Extended Public Offering was terminated and we commenced our Fourth Extended Public Offering of up to $1,500,000,000, in shares of which $1,200,000,000 in shares can be issued pursuant to our primary offering and $300,000,000 in shares can be issued pursuant to our distribution reinvestment plan.

As of March 27, 2026, we have received aggregate gross proceeds of approximately $83,640,000 including $23,667,000 from the sale of 2,069,583 Class A shares, $6,380,000 from the sale of 563,656 Class M shares, $1,026,000 from the sale of 91,176 Class A-I shares, and $52,567,000 from the sale of 4,624,595 Class M-I shares pursuant to our primary offering. There were $1,116,360,000 in shares of our common stock in our primary offering available for sale. As of March 27, 2026, we have received approximately $55,903,000 pursuant to our distribution reinvestment plan, including $21,791,000 from the sale of 1,931,627 Class A shares, $6,020,000 from the sale of 533,057 Class M shares, $771,000 from the sale of 68,131 Class A-I shares, and $27,321,000 from the sale of 2,420,606 Class M-I shares. There were $244,097,000 in shares of our common stock available for sale pursuant to our distribution reinvestment plan.

We are structured as an institutionally managed, daily valued perpetual-life REIT. This means that, subject to regulatory approval of our filing for additional offerings, we plan to sell shares of our common stock on a continuous basis and for an indefinite period of time. We will endeavor to take all reasonable actions to avoid interruptions in the continuous offering of our shares of common stock. There can be no assurance, however, that we will not need to suspend our continuous offering. The offering must be registered in every state in which we offer or sell shares. Generally, such registrations are for a period of one year. Thus, we may have to stop selling shares in any state in which our registration is not renewed or otherwise extended annually. We reserve the right to terminate this offering at any time and to extend our offering term to the extent permissible under applicable law.

Since the beginning of 2012, we raised a total of approximately $7,095,680,000 through our ongoing public and various private offerings, as well as our distribution reinvestment plan. As of March 27, 2026, our total Company NAV across all share classes was approximately $2,327,086,000.

### Share Repurchase Plan Amendment

Effective March 20, 2026, we amended our share repurchase plan to waive the one-year holding period for certain feeder vehicles primarily created to hold our shares that in turn offer interests in the feeder vehicles to non-U.S. persons.

*The following disclosure supersedes and replaces the first paragraph in the section of the prospectus titled "Share Repurchases—Repurchase Limitations" and all related disclosure in the prospectus:*

Under our share repurchase plan, the repurchase of shares is limited during any calendar quarter to shares whose aggregate value (based on the repurchase price per share on the day the repurchase is effected) is 5% of the combined NAV of all classes of shares as of the last day of the previous calendar quarter, which means that in any 12-month period, we limit repurchases to approximately 20% of our total NAV, to the extent we choose to repurchase shares. We are not obligated to repurchase any shares of our common stock and may choose to only repurchase some, or even none, of the shares requested to be repurchased. Shares are not eligible for repurchase for the

*Exhibit G*

The decrease in NAV from December 31, 2024 to December 31, 2025 is primarily related to an increase in total dividends paid during 2025.

The following table provides a breakdown of the major components of our NAV as of December 31, 2025:

| Component of NAV | December 31, 2025 | December 31, 2024 |
|---|---|---|
| Real estate investments[1] | $ 3,564,600 | $ 4,086,105 |
| Debt | (1,379,332) | (1,657,872) |
| Other assets and liabilities, net | 202,560 | 83,000 |
| Estimated enterprise value premium | None assumed | None assumed |
| NAV | $ 2,387,828 | $ 2,511,233 |

[1] The value of our real estate investments was less than the historical cost by approximately 1.6% and 1.0% as of December 31, 2025 and December 31, 2024, respectively.

