**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

United States Courts
Southern District of Texas
FILED

APR 16 2026

Nathan Ochsner, Clerk of Court

----------------------------------------------------------x

In re:

OFFICE PROPERTIES INCOME TRUST, et al.,

\*Debtors.\*[1]

----------------------------------------------------------x

: Chapter 11
:
: Case No. 25-90530 (CML)
: (Jointly Administered)
:

**LIMITED OBJECTION OF HARRISON HAINES, AS AN EQUITY SECURITY
HOLDER, TO CONFIRMATION OF THE DEBTORS' CHAPTER 11 PLAN AND
RENEWED MOTION FOR APPOINTMENT OF AN OFFICIAL COMMITTEE OF
EQUITY SECURITY HOLDERS**

**PRELIMINARY STATEMENT**

Harrison Haines ("Objector"), appearing pro se, as the beneficial holder of 200,000 common shares of Office Properties Income Trust, respectfully submits this limited objection (the "Objection") to confirmation of the Debtors' Chapter 11 Plan (as amended, modified, or supplemented, the "Plan"), and renews his request for the appointment of an Official Committee of Equity Security Holders ("Equity Committee") pursuant to 11 U.S.C. §§ 1102(a)(1) and 1109(b). Objector does not seek merits determinations on a final valuation record that has not yet been developed. Rather, this Objection is directed to process: the present record is inadequate to support confirmation because valuation has not been adequately tested, and no constituency has a meaningful economic incentive to do so.

---

[1] The Debtors in these jointly administered cases are set forth in the caption and on the case website maintained by Kroll Restructuring Administration at https://restructuring.ra.kroll.com/OPI.

## BACKGROUND AND STANDING

The confirmation hearing is scheduled for April 22, 2026 at 9:00 a.m. (Central Time) before the Honorable Chief Judge Christopher M. Lopez. The objection deadline is April 15, 2026 at 4:00 p.m. (Central Time).

Objector is a beneficial holder of approximately 200,000 shares of OPI common stock, held through Interactive Brokers. Objector has standing to appear and be heard in this case pursuant to 11 U.S.C. § 1109(b).

Objector is an experienced distressed investment professional and has been an active participant in this case since its early stages. He previously submitted a formal request on December 15, 2025 to the United States Trustee (the "UST") for the appointment of an official committee of equity security holders. The UST declined that request. Objector has been a party to the Agreed Protective Order (Dkt. 475), executed February 27, 2026, and has been actively engaged in discovery, as described further below.

## OBJECTION

### I. The Plan Should Not Be Confirmed on the Present Record Because Valuation Has Not Been Adequately Tested.

Sections 1129(a)(7) and 1129(b) require the Court to determine whether stakeholders are receiving at least the value to which they are entitled and whether the Plan is fair and equitable. Those determinations cannot be made on an untested valuation record where equity is being extinguished outright. The Supreme Court has made clear that the bankruptcy court must exercise "informed, independent judgment," and that there can be no such judgment until the court has "appraised [itself] of all facts necessary for an intelligent and objective opinion." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). The Court was direct that "[t]he need for expedition ... is not a justification for

abandoning proper standards," and that "[t]he right of stockholders to participate at all hung on the result of the valuation proceedings; sedulously eliminating all inquiry into the future may, in this context, have caused the rights of the stockholders to have been relinquished by default." *Id.* at 444–45.

In the Fifth Circuit, cramdown confirmation requires more than rote invocation of section 1129(b)'s statutory language. Even where one of section 1129(b)(2)'s alternatives is technically satisfied, the plan must actually be fair and equitable on the facts. *Matter of Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1167–68 (5th Cir. 1993). Feasibility under section 1129(a)(11) likewise turns on realistic projections and assumptions rather than label-driven advocacy. *See In re American HomePatient, Inc.*, 420 F.3d 559, 566–67 (6th Cir. 2005) (describing the lower court's feasibility analysis based on debtor projections and competing assumptions regarding debt amount and interest burden). Where the feasibility projections are anchored to the same understated valuation used in the liquidation analysis, as here, the feasibility determination is tainted by the same methodological deficiencies. Here, the record indicates substantial unresolved valuation issues (as described below).

An inadequately tested valuation record also infects the disclosure process. A disclosure statement must provide "adequate information" to permit a hypothetical investor to make an informed judgment about the Plan. 11 U.S.C. § 1125(a). Where valuation is the pivot on which cancellation of equity turns, the lack of tested valuation evidence is itself a disclosure deficiency. The Disclosure Statement here does not disclose the publicly filed CMBS appraisals or the cap rate assumptions implicit in the Moelis valuation, and does not address the structural alignment issues described in Section II below.