The following are key assumptions (shown on a weighted-average basis) that are used in the discounted cash flow models to estimate the value of our real estate investments as of December 31, 2025:

| | Healthcare | Industrial | Office | Residential | Retail | Other [1] | Total Company |
|---|---|---|---|---|---|---|---|
| Exit capitalization rate | 5.9 % | 5.7 % | 6.9 % | 5.3 % | 6.0 % | 6.5 % | 5.6 % |
| Discount rate/internal rate of return (IRR) | 7.3 | 7.4 | 8.6 | 7.0 | 7.5 | 8.3 | 7.3 |
| Annual market rent growth rate | 3.0 | 3.1 | 2.6 | 3.2 | 3.0 | 3.0 | 3.1 |
| Holding period (years) | 10.0 | 10.3 | 10.0 | 10.0 | 10.0 | 18.1 | 10.2 |

424B3 1 supp14april22026.htm 424B3

Exhibit G

Filed Pursuant to Rule 424(b)(3)
Registration No. 333-283571

## JLL INCOME PROPERTY TRUST, INC.
## SUPPLEMENT NO. 14 DATED APRIL 2, 2026
## TO THE PROSPECTUS DATED JUNE 6, 2025

This supplement No. 14 is part of the prospectus of JLL Income Property Trust, Inc. and should be read in conjunction with the prospectus. Terms used in this supplement No. 14 and not otherwise defined herein have the same meanings as set forth in our prospectus and any supplements thereto. The purpose of this supplement is to disclose:

- the components of NAV as of March 31, 2026;
- the status of our offering;
- the status of our share repurchase plan; and
- the recent share pricing information.

### Components of NAV

The following table provides a breakdown of the major components of our NAV as of March 31, 2026:

| Component of NAV | March 31, 2026 | | | | | |
|---|---|---|---|---|---|---|
| | Class A Shares | Class M Shares | Class A-I Shares | Class M-I Shares | Private Shares[1] | Total |
| Real estate investments[2] | $ 1,309,893,000 | $ 330,149,000 | $ 47,910,000 | $ 1,667,143,000 | $ 221,112,000 | $ 3,576,207,000 |
| Debt | (476,184,000) | (120,019,000) | (17,417,000) | (606,055,000) | (80,381,000) | $ (1,300,056,000) |
| Other assets and liabilities, net | 22,821,000 | 5,752,000 | 835,000 | 29,045,000 | 3,851,000 | $ 62,304,000 |
| Estimated enterprise value premium | None assumed | None assumed | None assumed | None assumed | None assumed | None assumed |
| NAV | $ 856,530,000 | $ 215,882,000 | $ 31,328,000 | $ 1,090,133,000 | $ 144,582,000 | $ 2,338,455,000 |
| Number of outstanding shares | 76,246,427 | 19,191,057 | 2,780,909 | 96,962,217 | 12,873,000 | |
| NAV per share[3] | $ 11.23 | $ 11.25 | $ 11.27 | $ 11.24 | $ 11.24 | |

(1) Private Shares represent the collective total for Class D, Class I, Class N, Class S and Class Z being offered in a continuous private offering.

(2) The value of our real estate investments was less than the historical cost by approximately 1.8% as of March 31, 2026

(3) NAV per share for Private Shares represents the average share price for Class D, Class I, Class N, Class S and Class Z collectively.

The following are key assumptions (shown on a weighted-average basis) that are used in the discounted cash flow models to estimate the value of our real estate investments as of March 31, 2026:

| | Healthcare | Industrial | Office | Residential | Retail | Other [1] | Total Company |
|---|---|---|---|---|---|---|---|
| Exit capitalization rate | 5.9 % | 5.7 % | 6.9 % | 5.4 % | 6.0 % | 6.5 % | 5.7 % |
| Discount rate/internal rate of return (IRR) | 7.3 | 7.4 | 8.5 | 7.1 | 7.6 | 8.3 | 7.3 |
| Annual market rent growth rate | 3.0 | 3.1 | 2.7 | 3.1 | 3.0 | 3.0 | 3.0 |
| Holding period (years) | 10.0 | 10.3 | 10.0 | 10.0 | 10.0 | 17.9 | 10.2 |

*Exhibit H*

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

### Form 10-K

**(Mark One)**

☑    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2025

**OR**

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Commission file number: 000-55599

# HINES GLOBAL INCOME TRUST, INC.
*(Exact name of registrant as specified in its charter)*

| Maryland | 80-0947092 |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

**845 Texas Avenue**
**Suite 3300**
**Houston , Texas**
*(Address of principal executive offices)*

**77002-1656**
*(Zip code)*

Registrant's telephone number, including area code: (888) 220-6121

Securities registered pursuant to Section 12(b) of the Act: None.
Securities registered pursuant to Section 12(g) of the Act: Common Stock, par value $0.001

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐  No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act. Yes ☐  No ☑

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑  No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Smaller reporting company ☐ | Non-accelerated filer ☑ |
| | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13 (a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☑

Aggregate market value of the common stock held by non-affiliates of the registrant: No established market exists for the registrant's common stock.