## II. Publicly Available Evidence and Materials Produced Under the Protective Order Raise Substantial Valuation Questions.

Objector has reviewed publicly available information and documents produced under the Agreed Protective Order (Dkt. 475) and has identified independent lines of evidence that raise serious questions about the adequacy of the plan valuation.

### A. SEC-Filed CMBS Appraisals Are Materially Inconsistent With the Plan Valuation.

Seven of the Debtors' properties serve as collateral for mortgage debt pooled into commercial mortgage-backed securities ("CMBS"). In connection with those securitizations, independent third-party appraisals were conducted and publicly filed with the Securities and Exchange Commission as part of the offering prospectuses. Those appraisals, conducted between April and July 2023, reflect a total appraised value for these seven properties of $347.7 million. Please see Exhibit A for further references to this fact.

The Debtors' Valuation Analysis, filed as Exhibit E to the Disclosure Statement (Dkt. 835), assigns a Gross Property Value ("GPV") to these same seven properties of between $198.6 million (low scenario) and $223.5 million (high scenario) — a haircut of c. 35% to 45% relative to the CMBS appraisals. Using publicly available market cap rate change data from Co-Star for each property's specific submarket, and applying the Debtors' own most recently published Net Operating Income figures for each property, Objector estimates the current fair market value of these seven properties may have fallen to approximately $323.3 million — consistent with modest cap rate movements of 25 to 130 basis points since the 2023 appraisal dates. However, this estimate is far removed from the 35–45% write-down reflected in the Plan.

Applying the ratio between cap-rate-adjusted CMBS appraisals and the Debtors' high-case GPV for the mortgage pool (approximately 1.45x) consistently across all collateral pools in the Valuation Analysis — using the Debtors' high-case total Gross Property Value of $2,380 million plus the Debtors' own reported cash balance of approximately $49 million — implies a total estate value of approximately $3.49 billion. After satisfying all non-equity claims of approximately $2.69 billion, as reflected in the Liquidation Analysis (Dkt. 835), this would imply residual equity value of approximately $800 million. The Objector does not ask the Court to adopt this figure today; the point is that a non-frivolous, data-grounded dispute exists that warrants adversarial testing.

**B. Documents Produced Under the Protective Order Present Additional Questions.**

Among the limited materials produced by the Debtors in response to Objector's discovery requests, one document prepared by Moelis & Company, the Debtors' investment banker, lists individual Gross Property Values across the portfolio. The aggregate of those property-level

values appears to imply a total Gross Property Value substantially higher than the figures presented in the Liquidation Analysis and Valuation Analysis filed with the Court. Further, this number is higher than the estimates described in Section II A of this filing. Objector does not suggest the Debtors or their advisors have acted in bad faith — there may be methodological or definitional differences that explain the discrepancy — but Objector has not been able to reconcile these figures from the materials produced, and the information necessary to do so has not yet been provided. This document is subject to the Agreed Protective Order (Dkt. 475), and Objector will seek to file it under seal consistent with paragraph 12 of that Order.

### III. The Incentive Structure of This Case Has Eliminated All Parties With a Reason to Test Valuation — Except Equity.

One of the most consequential features of this case is that the economic incentive structure among the principal constituencies has effectively aligned every organized party against rigorous valuation testing, leaving equity as the sole class with an unambiguous interest in maximizing and testing enterprise value.

Secured lenders receive fixed take-back assets, with some equitizing a portion of their claim. A lower plan valuation generates larger deficiency claims, which can improve their relative position. They have no incentive to challenge a low valuation.

The DIP lenders equitize at a stated discount of approximately 35% to plan value. A lower plan value means the DIP acquires reorganized equity at a greater discount to the fair market value, increasing the implied return on its investment. The DIP lenders benefit from a lower plan valuation.

The PGN Noteholders are equitizing their entire claim. A larger discount between plan value and real fair market value produces a higher total return. They benefit from a lower plan valuation.

This leaves the other members of the UCC, which is represented by two Unsecured Note Holders and the agent for the bonds. The Official Committee of Unsecured Creditors (the "UCC") initially filed a robust objection to the RSA on February 16, 2026 (Dkt. 816), in which it

argued that the DIP was equitizing "at a steep 37% discount to the RSA's undervalued (and not market tested) total enterprise value of $1.7 billion." Within eight days, on February 24, 2026, the UCC settled with the RSA parties and confirmed both the DIP discount and the plan valuation in exchange for an Equity Rights Offering ("ERO") in which two UCC members will serve as Backstop Parties (Dkt. 855).