Exhibit H

he valuations of our investment properties as of December 31, 2025 were reviewed by Altus in accordance with our valuation procedures. Certain key assumptions that were used in the discounted cash flow analysis, which were determined by our Advisor and reviewed by Altus, are set forth in the following table based on weighted-averages by property type. However, the table below excludes assumptions related to properties acquired in the past 12 months and are being carried at their purchase price. In accordance with our valuation policy, the acquisition cost of these properties may serve as their value for a period of up to one year following their acquisition.

| | Office | Industrial | Retail | Residential / Living | Other | Weighted-Average Basis |
|---|---|---|---|---|---|---|
| Exit capitalization rate | 6.96% | 5.53% | 6.14% | 5.49% | 6.43% | 5.85% |
| Discount rate / internal rate of return ("IRR") | 8.32% | 7.15% | 7.03% | 7.13% | 7.51% | 7.33% |
| Average holding period (years) | 8.8 | 8.6 | 9.6 | 9.5 | 7.9 | 9.0 |

Exhibit I

| Q2 Filing 2025 | Property | SEC Registration File No. | Mortagage Notes | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Tenant | Appraised Value | Loan Amount | LTV | Underwritten NOI | CAP Rate | CMBS/Loan Date |
| 1 | 145 Rio Robles | 333-257991-07 | Kawasaki Robotics | $ 21,593 | $ 8,400 | 38.9% | $ 1,354 | 6.27% | 8/3/2023 |
| 2 | One Primerica Parkway | 333-255934-09 | Primerica | $ 76,935 | $ 37,300 | 48.5% | $ 5,149 | 6.69% | 9/13/2023 |
| 3 | 3300 75th Avenue | 333-262701-04 | GSA | $ 67,800 | $ 30,680 | 45.3% | $ 4,305 | 6.35% | 6/23/2023 |
| 4 | 1220 Echelon Parkway | 333-258342-03 | GSA/FBI | $ 30,000 | $ 14,900 | 49.7% | $ 2,160 | 7.20% | 8/8/2023 |
| 5 | 500 Charles Ewing Blvd | 333-261764-02 | Church and Dwight | $ 71,200 | $ 42,700 | 60.0% | $ 5,661 | 7.95% | 6/27/2023 |
| 6 | 701 Clay Road | 333-255934-09 | GSA/VA | $ 35,065 | $ 17,000 | 48.5% | $ 2,347 | 6.69% | 9/13/2023 |
| 7 | 22330 Glenn Drive | 333-257991-07 | GSA | $ 45,000 | $ 26,340 | 58.5% | $ 3,986 | 8.86% | 6/1/2023 |
| | WAVG/Total | | | $ 347,593 | $ 177,320 | 51.0% | $ 24,963 | 7.18% | |
| | | | | | | | | | |
| | | | | | Doc. 1007 | Hi recovery | $ 178,822 | | |
| | | | | | | Cap Rate | 13.96% | | |

Exhibit J

**PRELIMINARY DRAFT | SUBJECT TO SUBSTANTIAL REVISION**

# Disclaimer



OFFICE PROPERTIES
INCOME TRUST

This presentation has been prepared by Moelis & Company LLC ("Moelis") solely for the information and assistance of Office Properties Income Trust (the "Company") in considering the matters referred to in these materials.  This presentation is confidential and may not be disclosed (in whole or in part) or utilized for other purposes without the express prior written consent of Moelis.