Academic research by Buccola, Marcovich Gross, and McBrady (2025, SSRN working paper "The Backstop Party") examined 49 Chapter 11 EROs since 2016 and found that backstop parties recover 4x to 11x more per claim dollar than non-backstop creditors in the same class, and that market-implied post-reorganization equity values in ERO cases average approximately 150% of plan value. The same academic work documents a systematic pattern of low plan valuations in ERO cases. Further, an analysis of the ERO economics in this case shows that depending on the Backstop Parties ultimate size, there is a possibility they receive an above par recovery, while the rest of their class is materially impaired. However, Obejctor is unable to calculate this exact recovery, as the holdings of both UCC members, along with the identities and holdings of any other Backstop Parties (described as the Unsecured Note Ad Hoc Group), have not been disclosed.

Having accepted preferential positions in the ERO which generate materially higher recoveries from a lower plan value, the two unsecured bond holders who serve as UCC members, can no longer be relied upon as a disinterested advocate for rigorous valuation testing on behalf of equity.

Of the four members of the UCC, three are conflicted based on the description above (Dkt. 777). The first being the PGN agent (Computershare Trust Company, N.A. As Trustee for 8.00% $14M Senior Unsecured Notes Due 2030), the other two being ValueWorks, LLC and Diamond Family Investments, LLC, who having accepted preferential positions in the ERO which generate materially higher recoveries from a lower plan value, are now no longer incentivized to properly test plan value.

The result is a vacuum. Equity holders are the only party whose recovery depends entirely on an honest answer to the question of what the estate is worth — every other

constituency benefits, in one way or another, from a lower number. And yet equity cannot speak: the Debtors' 5% ownership poison pill ensures that no single shareholder can accumulate a position large enough to justify retained counsel and a valuation expert, the shares are scattered across thousands of retail accounts, and every organized party in the room has quietly agreed that no one should look too hard at the math. The equity committee mechanism exists precisely for this moment — for the case where value may exist, where those who would benefit from finding it cannot organize themselves to look, and where this Court is the only protection that remains.

## IV. The Absence of a Valuation Hearing and Incomplete Discovery Make Confirmation Premature.

### A. No Valuation Hearing Has Occurred.

The principal valuation contest in this case was expected to arise in connection with the 2027 Senior Secured Noteholders' challenge to the value of their collateral pool. That dispute was the subject of multiple rounds of court-ordered mediation before Judge Marvin Isgur. The parties reached a settlement framework on approximately March 31st, resolving the 2027 noteholders' claims without a valuation hearing — and with it, the only scheduled proceeding at which estate value would have been subject to adversarial testing and expert testimony. As a result, no valuation hearing has taken place in this case, and none is currently scheduled prior to the April 22 confirmation hearing. Confirming a plan that wipes out equity without any court-supervised valuation proceeding is precisely the harm the Supreme Court cautioned against in *TMT Trailer Ferry*.

### B. Discovery Remains Materially Incomplete.

Objector submitted formal discovery requests to the Debtors on February 25, 2026. An initial response was not received until March 28, 2026, thirty-one days later, producing only seven files. Of the sixteen Objector's requests, one was fully produced; four were partially produced; and the remainder received no substantive response (nor commentary for why a response could not occur). Objector does not believe the Debtors or their counsel have acted in bad faith in responding to these requests; there are procedural and logistical reasons why discovery in a large Chapter 11 case can take time, and Objector understands that. But whatever

the reason, the practical consequence is that the evidentiary record on the issue most central to whether equity may lawfully be cancelled — the value of the estate — remains underdeveloped. Proceeding to confirmation without adequate time to digest the valuation materials deprives equity holders of the basic evidentiary tools necessary to protect their rights, and risks locking in an irreversible capital-structure outcome before the Court has the tested valuation record required by sections 1129(a)(7) and 1129(b).

## V. An Official Committee of Equity Security Holders Is Warranted.

Section 1102(a)(1) of the Bankruptcy Code authorizes the UST — or, where appropriate, this Court — to direct the appointment of an Official Committee of Equity Security Holders where equity has a reasonable prospect of receiving a meaningful distribution and where equity holders lack adequate representation. Both conditions are satisfied here.