This presentation has been prepared based on information provided by the Company and/or from third party sources.  Moelis assumed such information is complete and accurate in all material respects. Moelis has not independently verified such information (or assumed responsibility for the independent verification of such information).  To the extent this presentation includes projections, forecasts or other forward-looking statements, Moelis has assumed that such information was reasonably prepared based on the best currently available estimates and judgments of the Company and/or other parties as to the future performance of the Company and/or such other parties.  Moelis expresses no views as to the reasonableness of any such projections, forecasts or other forward-looking statements or the assumptions on which they are based.  Moelis has not made any independent evaluation or appraisal of any of the assets or liabilities (contingent, derivative, off-balance-sheet, or otherwise) of the Company or any other party.  Moelis' participation in any due diligence review is solely for purposes of supporting its advice and analysis.

This presentation is based on economic, monetary, market and other conditions as in effect on, and the information made available to us as of, the date hereof, and Moelis assumes no obligation to update this presentation or correct any information herein.  No company or transaction used in this presentation is identical to the Company or any potential transaction. The analyses set forth in this presentation do not purport to be appraisals and such analyses do not reflect Moelis' views of the prices at which businesses or securities actually may be sold.  Because the analyses described in these materials (including the information used in such analyses) are inherently subject to uncertainty, Moelis does not assume responsibility if future results are materially different from those forecast.

This presentation was designed for use by certain persons familiar with the business of the Company.  This presentation is not intended to provide the sole basis for any decision on any transaction or strategic alternative and is not a recommendation with respect to any transaction or strategic alternative.  This presentation does not address the Company's underlying business decision to engage in any transaction or strategic alternative or the relative merits of any transaction or strategic alternative as compared to any alternative business strategies or transactions that might be available to the Company.  Nothing contained in this presentation should be construed as legal, regulatory, tax or accounting advice.

Moelis and its affiliates are engaged globally in a wide range of investment banking and other activities for their own account and otherwise. Moelis and its affiliates may have advised, may seek to advise and may in the future advise companies referred to in this presentation. Personnel of Moelis or such affiliates may make statements or provide advice that is contrary to information included in this presentation.  The proprietary interests of Moelis or its affiliates may conflict with your interests. In addition, Moelis and its affiliates and their personnel may from time to time have positions in or effect transactions in securities referred to in this material (or derivatives of such securities), or serve as a director of companies referred to in this presentation.

**Moelis** LATHAM& WATKINS LLP **AlixPartners**

Confidential | 9

# Exhibit K

|  | F'cst May-Dec '26 | F'cst 2027 | F'cst 2028 | F'cst 2029 | F'cst 2030 |
|---|---|---|---|---|---|
| Property Revenue | 283,830 | 385,086 | 409,212 | 416,629 | 424,136 |
| (-) Property Operating Expenses | (138,330) | (178,498) | (183,573) | (187,858) | (192,730) |
| **Cash Basis Net Operating Income** | **145,499** | **206,588** | **225,639** | **228,772** | **231,406** |
|  |  |  |  |  |  |
| (-) Building Capex | (7,742) | (10,806) | (15,432) | (15,293) | (19,631) |
| (-) Leasing Capex | (31,217) | (72,156) | (51,459) | (44,318) | (53,111) |
| (-) Redevelopment Capex | (1,254) | - | - | - | (368) |
| **Total Capex** | **(40,213)** | **(82,962)** | **(66,890)** | **(59,611)** | **(73,110)** |
|  |  |  |  |  |  |
| (-) G&A | (11,333) | (17,000) | (17,000) | (17,000) | (17,000) |
| (+) Dispositions | 272,925 | - | - | - | - |
| **Unlevered Free Cash Flows** | **366,878** | **106,626** | **141,749** | **152,161** | **141,296** |
|  |  |  |  |  |  |
| (-) Principal Payments | (257,923) | - | (122) | (277) | (298) |
| (-) Interest Payments | (80,078) | (125,344) | (122,798) | (123,314) | (123,972) |
| **Levered Free Cash Flows** | **28,877** | **(18,718)** | **18,829** | **28,570** | **17,026** |
|  |  |  |  |  |  |
| (-) Dividends / Distributions | - | - | - | - | - |
| **Net Cash Flow** | **28,877** | **(18,718)** | **18,829** | **28,570** | **17,026** |
|  |  |  |  |  |  |
| **Beginning Cash Balance** | **40,000** | **68,877** | **50,159** | **68,988** | **97,558** |
| (+) Net Cash Flow | 28,877 | (18,718) | 18,829 | 28,570 | 17,026 |
| **Ending Cash Balance** | **68,877** | **50,159** | **68,988** | **97,558** | **114,584** |
|  |  |  |  |  |  |
| **Memo: Indebtedness (End of Period)** |  |  |  |  |  |
| Mortgage Debt | 177,320 | 177,320 | 177,198 | 176,921 | 176,623 |
| Corporate Debt | 1,282,077 | 1,282,077 | 1,282,077 | 1,282,077 | 1,282,077 |
| **Total Debt** | 1,459,397 | 1,459,397 | 1,459,275 | 1,458,998 | 1,458,700 |
| (-) Cash | (68,877) | (50,159) | (68,988) | (97,558) | (114,584) |
| **Net Debt** | 1,390,520 | 1,409,238 | 1,390,287 | 1,361,440 | 1,344,116 |
|  |  |  |  |  |  |
| EBITDA (Cash NOI less G&A) | n/m | 189,588 | 208,639 | 211,772 | 214,406 |
| **Leverage (Net Debt / EBITDA)** | **n/m** | **7.4x** | **6.7x** | **6.4x** | **6.3x** |
|  |  |  |  |  |  |
| EBITDA (Cash NOI less G&A) | n/m | 189,588 | 208,639 | 211,772 | 214,406 |
| Debt Service | n/m | 125,344 | 122,920 | 123,591 | 124,270 |
| **Debt Service Coverage Ratio** | **n/m** | **1.5x** | **1.7x** | **1.7x** | **1.7x** |