As demonstrated above, a reasonable application of publicly available market cap rate data to the Debtors' own reported NOI yields a total estate value potentially sufficient to generate material equity recovery after satisfying the approximately $2.69 billion in non-equity claims reflected in the Liquidation Analysis. That is not a guarantee of recovery, but it is more than sufficient to satisfy the "reasonable possibility" standard applicable to equity committee appointments.

Equity holders lack adequate representation: the UCC has settled its valuation challenge in exchange for ERO backstop economics that create a structural conflict between its members' interests and those of equity, management is employed by RMR under a fee structure that is economically indifferent to equity value, and equity holders are dispersed retail investors who individually lack the resources to retain valuation and legal professionals. Objector has been in ongoing contact with experienced bankruptcy counsel since December, along with real estate valuation professionals who are prepared to serve a formally constituted committee.

If the Court determines it cannot itself direct the appointment of a committee, it should at minimum deny confirmation without prejudice or adjourn the matter to permit the UST to revisit that question on an updated record, now that the settlement among other constituencies has left valuation untested and equity without a fiduciary advocate.

## RESERVATION REGARDING SEALED MATERIALS

To the extent Objector relies on materials designated Confidential or Highly Confidential under the Agreed Protective Order (Dkt. 475), Objector reserves the right to file supporting exhibits under seal, with appropriate redactions where feasible, pursuant to paragraph 12 of that Order, which authorizes parties to file Designated Material under seal without a separate sealing motion, provided the pleading references the Order.

## RESERVATION OF RIGHTS

Objector reserves all rights to supplement, amend, or modify this Objection; to submit declarations or exhibits, including exhibits under seal; to request an evidentiary hearing; to seek discovery or Rule 2004 relief to the extent available; and to object on any additional grounds that may arise from continued review of the record or any supplemental filings by any party.

## REQUEST FOR RELIEF

WHEREFORE, Objector respectfully requests that the Court enter an order:

(a) denying confirmation of the Plan without prejudice; or, alternatively, adjourning the confirmation hearing and delaying any implementation or effectiveness steps until valuation can be adequately tested;

(b) directing that adequate valuation discovery and, if necessary, an evidentiary hearing occur before any finding that equity is out of the money;

(c) directing the U.S. Trustee to revisit the appointment of an official committee of equity security holders, or otherwise conditioning any further confirmation process on a mechanism that gives equity a practical ability to test enterprise value;

(d) permitting any supporting designated material to be filed under seal consistent with the Agreed Protective Order (Dkt. 475); and

(e) granting such other and further relief as the Court deems just and proper.

Dated: April 15, 2026

Respectfully submitted,

/s/ Harrison Haines

**Harrison Haines**
Adelaide Capital Management LLC
45 Grove St, Apt. 4D New York, NY 10014
Tel.: (781) 698-6447 Email: Harrison@AdelaideCap.com

*Pro Se Equity Security Holder*

**EXHIBIT A**

# Prospectuses filed with the SEC contain third-party appraisals for OPI properties, and estimate total value of $348mm for the seven properties backing mortgage debt

| | Borrower | Property Address | Lender | Loan Balance ($mm) | CMBS Listed LTV | CMBS Appraised Value ($mm) | Sources (SEC filings) |
|---|---|---|---|---|---|---|---|
| a. | Rio Robles CA LLC (DE) | 145 Rio Robles Drive, San Jose, CA | BANK 2023-BNK46 | 8.4 | 39% | 21.6 | Source[1] |
| b. | 3300 75th Avenue LLC (DE) | 3300 75th Avenue, Landover, MD | BENCHMARK 2023-B39 Mortgage Trust | 30.7 | 45% | 67.8 | Source[2] |
| c. | Echelon Pkwy MS LLC (DE) | 1220 Echelon Parkway, Jackson, MS | BENCHMARK 2023-B40 Mortgage Trust | 14.9 | 50% | 30.0 | Source[3] |
| d. | Ewing Boulevard LLC (DE) | 500 Charles Ewing Boulevard, Ewing, NJ | BENCHMARK 2023-V3 Mortgage Trust | 42.7 | 60% | 71.2 | Source[4] |
| e. | Sterling Park LLC (DE) | 22330 Glenn Drive, Sterling, VA | BANK 2023-BNK46 | 26.3 | 59% | 45.0 | Source[1] |
| | **JPM Mortgage Subtotal** | | | *123.0* | | *235.6* | |
| f. | Primerica Pkwy GA LLC (DE) | One Primerica Parkway, Duluth, GA | BMO 2023-C7 | | | 77.1 | Source[5] |
| g. | Clay Ave Waco LLC (DE) | 701 Clay Road, Waco, TX | BMO 2023-C7 | | | 35.0 | Source[5] |
| | **UBS Mortgage Subtotal** | | | 54.3 | 48% | 112.1 | Source[5] |
| | **Grand Total** | | | **$177.3** | | **$347.7** | |