EX-99.1 2 tm268341d1_ex99-1.htm EXHIBIT 99.1

*Exhibit L*

**Exhibit 99.1**



# OFFICE PROPERTIES

## INCOME TRUST

**Consolidated Financial Statements**
**As of and for the year ended December 31, 2025**

# OFFICE PROPERTIES INCOME TRUST

## Consolidated Financial Statements

## Table of Contents

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 1 |
| Consolidated Balance Sheets as of December 31, 2025 and 2024 | 4 |
| Consolidated Statements of Comprehensive Income (Loss) for years ended December 31, 2025 and 2024 | 5 |
| Consolidated Statements of Shareholders' Equity for years ended December 31, 2025 and 2024 | 6 |
| Consolidated Statements of Cash Flows for years ended December 31, 2025 and 2024 | 7 |
| Notes to Consolidated Financial Statements | 9 |

**OFFICE PROPERTIES INCOME TRUST**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED BALANCE SHEETS**
**(dollars in thousands, except per share data)**

| | December 31, | |
| --- | --- | --- |
| | 2025 | 2024 |
| ASSETS | | |
| Real estate properties: | | |
| Land | $ 706,623 | $ 711,039 |
| Buildings and improvements | 2,970,072 | 2,946,520 |
| Total real estate properties, gross | 3,676,695 | 3,657,559 |
| Accumulated depreciation | (729,543) | (618,650) |
| Total real estate properties, net | 2,947,152 | 3,038,909 |
| Assets of properties held for sale | — | 32,199 |
| Investment in unconsolidated joint venture | 16,965 | 17,370 |
| Acquired real estate leases, net | 150,254 | 193,739 |
| Cash and cash equivalents | 29,486 | 261,318 |
| Restricted cash | 51,175 | 13,847 |
| Rents receivable | 164,114 | 155,668 |
| Due from related persons | 231 | — |
| Deferred leasing costs, net | 98,268 | 97,642 |
| Other assets, net | 30,951 | 11,594 |
| Total assets | $ 3,488,596 | $ 3,822,286 |
| | | |
| LIABILITIES AND SHAREHOLDERS' EQUITY | | |
| Unsecured debt, net | $ — | $ 662,277 |
| Secured debt, net | 889,557 | 1,872,357 |
| Liabilities of properties held for sale | — | 765 |
| Accounts payable and other liabilities | 126,856 | 118,689 |
| Due to related persons | 4,689 | 5,869 |
| Assumed real estate lease obligations, net | 8,374 | 9,525 |
| Total liabilities not subject to compromise | 1,029,476 | 2,669,482 |
| Liabilities subject to compromise | 1,578,133 | — |
| Total liabilities | 2,607,609 | 2,669,482 |
| | | |
| Commitments and contingencies | | |
| | | |
| Shareholders' equity: | | |
| Common shares of beneficial interest, $.01 par value: 250,000,000 shares authorized, 73,941,128 and 69,824,743 shares issued and outstanding, respectively | 739 | 698 |
| Additional paid in capital | 2,658,471 | 2,656,548 |
| Cumulative net loss | (308,307) | (35,933) |
| Cumulative common distributions | (1,469,916) | (1,468,509) |
| Total shareholders' equity | 880,987 | 1,152,804 |
| Total liabilities and shareholders' equity | $ 3,488,596 | $ 3,822,286 |