Sources: [1]BANK 2023-BNK46 Prospectus (Form FWP, Annex A-1, Filed 2023-07-28), [2]BENCHMARK 2023-B39 Mortgage Trust Prospectus (Form FWP, filed 2023-06-20), [3]Benchmark 2023-B40 Mortgage Trust Prospectus (Form FWP, filed 2023-12-06), [4]BENCHMARK 2023-V3 Mortgage Trust Prospectus (Form FWP, filed 2023-07-13), [5]BMO 2023-C7 Prospectus (Form FWP, Annex A-1, Filed 2024-01-22)

# In comparison, the Valuation Analysis as presented shows a gross property value of $199 - $224mm, a 35 – 45% haircut to the CMBS appraised fair market values

## Low Recovery Scenario:

| First Lien Collateral Pool:<br><br>(in $ thousands) | | Mortgage Debt Guarantees |
|---|---|---|
| Building Count | | 7 |
| Gross Property Value | [A] $ | 198,628 |
| Liquidated Property Value | [B] | 148,971 |
| Real Estate Broker Fees | [C] | (4,469) |
| Net Property Value | $ | 144,502 |
| Chapter 7 Trustee Fees | [D] | (2,890) |
| Professional Fees | [D] | (3,613) |
| Cash | [E] | - |
| Distributable Value Before Admin Interco. | $ | 138,000 |
| Administrative Intercompany Claim | [F] | - |
| (Excess Value) / Equity in Subsidiaries | | (242) |
| Distributable Value | $ | 137,758 |

## High Recovery Scenario:

| First Lien Collateral Pool:<br><br>(in $ thousands) | | Mortgage Debt Guarantees |
|---|---|---|
| Building Count | | 7 |
| Gross Property Value | [A] $ | 223,528 |
| Liquidated Property Value | [B] | 178,822 |
| Real Estate Broker Fees | [C] | (5,365) |
| Net Property Value | $ | 173,458 |
| Chapter 7 Trustee Fees | [D] | (3,469) |
| Professional Fees | [D] | (4,336) |
| Cash | [E] | - |
| Distributable Value Before Admin Interco. | $ | 165,652 |
| Administrative Intercompany Claim | [F] | - |
| (Excess Value) / Equity in Subsidiaries | | (2,016) |
| Distributable Value | $ | 163,636 |

Sources: In re Office Properties Income Trust, et al. Docket No. 835, "Exhibits C–E to Disclosure Statement (Liquidation Analysis; Financial Projections; Valuation Analysis)." Bankr. S.D. Tex., Case No. 25-90530, filed 19 Feb. 2026. Kroll Restructuring Administration, accessed 26 Feb. 2026; Note: CRO testitfied 2/14/26 that the liquidation analysis GPV is simply the Moelis-prepared Valuation Analysis

Case 25-90530   Document 1201   Filed in TXSB on 04/16/26   Page 13 of 15

# While single-digit cap rate movements may be reasonable, industry-wide valuation declines have been driven by occupancy reductions not applicable to this portfolio

| Property | 145 Rio Robles Dr., San Jose, CA | 3300 75th Ave., Landover, MD | 1220 Echelon Pkwy, Jackson, MS | 500 Charles Ewing Blvd, Ewing, NJ | 22330 Glenn Dr., Sterling, VA | 1 Primerica Pkwy, Duluth, GA | 701 Clay Rd., Waco, TX | |
|---|---|---|---|---|---|---|---|---|
| a. CMBS Appraisal Date[1] | 4/24/2023 | 5/2/2023 | 4/24/2023 | 5/3/2023 | 5/4/2023 | 7/11/2023 | 7/12/2023 | |
| b. CMBS Appraisal ($mm)[1] | 21.60 | 67.80 | 30.00 | 71.20 | 45.00 | | 112.10 | Sum: $347.7mm |
| c. CMBS Used NOI ($mm)[1] | 1.20 | 4.31 | 2.16 | 5.51 | 3.79 | | 7.26 | |
| d. Implied CMBS Cap Rate (c. / b.) | 5.6% | 6.4% | 7.2% | 7.7% | 8.4% | | 6.5% | |
| e. Co-Star Avg. Market Cap Rate Change From Appraisal Date (p.p.)[2] | +0.81% | +0.25% | +0.89% | +0.70% | +1.30% | | +0.76% | |
| f. Implied Current Property Cap Rate (d. + e.) | 6.4% | 6.6% | 8.1% | 8.4% | 9.7% | | 7.2% | |
| g. Latest Published NOI[3] | 1.58 | 4.40 | 2.33 | 5.66 | 3.95 | | 6.90 | |
| h. Implied Current Value (g. / f.) | 24.83 | 66.61 | 28.83 | 67.01 | 40.72 | | 95.35 | Sum: $323.3mm |