The accompanying notes are an integral part of these consolidated financial statements.

4

**OFFICE PROPERTIES INCOME TRUST**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**
**(amounts in thousands, except per share data)**

| | Year Ended December 31, | |
| --- | --- | --- |
| | **2025** | **2024** |
| Rental income | $ 442,556 | $ 501,979 |
| | | |
| Expenses: | | |
| Real estate taxes | 49,010 | 62,369 |
| Utility expenses | 26,880 | 27,467 |
| Other operating expenses | 121,456 | 107,400 |
| Depreciation and amortization | 174,957 | 194,737 |
| Loss on impairment of real estate | 2,048 | 181,578 |
| Transaction related costs | 42,455 | 1,144 |
| General and administrative | 19,429 | 21,128 |
| Total expenses | 436,235 | 595,823 |
| | | |
| Gain (loss) on sale of real estate | 916 | (7,410) |
| Interest and other income | 3,146 | 3,668 |
| Interest expense (including net amortization of debt premiums, discounts and issuance costs of $40,825 and $13,463, respectively) | (203,454) | (163,745) |
| (Loss) gain on early extinguishment of debt | (449) | 126,185 |
| Reorganization items, net | (78,333) | — |
| Loss before income tax expense and equity in net losses of investees | (271,853) | (135,146) |
| Income tax expense | (116) | (203) |
| Equity in net losses of investees | (405) | (758) |
| Net loss | (272,374) | (136,107) |
| | | |
| Weighted average common shares outstanding (basic and diluted) | 71,915 | 51,806 |
| | | |
| Per common share amounts (basic and diluted): | | |
| Net loss | $ (3.79) | $ (2.63) |

The accompanying notes are an integral part of these consolidated financial statements.

5

**OFFICE PROPERTIES INCOME TRUST**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(dollars in thousands)**

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2025 | 2024 |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| Net loss | $ (272,374) | $ (136,107) |
| Adjustments to reconcile net loss to net cash (used in) provided by operating activities: | | |
| Depreciation | 121,856 | 118,710 |
| Net amortization of debt premiums, discounts and issuance costs | 40,825 | 13,463 |
| Amortization of acquired real estate leases and assumed real estate lease obligations, net | 41,153 | 64,636 |
| Amortization of deferred leasing costs | 14,402 | 12,990 |
| (Gain) loss on sale of real estate | (916) | 7,410 |
| Loss on impairment of real estate | 2,048 | 181,578 |
| Net gain on early extinguishment of debt | (1,146) | (138,603) |
| Non-cash reorganization items | 25,654 | — |
| Straight line rental income | (23,074) | (31,102) |
| Other non-cash expenses, net | 237 | 575 |
| Equity in net losses of investees | 405 | 758 |
| Change in assets and liabilities: | | |
| Rents receivable | 2,409 | 5,999 |
| Due from related persons | (231) | — |
| Deferred leasing costs | (18,819) | (22,969) |
| Other assets | (8,901) | 1,377 |
| Accounts payable and other liabilities | 71,085 | (10,392) |
| Due to related persons | (1,182) | (1,156) |
| Net cash (used in) provided by operating activities | (6,569) | 67,167 |
| | | |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Real estate improvements | (37,635) | (123,376) |
| Proceeds from sale of property, net | 39,827 | 189,986 |
| Net cash provided by investing activities | 2,192 | 66,610 |
| | | |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Repayment of senior unsecured notes | (171,600) | (350,242) |
| Proceeds from issuance of senior secured notes | — | 338,986 |
| Repayment of senior secured notes | (26,998) | — |
| Borrowings on revolving credit facility | — | 452,000 |
| Repayments on revolving credit facility | — | (332,000) |
| Borrowings on secured term loan | — | 100,000 |
| Borrowings on debtor-in-possession secured term loan | 10,000 | — |
| Payment of debt issuance costs | (1,196) | (91,845) |
| Proceeds from issuance of common shares, net | 1,106 | — |
| Repurchases of common shares | (32) | (192) |
| Distributions to common shareholders | (1,407) | (2,033) |
| Net cash (used in) provided by financing activities | (190,127) | 114,674 |
| | | |
| (Decrease) increase in cash, cash equivalents and restricted cash | (194,504) | 248,451 |
| Cash, cash equivalents and restricted cash at beginning of period | 275,165 | 26,714 |
| Cash, cash equivalents and restricted cash at end of period | $ 80,661 | $ 275,165 |