> The math supports a 7% cap rate impact to FMV; not 45%
>
> $323mm is 1.45x the Moelis "High GPV"

Sources: [1]Various CMBS prospectus filings, as described on pg. 1, [2]CoStar Group, Inc. (2026). *CoStar Market Analytics,* (Cap rate data for ["Flex San Jose" "Logistics Washington", "3-5 Star Jackson", "3-5 Star Trenton", "3-5 Star Washington", "3-5 Star Atlanta", and "1-3 Star Waco" respectively]; extracted 3/2/2026), calculated as the difference between appraised quarter market cap rates and current quarter-to-date cap rates, weighted average used for UBS Mortgage properties, [3]Office Properties Income Trust. (2025, July 30). *Earnings presentation—Q2 2025* (p. 31) [Investor presentation]. Accessed 3/2/2026

# If the rest of the valuations haircut similarly to the adj. CMBS appraisals, the estate could have a total value of $3.49B; critical information for both shareholders and § 1129(a)(7) tests

## High Recovery Scenario:

| First Lien Collateral Pool: (in $ thousands) | | Mortgage Debt Guarantees | Secured Credit Facility | March 2029 Senior Secured Notes | September 2029 Senior Secured Notes | 2027 Senior Secured Notes | Unencumbered Assets | Office Properties Income Trust | Sum |
|---|---|---|---|---|---|---|---|---|---|
| Building Count | | 7 | 19 | 17 | 19 | 35 | 25 | na | |
| Gross Property Value | [A] | $ 223,528 | $ 608,481 | $ 393,246 | $ 407,617 | $ 530,240 | $ 217,128 | $ — | $2,380,240 |
| Liquidated Property Value | [B] | 178,822 | 456,360 | 294,934 | 264,951 | 344,656 | 130,277 | — | |
| Real Estate Broker Fees | [C] | (5,365) | (13,691) | (8,848) | (7,949) | (10,340) | (3,908) | — | |
| Net Property Value | | $ 173,458 | $ 442,670 | $ 286,086 | $ 257,003 | $ 334,316 | $ 126,369 | $ — | |
| Chapter 7 Trustee Fees | [D] | (3,469) | (8,853) | (5,722) | (5,140) | (6,686) | (2,527) | - | |
| Professional Fees | [D] | (4,336) | (11,067) | (7,152) | (6,425) | (8,358) | (3,159) | - | |
| Cash | [E] | - | 970 | - | - | 2,589 | 10,754 | 35,112 | $49,425 |
| Distributable Value Before Admin Interco. | | $ 165,652 | $ 423,720 | $ 273,212 | $ 245,437 | $ 321,861 | $ 131,436 | $ 35,112 | |
| Administrative Intercompany Claim | [F] | - | - | (903) | (41,324) | (23,284) | (2,196) | 67,707 | |
| (Excess Value) / Equity in Subsidiaries | | (2,016) | - | - | - | - | 2,016 | | |
| Distributable Value | | $ 163,636 | $ 423,720 | $ 272,309 | $ 204,113 | $ 298,577 | $ 131,257 | $ 102,819 | |

| $2,380mm<br>Moelis High GBV | ✖ | 1.45x<br>*Ratio between Moelis and CMBS appraisals w/ updated cap rates* | ➕ | $49mm<br>*Cash* | ═ | $3,492mm<br>Of potentially implied Estate Value | Implies full unsecured coverage + |
|---|---|---|---|---|---|---|---|

Sources: In re Office Properties Income Trust, et al. Docket No. 835, "Exhibits C–E to Disclosure Statement (Liquidation Analysis; Financial Projections; Valuation Analysis)." Bankr. S.D. Tex., Case No. 25-90530, filed 19 Feb. 2026. Kroll Restructuring Administration, accessed 26 Feb. 2026.