The accompanying notes are an integral part of these consolidated financial statements.

**OFFICE PROPERTIES INCOME TRUST**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED STATEMENTS OF CASH FLOWS (Continued)**
**(dollars in thousands)**

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2025 | 2024 |
| SUPPLEMENTAL CASH FLOW INFORMATION: | | |
| Interest paid | $ 130,554 | $ 145,326 |
| Income taxes paid | $ 192 | $ 361 |
| Cash paid for reorganization costs | $ 19,501 | $ — |
| | | |
| NON-CASH INVESTING ACTIVITIES: | | |
| Real estate improvements accrued, not paid | $ 18,078 | $ 16,767 |
| Capitalized interest | $ — | $ 969 |
| | | |
| NON-CASH FINANCING ACTIVITIES: | | |
| Extinguishment of unsecured senior notes in exchange for senior priority guaranteed unsecured notes | $ (6,537) | $ — |
| Extinguishment of unsecured senior notes in exchange for senior secured notes and common shares | $ — | $ (180,548) |

SUPPLEMENTAL DISCLOSURE OF CASH, CASH EQUIVALENTS AND RESTRICTED CASH:

The following table provides a reconciliation of cash, cash equivalents and restricted cash reported within the consolidated balance sheets to the amounts shown in the consolidated statements of cash flows:

| | As of December 31, | |
| --- | --- | --- |
| | 2025 | 2024 |
| Cash and cash equivalents | $ 29,486 | $ 261,318 |
| Restricted cash | 51,175 | 13,847 |
| Total cash, cash equivalents and restricted cash shown in the condensed consolidated statements of cash flows | $ 80,661 | $ 275,165 |

The accompanying notes are an integral part of these consolidated financial statements.

8

## CERTIFICATE OF SERVICE

I hereby certify that on **March 25, 2026** I caused a true and correct copy of the foregoing Objection to be served by first class, courier or electronic mail upon: (i) the Debtors, (ii) counsel to the Debtors, (iii) the Office of the United States Trustee for the Southern District of Texas, (iv), counsel to the Official Committee of Unsecured Creditors, and (v) all other parties entitled to notice in accordance with the Court's rules and procedures.

Gerald Eggleston

Gerald L. Eggleston

2021 Rosemont Ave #2

Pasadena, CA, 91103

Email: jeggleston@glecre.com


April 13, 2026


Clerk of the Court

United States Bankruptcy Court

Southern District of Texas – Houston Division

515 Rusk Street, Room 5300

Houston, TX 77002


Re: In re Office Properties Income Trust, et al., Case No. 25-90530 (CML)


Dear Houston Clerk,

Enclosed please find my Objection to the Chapter 11 Plan of Reorganization of Office Properties Income Trust


Thank you for your assistance.

Gerald L. Eggleston

2021 Rosemont Ave #2

Pasadena, CA, 91103

Email: jeggleston@glecre.com

Pro se individual holder of the 6.375% June 23, 2026 Senior Notes issued by Office Properties Income Trust.